**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| KHONG MENG CHEW, Individually and on behalf of all others similarly situated, | ) Case No: <br> ) <br> ) <br> ) JURY TRIAL DEMANDED |
| Plaintiff, | ) <br> ) |
| v. | ) <br> ) |
| MONEYGRAM INTERNATIONAL, INC., W. ALEXANDER HOLMES, PAMELA H. PATSLEY, and LAWRENCE ANGELILLI, | ) <br> ) <br> ) <br> ) |
| Defendants. | ) <br> ) |

**CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff Khong Meng Chew ("Plaintiff") individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by MoneyGram International, Inc. ("MoneyGram" or the "Company"), as well as media and analyst reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased publicly traded MoneyGram securities from February 11, 2014 through November 8, 2018, both dates inclusive

("Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

4.      Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the Company conducts business in this District, the alleged misstatements entered and subsequent damages occurred in this District, and there is a related FTC action in this District, styled *FTC v. MoneyGram International, Inc.*, No. 09-cv-6576.

5.      In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying PSLRA Certification, acquired MoneyGram securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

7.      Defendant MoneyGram, together with its subsidiaries, provides money transfer

services in the United States and internationally. The Company is a Delaware corporation with offices/branches located throughout the United States, including in Illinois. During the Class Period, MoneyGram securities traded on the NASDAQ under the ticker symbol, "MGI."

8. Defendant W. Alexander Holmes ("Holmes") has served as the Chief Executive Officer ("CEO") of the Company since January 1, 2016 and Chairman of the Board of Directors (the "Board") since February 2018. He formerly served as the Company's Chief Financial Officer ("CFO") between March 2012 and January 1, 2016, and as the Company's Chief Operating Officer ("COO") from February 2014 to January 1, 2016. He joined the Company in 2009.

9. Defendant Pamela H. Patsley ("Patsley") served as CEO of the Company from September 2009 until December 31, 2015. She also served as Executive Chairman of the Company from 2016 until February 2018.

10. Defendant Lawrence Angelilli ("Angelilli") has served at the Company as an Executive Vice President and CFO since January 1, 2016. He previously served as Senior Vice President of Corporate Finance from 2014 to December 31, 2015, Treasurer from August 2011 to December 31, 2015 and Senior Vice President from August 2011 to August 2014.

11. Defendants Holmes, Patsley, and Angelilli are herein referred to as "Individual Defendants."

12. Collectively, Defendant MoneyGram and Individual Defendants are herein referred to as "Defendants."

13. Each of the Individual Defendants:

    a. directly participated in the management of the Company;

    b. was directly involved in the day-to-day operations of the Company at the

highest levels;

c.     was privy to confidential proprietary information concerning the Company and its business and operations;

d.     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e.     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f.     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g.     approved or ratified these statements in violation of the federal securities laws.

14.     MoneyGram is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

15.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to MoneyGram under *respondeat superior* and agency principles.

## SUBSTANTIVE ALLEGATIONS
### Defendants' False and Misleading Class Period Statements

16.     On February 11, 2014, the Company issued a press release reporting its financial results for its fourth quarter and year ended December 31, 2013. The press release stated that the Company would continue to implement anti-fraud programs to comply with legal and regulatory requirements, stating in relevant part:

4

Enhancing compliance. The legal and regulatory requirements for the financial services industry continue to increase. Since 2009, MoneyGram has invested more than $120 million in its compliance and anti-fraud programs and has successfully prevented more than $365 million in fraud losses, with $135 million prevented in 2013. The Company will continue to advance its leadership in global compliance by implementing market-leading systems, technology and processes, and increasing agent oversight around the world.

17. On March 3, 2014, the Company filed a Form 10-K with the SEC, which provided the Company's financial results and position for the fiscal year ended December 31, 2013 (the "2013 10-K"). The 2013 10-K was signed by Defendants Patsley and Holmes. The 2013 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Patsley and Holmes attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud. The 2013 10-K stated the Company's internal controls were effective.

18. The 2013 10-K stated, "[w]e continually monitor and enhance our global compliance programs to comply with the most recent legal and regulatory changes."

19. On March 3, 2015, the Company filed a Form 10-K with the SEC, which provided the Company's financial results and position for the fiscal year ended December 31, 2014 (the "2014 10-K"). The 2014 10-K was signed by Defendants Patsley and Holmes. The 2014 10-K contained signed SOX certifications by Defendants Patsley and Holmes attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud. The 2014 10-K stated the Company's internal controls were effective.

20. The 2014 10-K stated, "[w]e continually monitor and enhance our global compliance programs in light of the most recent legal and regulatory changes."

21. On March 2, 2016, the Company filed a Form 10-K with the SEC, which provided the Company's financial results and position for the fiscal year ended December 31,

2015 (the "2015 10-K"). The 2015 10-K was signed by Defendants Holmes, Patsley, and Angelilli. The 2015 10-K contained signed SOX certifications by Defendants Holmes and Angelilli attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

22.     The 2015 10-K stated, "[w]e continually monitor and enhance our global compliance programs in light of the most recent legal and regulatory changes."

23.     On March 16, 2017, the Company filed a Form 10-K with the SEC, which provided the Company's financial results and position for the fiscal year ended December 31, 2016 (the "2016 10-K"). The 2016 10-K was signed by Defendants Holmes and Angelilli. The 2016 10-K contained signed SOX certifications by Defendants Holmes and Angelilli attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud. The 2016 10-K stated the Company's internal controls were effective.

24.     The 2016 10-K stated, "[w]e continually monitor and enhance our global compliance programs in light of the most recent legal and regulatory changes."

25.     On March 16, 2018, the Company filed a Form 10-K with the SEC, which provided the Company's financial results and position for the fiscal year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K was signed by Defendants Holmes and Angelilli. The 2017 10-K contained signed SOX certifications by Defendants Holmes and Angelilli attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud. The 2017 10-K stated the Company's internal controls were effective.

26.     The 2017 10-K stated, "[w]e continually monitor and enhance our global

compliance programs in light of the most recent legal and regulatory changes."

27.     The statements referenced in ¶¶16-26 above were materially false and/or misleading because they misinterpreted and failed to disclose the following adverse facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) MoneyGram was aware for years of high levels of fraud involving its money transfer system; (2) MoneyGram failed to implement appropriate anti-fraud countermeasures, in part, because doing so would adversely impact its revenue; (3) this misconduct would draw scrutiny from the FTC, which had an agreed-upon order requiring MoneyGram to implement a comprehensive anti-fraud program, and the Department of Justice, which entered into a Deferred Prosecution Agreement concerning MoneyGram's anti-fraud and anti-money laundering programs; and (5) as a result, Defendants' statements about MoneyGram's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## The Truth Slowly Emerges

28.     On November 8, 2018, shortly before market-close, the FTC issued a press release entitled, "MoneyGram Agrees to Pay $125 Million to Settle Allegations that the Company Violated the FTC's 2009 Order and Breached a 2012 DOJ Deferred Prosecution Agreement[.]" According to the press release, the FTC filed a complaint against MoneyGram alleging, *inter alia*, that: (i) MoneyGram "failed to implement the comprehensive fraud prevention program mandated by the 2009 [FTC] order"; (ii) "MoneyGram was aware for years of the high levels of fraud and suspicious activities involving certain agents"; and (iii) allowed its computerized monitoring system to malfunction even though the system was aimed at blocking

known fraudsters from using its service; (iv) failed to properly vet its agents and provide appropriate training on how to detect and prevent consumer fraud, including at locations with high fraud rates; (v) failed to share complaints concerning fraud-induced money transfers with the FTC. The press release states, in relevant part:

> MoneyGram International, Inc. has agreed to pay $125 million to settle allegations that the company failed to take steps required under a 2009 Federal Trade Commission order to crack down on fraudulent money transfers that cost U.S. consumers millions of dollars.

> The $125 million payment is part of a global settlement that resolves allegations that MoneyGram also violated a separate 2012 deferred prosecution agreement with the Department of Justice.

> "The FTC's 2009 order required MoneyGram to protect consumers from fraud through its money transfer system, and today we are holding MoneyGram accountable for its failure to do so," said FTC Chairman Joe Simons. "MoneyGram's alleged failure to implement key provisions of the order allowed scammers to continue to use its money transfer system to rip off consumers."

> Money transfers are a preferred method of payment for fraudsters because money sent through money transfer systems can be picked up quickly at locations all over the world, and once the money is paid out, it is all but impossible for consumers to get their money back. The systems also often allow scam artists to remain anonymous when receiving money from their victims.

> In its new filing addressing violations of the 2009 order, the FTC alleges that MoneyGram failed to implement the comprehensive fraud prevention program mandated by the 2009 order, which requires the company to promptly investigate, restrict, suspend, and terminate high-fraud agents.

> The 2009 order required MoneyGram to conduct timely fraud investigations of any agent location that has received two or more fraud complaints within 30 days; has fraud complaints totaling 5 percent or more of the location's total monthly received transactions; or has displayed any unusual or suspicious money transfer activity. It also must terminate locations that may be complicit in fraud-induced money transfers.

> The FTC alleges that MoneyGram was aware for years of the high levels of fraud and suspicious activities involving certain agents, including large chain agents. For example, the standards MoneyGram established for taking disciplinary actions did not comply with the 2009 order, because those standards required agents to have unreasonably high fraud rates before they could be suspended or terminated, according to the FTC. At the same time, MoneyGram also often

failed to promptly conduct the required reviews or to suspend or terminate agents, particularly those from larger locations with high levels of fraud.

The FTC alleges, for example, that MoneyGram did not place any restrictions on one large chain agent until approximately mid-2013, even though the chain was the subject of more fraud complaints than any other MoneyGram agent worldwide. Some of the chain's locations had fraud rates as high as 50 percent of the money transfer activity. When it did take disciplinary action, MoneyGram focused on lower-volume, "mom and pop" agents with high levels of fraud, while treating large chain agents differently, according to the FTC.

The FTC also alleges that MoneyGram's computerized monitoring system, aimed at blocking known fraudsters from using its service, malfunctioned for an 18-month period in 2015 and 2016. During that time, MoneyGram failed to block individuals that the company knew or should have known were using its service for fraud or to obtain fraud-induced money transfers.

MoneyGram also allegedly violated the order by failing to properly vet its agents and by not providing appropriate training on how to detect and prevent consumer fraud for all its agents, including locations with high fraud rates.

Under the 2009 order, MoneyGram also was required to record the complaints it receives about fraud-induced money transfers and to share that information with the Commission. Between January 1, 2013 and April 30, 2018, MoneyGram received at least 295,775 complaints about fraud-induced money transfers—a large majority of which involved a small percentage of agents. The Commission alleges, however, that the company, in some cases, failed to record information it received about fraud-induced money transfers and share it with the FTC.

In addition to the monetary payment, MoneyGram has agreed to an expanded and modified order that will supersede the 2009 order and apply to money transfers worldwide. The modified order requires, among other things, that the company block the money transfers of known fraudsters and provide refunds to fraud victims in circumstances where its agents fail to comply with applicable policies and procedures. In addition, the modified order includes enhanced due diligence, investigative, and disciplinary requirements.

The Commission wishes to thank the following agencies for their assistance in this matter: The Department of Justice's Money Laundering and Asset Recovery Section; the U.S. Attorney's Office for the Middle District of Pennsylvania; the U.S. Postal Inspection Service, Philadelphia Division Office in Harrisburg, Pennsylvania; and the Office of the Minnesota Attorney General.

The Commission vote authorizing the staff to file the stipulated order for compensatory relief and modified order for permanent injunction was 5-0. The FTC filed the stipulated order in the U.S. District Court for the Northern District

of Illinois, Eastern Division. NOTE: Stipulated final orders have the force of law
when approved and signed by the District Court judge.

29.     On November 9, 2018, MoneyGram reported its third quarter 2018 earnings,
stating that "[m]oney transfer revenue" decreased "15% on a reported basis . . . as compared to
third quarter 2017" due to "the impact of higher compliance standards and newly implemented
corridor specific controls."

30.     On this news, shares of MoneyGram fell $2.20 per share or over 49.2% to close at
$2.27 per share on November 9, 2018, damaging investors.

31.     As a result of Defendants' wrongful acts and omissions, and the precipitous
decline in the market value of the Company's common shares, Plaintiff and other Class members
have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

32.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil
Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or
otherwise acquired the publicly traded securities of MoneyGram during the Class Period (the
"Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded
from the Class are Defendants herein, the officers and directors of the Company, at all relevant
times, members of their immediate families and their legal representatives, heirs, successors or
assigns and any entity in which Defendants have or had a controlling interest.

33.     The members of the Class are so numerous that joinder of all members is
impracticable. Throughout the Class Period, the Company's securities were actively traded on
NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and
can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds
or thousands of members in the proposed Class. Record owners and other members of the Class

may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

34.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

35.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

36.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants' acts as alleged violated the federal securities laws;

(b)    whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)    whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)    whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

37.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

38.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's securities are traded in efficient markets;

(d)     the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)     the Company traded on the NASDAQ, and was covered by multiple analysts;

(f)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the

true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g)     Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

39.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

40.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

41.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

42.     This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

43.      During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

44.     The Company and the Individual Defendants violated §10(b) of the 1934 Act and

Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

45.     The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

46.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

47.     As a result of the foregoing, the market price of the Company's securities was

artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

48.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

49.      As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

50.     By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

**COUNT II**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

51.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

52.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the

adverse non-public information regarding the Company's business practices.

53.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

54.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

55.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

56.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: November 14, 2018                  Respectfully submitted,

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLC**

 /s/ Carl V. Malmstrom
Carl V. Malmstrom
111 W. Jackson St., Suite 1700
Chicago, IL 60602
Tel: (312) 984-0000
Fax: (312) 214-3110
malmstrom@whafh.com

*Liaison Counsel for Plaintiff*

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim (*pro hac vice forthcoming*)
Laurence M. Rosen (*pro hac vice forthcoming*)
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
pkim@rosenlegal.com

lrosen@rosenlegal.com

*Counsel for Plaintiff*