**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| KHONG MENG CHEW, Individually and On Behalf of All Others Similarly Situated, ) ) ) | Case No. 1:18-cv-07537 |
| Plaintiff, ) ) | Judge Joan Humphrey Lefkow |
| v. ) ) | |
| MONEYGRAM INTERNATIONAL, INC., W. ALEXANDER HOLMES, PAMELA H. PATSLEY, LAWRENCE ANGELILLI, GANESH B. RAO, ANTONIO O. GARZA, SETH W. LAWRY, and W. BRUCE TURNER, ) ) ) ) ) ) ) | |
| Defendants. ) | |

1

I.      NATURE OF THE ACTION ........................................................................ 4

II.     JURISDICTION AND VENUE .................................................................. 11

III.    PARTIES .................................................................................................... 11

        A.      Lead Plaintiffs ................................................................................ 11

        B.      Defendants ...................................................................................... 12

IV.     SUBSTANTIVE ALLEGATIONS ............................................................ 15

        A.      MoneyGram's Business Model Offers an Attractive Target to Fraudsters ......... 15

        B.      In 2009 the FTC Finds MoneyGram Engaged in Fraudulently Induced Money
                Transfers and Directs Specific Remedial Actions ................................. 17

        C.      In 2012, MoneyGram's Failure to Remedy Problems Identified in the 2009 FTC
                Order Leads to the Entry of a Deferred Prosecution Agreement with the
                Department of Justice ...................................................................... 18

        D.      Throughout the Class Period, Defendants Falsely Touted MoneyGram's
                Compliance Efforts, the Positive Impact of its Compliance Efforts on Revenue,
                the Efficacy of MoneyGram's Fraud Prevention Systems and Technology, and
                Dropping Fraud Losses ................................................................... 21

        E.      As the Truth Begins to Emerge, MoneyGram's Stock Price Spirals Down ......... 24

        F.      In November 2018, the Truth is Fully Revealed: MoneyGram Enters into DPA II
                with the Government, Admitting That the Company Failed to Fulfill the Remedial
                Requirements of DPA I and the 2009 FTC Order ................................. 26

        G.      The DOJ and FTC's Findings in November 2018 Reveal the Falsity of
                Defendants' Class Period Statements ................................................. 27

V.      ADDITIONAL FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER 33

        A.      As the Government Found, MoneyGram's Own Records Revealed its Violations
                of the 2009 FTC Order and DPA I ..................................................... 33

        B.      MoneyGram Created Institutional Procedures and Written Guidelines Concerning
                its Core Business that Permitted Fraud, Especially at Large Chain Agents ......... 35

        C.      Confidential Witnesses Confirms Government Findings That MoneyGram Used a
                Defective Fraud Interdiction System and Failed to Terminate Agents Despite
                Violations of Fraud Prevention Policies ............................................. 37

        D.      Defendants Patsley and Holmes Were Motivated to Make False and Misleading
                Statements Since It Allowed Them to Profit from Insider Sales at Inflated Prices
                ..................................................................................................... 39

        E.      Defendants were Motivated to Conceal the Problems to Encourage a Successful
                Sale of the Company ....................................................................... 40

        F.      Former Employee Whistleblower Confirms DOJ and FTC's Findings ............... 41

VI.     False and Misleading Statements and Omissions ............................................. 42

        A.      False and Misleading Statements and Omissions in 2014 ............................... 42

|       | B. | False and Misleading Statements and Omissions in 2015 | 47 |
|       | C. | False and Misleading Statements and Omissions in 2016 | 53 |
|       | D. | False and Misleading Statements and Omissions in 2017 | 59 |
| VII. | Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303 | | 60 |
| VIII. | CLASS ACTION ALLEGATIONS | | 62 |
| IX. | LOSS CAUSATION AND ECONOMIC LOSS | | 63 |
| X. | APPLICABILITY OF PRESUMPTION OF RELIANCE—FRAUD ON THE MARKET DOCTRINE AND *AFFILIATED UTE* ALLEGATIONS | | 64 |
| XI. | NO SAFE HARBOR | | 65 |
| XII. | CAUSES OF ACTION | | 66 |
| XIII. | JURY TRIAL DEMAND | | 68 |
| XIV. | PRAYER FOR RELIEF | | 68 |

Lead Plaintiffs Norfolk County Retirement System ("Norfolk County") and Ozgur Karakurt ("Karakurt") (collectively, the "Lead Plaintiffs") through their undersigned attorneys, allege the following based upon personal knowledge, on information and belief, and on the investigation of Lead Plaintiffs' counsel, which included a review of relevant U.S. Securities and Exchange Commission ("SEC") filings by MoneyGram International, Inc. ("MoneyGram" or the "Company"), records of judicial proceedings in the United States District Court for the Northern District of Illinois and the United States District Court for the Middle District of Pennsylvania, records of judicial proceedings and deposition testimony and exhibits from a whistleblower action involving MoneyGram filed with the Department of Labor and Eastern District of Texas, regulatory filings and reports, press releases, public statements, interviews with former employees of MoneyGram (referred to herein as "Confidential Witnesses"), news articles, other publications, securities analysts' reports and advisories about MoneyGram, and other readily obtainable information. Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1.      This action is brought on behalf of purchasers of MoneyGram securities during the period from February 11, 2014 through and including November 8, 2018 (the "Class Period") asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.  Lead Plaintiffs allege that during the Class Period, Defendant MoneyGram and certain of its officers and directors misrepresented and concealed from investors MoneyGram's breach of both a 2009 order obtained by the Federal Trade Commission ("2009 FTC Order") and a 2012 Deferred Prosecution Agreement with the Department of Justice ("DPA I"), the impact of compliance efforts on revenue, the efficacy of MoneyGram's fraud prevention

4

systems and technology, and the spike in fraudulently induced money transfers. At no point did Defendants reveal that the Company was in breach of the 2009 FTC Order or DPA I or warn that the Company was unable to comply with the terms of those orders.

2.    At all relevant times, MoneyGram was engaged in the business of providing money transfer services to consumers worldwide through a network of approximately 350,000 agent locations in more than 200 countries. Prior to the commencement of the Class Period, MoneyGram publicly admitted that many of its agents participated in criminal schemes inducing consumers to send money to MoneyGram outlets across the world based on false promises of future financial benefits (e.g. large cash prizes, lottery winnings, fictitious loans, high ticket items at deep discounts). In exchange for transfer fees from the fraudsters, MoneyGram agents turned the fraudulently induced funds over to the wrongdoers and accepted false identification, thereby concealing the wrongdoers' identity. MoneyGram profited from the fraud schemes by collecting fees and other revenues on each fraudulent transaction.

3.    The United States government twice ordered MoneyGram to desist from these fraudulent practices. First, on October 20, 2009, the FTC announced a settlement with MoneyGram to resolve allegations that MoneyGram knew that its system was used to defraud consumers, but MoneyGram failed to stop the schemes and in some cases MoneyGram agents participated in the scheme ("2009 FTC Order").[1] Defendants W. Alexander Holmes ("Holmes"), Pamela H. Patsley ("Patsley"), Ganesh B. Rao ("Rao"), and Seth W. Lawry ("Lawry") were all at MoneyGram at the time the Company agreed to the entry of the 2009 FTC Order. MoneyGram

---

[1] *FTC v. MoneyGram International, Inc.*, No. 09-cv-6576 (N.D. Ill. Oct. 20, 2009), Dkt. No. 13; *see also* Dkt. No. 1 (Complaint).

had to pay $18 million for consumer redress and undertake numerous specific enhancements to its compliance system, which were clearly laid out in the 2009 FTC Order.

4.      Then three years later, on November 9, 2012 MoneyGram entered into a five-year deferred prosecution agreement with the DOJ ("DPA I").[2]  In DPA I, MoneyGram admitted that between 2003 and 2009 it had criminally aided and abetted the fraudulent inducement of money transfers.  MoneyGram "knew that specific MoneyGram agents were involved in a fraud scheme" but did not shut those agents down and as a result, "the fraudulent activity skyrocketed."  The scope of MoneyGram's criminal misconduct identified in DPA I was sweeping.  Fraud complaints increased ten-fold from 2004 to 2008.  MoneyGram admitted to having received 63,814 consumer fraud reports between 2004 and 2009, representing $128,445,411 in losses to consumers who were duped into using MoneyGram's services (and that number is under-inclusive because not every victim reported the fraud to MoneyGram).

5.      All of the Individual Defendants were at MoneyGram when the Company entered into DPA I. Patsley entered into DPA I with the consent and approval of MoneyGram's Board of Directors ("the Board").

6.      Under DPA I MoneyGram did not just admit it engaged in criminal misconduct, but it also publicly agreed, with the knowledge and consent of its Board, that MoneyGram would take very specific remedial actions.  These actions included:

        a.      implementing systems to detect and prevent consumer fraud,

        b.      conducting timely fraud investigations and suspensions of outlets and agents who met specific fraud thresholds,

---

[2] *United States v. MoneyGram*, No. 1:12-cr-00291-CCC (M.D. Pa. Nov. 9, 2012), Dkt. No. 3 (Deferred Prosecution Agreement); Dkt. No. 3-1 (Statement of Facts, Certificate of Corporate Resolutions, and Enhanced Compliance Undertakings); *see also* Dkt. No 1 (Criminal Information).

      c.      creating an independent Compliance and Ethics Committee (the "Compliance Committee") within the Board "responsible for ensuring that the Company is in compliance with all aspects of this Agreement," and

      d.      providing monthly updates to the FTC of all consumer fraud complaints.

7.      DPA I also required MoneyGram to pay a $100 million forfeiture.

8.      Throughout the Class Period, Defendants steadily and repeatedly led investors to believe that MoneyGram was fully complying with all aspects of DPA I and the 2009 FTC Order (indeed, that MoneyGram was a leader in compliance), its compliance initiatives positively impacted financial results, MoneyGram had effective fraud prevention systems and technology, and losses from fraudulently induced money transfers were decreasing.

9.      For example, on February 11, 2014 (the first day of the Class Period), MoneyGram stated that "[t]he Company will ***continue to advance its leadership in global compliance***." On May 1, 2015, it touted the launch of a "new ***market-leading compliance system***." On October 30, 2015, Defendant Patsley said that "***impressive results***" for the third quarter showed that MoneyGram's ***"world-class compliance engine"*** was ***"not only core to our business but a true competitive advantage that we can leverage in the future"*** and that ***"our technological capabilities led to great results in the third quarter."*** On October 28, 2016, Defendant Holmes told investors that the Company replaced its fraud interdiction system (with no explanation of the reason for the replacement) and that the new system had a ***"fantastic impact on our business"*** and was "***freeing up more transactions***." And throughout the Class Period, MoneyGram stated that its compliance enhancement program was **"*focused on … completing the programs recommended in adherence with"*** DPA I.

10.     All of these positive affirmative statements introduced artificial inflation into MoneyGram's common stock price, causing its stock to reach in excess of $17 per share during the Class Period.

11.     Unfortunately for MoneyGram's investors, all of these affirmative representations were blatantly false, and Defendants also omitted critical adverse information. During the Class Period, instead of MoneyGram preventing or lowering fraudulently induced money transfers, complaints of fraudulent money transfers spiked dramatically to ***295,775*** defrauded consumers representing over ***$125 million*** in lost consumer funds.

12.     Further, instead of implementing the remedial actions to ensure compliance with the 2009 FTC Order and DPA I, MoneyGram implemented systems with known fundamental weaknesses. For example, as MoneyGram admitted, the fraud interdiction system it introduced in April 2015 failed to effectively block known fraudsters and was not replaced until October 2016. As a result, individuals who should have been blocked were able to continue engaging in fraudulent transactions. Confidential Witnesses corroborated this admission.

13.     Further, MoneyGram adopted written compliance guidelines that clearly violated the 2009 FTC Order and allowed MoneyGram agents at large chain outlets to continue to engage in fraudulent money transfers without review or discipline.

14.     Beginning in late 2017, MoneyGram's non-compliance with DPA I began to reveal itself to the market. Instead of DPA I expiring on schedule in November 2017 (as MoneyGram's claims of excellent progress suggested it would), DPA I was extended seven times from November 2017 to September 2018 while the DOJ determined if MoneyGram was in compliance. During that time, MoneyGram also disclosed that the Company set aside first $85 million and then $95 million to resolve DPA I.

15. The market reacted negatively to this news. After the first extension of DPA I, the stock price dropped from a closing price of $15.38 per share on November 2, 2017 to a closing price of $14.54 per share on November 3, 2017. After the announcement of the $85 million reserve, the stock price dropped from a closing price of $9.52 per share on March 16, 2018 to a closing price of $9.35 per share on March 19, 2018. After the announcement of another DPA extension and that newly implemented compliance measures had a major negative impact on revenue, the stock price dropped from $8.60 per on May 7, 2018 to $7.55 per share on May 8, 2018 and then $6.57 per share on May 9, 2018. After the announcement that MoneyGram increased reserves from $85 million to $95 million to resolve DPA I, the stock price dropped from a close of $6.59 per share on August 2, 2018 to a close of $6.10 per share on August 3, 2018.

16. Finally, on November 8, 2018, the full truth emerged when the DOJ and FTC revealed that MoneyGram had been in breach of DPA I and the 2009 FTC Order throughout the entire Class Period, DPA I was extended for another three years and amended to include even more compliance enhancements, and MoneyGram had to forfeit to the United States an additional $125 million ("DPA II," attached hereto as Exhibit A, and "2018 FTC Order," attached hereto as Exhibit B). MoneyGram also revealed the high cost of finally implementing higher compliance standards, disclosing that implementation of compliance standards caused revenue to decline by *15%*.

17. Investors' reaction to this news was dramatic. On November 9, 2018, MoneyGram's common stock price cratered by *49%* to close at $2.27 per share, down from $4.47 per share the previous day, on exceptionally heavy volume of 4,485,500 (up from 988,300 on November 8, 2018).

18. The intentionality and recklessness of Defendants' false and misleading statements and omissions during the Class Period is demonstrated in multiple ways, including by the volume

and nature of MoneyGram's violations as detailed by the FTC and the DOJ in November 2018. Additionally, as noted above and herein, the FTC and DOJ found that MoneyGram's own internal records during the Class Period showed the undisclosed increase in fraud complaints, reflecting that Defendants either intentionally or recklessly disregarded MoneyGram's non-compliance with DPA I and the 2009 FTC Order.

19. Defendants' scienter is even more acute because in 2014 MoneyGram established at the Board level a new Compliance Committee, as required by DPA I under the threat of criminal prosecution, whose sole function was to monitor MoneyGram's compliance with the FTC Order and DPA I and the Company's involvement in fraud-induced money transfers. Additionally, MoneyGram was subject to review by an outside, independent compliance Monitor (the "Monitor") who provided regular reports to the Board and Compliance Committee of his findings, including five annual reports. As a result, for Defendants to falsely tout MoneyGram's compliance achievements throughout the Class Period means that either the Compliance Committee and Monitor were completely dysfunctional (which the DOJ and FTC did not conclude in their 2018 findings) or Defendants intentionally or recklessly ignored their findings during the Class Period.

20. Further, the undisclosed increase in fraud-induced money transfers during the Class Period was the result of intentional conduct. The FTC specifically found that during the Class Period MoneyGram had procedures and written compliance guidelines that allowed its large chain outlets to continue to engage in fraudulent money transfers without review or discipline.

21. Finally, Defendants Patsley and Holmes were personally motivated to issue the false and misleading statements and/or not disclose the truth to investors during the Class Period. While public investors suffered from the collapse of their MoneyGram shares to a 90-day average price of $2.11 per share following the disclosure of the facts concealed and misrepresented during

the Class Period, Defendants Holmes and Patsley collectively reaped massive profits from insider sales of over $7 million dollars during the Class Period, selling 708,861 shares of MoneyGram common stock at inflated prices of between $5.30 and $20.08 per share.

## II. JURISDICTION AND VENUE

22.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, 240.14a-9.

23.     This Court has jurisdiction over the subject matter of the federal securities claims pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act.

24.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) because the Company conducts business in this district through its hundred-plus agents located in this District,[3] the alleged misstatements entered and subsequent damages occurred in this District, and there is a related FTC action in this District, styled *FTC v. MoneyGram International, Inc.*, No. 09-cv-6576.

25.     In connection with the acts and conduct alleged in this Consolidated Amended Class Action Complaint ("Amended Complaint"), Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mail, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A.     Lead Plaintiffs

26.     Lead Plaintiff **Norfolk County** is a public pension fund established in 1911 to provide retirement benefits to employees of Norfolk County, Massachusetts.  Norfolk County

---

[3] http://locations.moneygram.com/il/chicago/

serves approximately 10,000 active and retired members of the county and manages assets of approximately $1 billion. Norfolk County purchased and/or acquired MoneyGram securities during the Class Period and was damaged thereby. Throughout the Class Period, Norfolk County purchased a total of 30,000 shares of MoneyGram common stock at artificially inflated prices up to $6.69 per share, totaling $181,254.50, as reflected on the loss chart included with the Lead Plaintiff Motion it filed on January 14, 2019 (Dkt. No. 17-2 at 2).

27. Lead Plaintiff **Ozgur Karakurt** is an individual investor. Mr. Karakurt purchased and/or acquired MoneyGram securities during the Class Period and was damaged thereby. Throughout the Class Period, Mr. Karakurt purchased a total of 18,749 shares of MoneyGram common stock at artificially inflated prices up to $12.00 per share, totaling $159,906.13, as reflected on the loss chart included with the Lead Plaintiff Motion he filed on January 14, 2019 (Dkt. No. 12-3 at 2).

28. Together, Norfolk County and Mr. Karakurt are the Court-appointed "Lead Plaintiffs."

**B. Defendants**

29. Defendant **MoneyGram International, Inc.** is a publicly traded Delaware corporation headquartered in Dallas, Texas. The Company provides money transfer services globally through a network of agents. MoneyGram stock trades on the Nasdaq exchange under the ticker symbol MGI.

30. Defendant **Pamela H. Patsley** joined MoneyGram in January 2009, ten months before the Company entered into the 2009 FTC Order and over three years before the Company entered into DPA I. She served as Executive Chairman of the Company from January 2009 to September 2009, and Chairman and Chief Executive Officer of the Company from September

12

2009 until December 2016. Patsley has been a member of the Board since 2009 and was the Executive Chairman of the Board from January 1, 2016 through February 1, 2018. Patsley signed DPA I on behalf of MoneyGram, acknowledging all of the Company's fraud prevention problems and agreeing to fulfill the specific obligations imposed by DPA I to avoid criminal prosecution. During the Class Period, Patsley made numerous materially false and misleading statements and omissions. Additionally, she reaped enormous profits from insider sales during the Class Period, earning $5,073,561.26 on sales of 513,752 shares at inflated prices between $5.30 and $20.08 per share.

31.     Defendant **W. Alexander Holmes** joined MoneyGram in June 2009, four months before the Company entered into the 2009 FTC Order and over three years before the Company entered into DPA I. Defendant Holmes became the Executive Vice President and Chief Financial Officer in March 2012 – just months before MoneyGram entered into DPA I. He began serving as Executive Vice President, Chief Financial Officer, and Chief Operating Officer of the Company in February 2014 and Chief Executive Officer since January 2016. Holmes has been a member of the Board since 2015 and Chairman of the Board since February 2018. Holmes signed DPA II, admitting to the Company's misconduct throughout the Class Period. During the Class Period, Holmes made numerous materially false and misleading statements and omissions. Additionally, Holmes reaped enormous profits from insider sales during the Class Period, earning $2.1 million on sales of 195,109 shares of MoneyGram common stock at between $5.30 and $20.08 per share.

32.     Defendant **Lawrence Angelilli** joined MoneyGram in August 2011, over a year before the Company entered into DPA I. He served as Senior Vice President from August 2011 to August 2014, Treasurer from August 2011 to December 31, 2015, Senior Vice President of

Corporate Finance from 2014 to December 31, 2015, and in his current position of Executive Vice President and Chief Financial Officer since January 1, 2016.

33.     Defendant **Seth W. Lawry** joined MoneyGram as a Director in April 2008, over a year before the Company entered into the 2009 FTC Order and over four years before the Company entered into DPA I. He is also a member of the Compliance Committee the Company formed in 2014 as required by DPA I.  As a member of the Compliance Committee, Lawry was charged with ensuring the Company's compliance with DPA I – a charge that was not fulfilled.  During the Class Period, Lawry made materially false and misleading statements and omissions.

34.     Defendant **Ganesh B. Rao** joined MoneyGram as a Director in November 2008, over a year before the Company entered into the 2009 FTC Order and over four years before the Company entered into DPA I. He is a member of the Compliance Committee the Company formed in 2014 as required by DPA I.  As a member of the Compliance Committee, Rao was charged with ensuring the Company's compliance with DPA I – a charge that was not fulfilled.  During the Class Period, Rao made materially false and misleading statements and omissions.

35.     Defendant **W. Bruce Turner** joined MoneyGram as a Director in May 2010, over two years before the Company entered into DPA I.  He is a member of the Compliance Committee the Company formed in 2014 as required by DPA I.  As a member of the Compliance Committee, Rao was charged with ensuring the Company's compliance with DPA I – a charge that was not fulfilled.  During the Class Period, Turner made materially false and misleading statements and omissions.

36.     Defendant **Antonio O. Garza** joined MoneyGram as a Director in April 2012, seven months before the Company entered into DPA I.  He is the Chair of the Compliance Committee the Company formed in 2014 as required by DPA I.  As a member of the Compliance

14

Committee, Rao was charged with ensuring the Company's compliance with DPA I – a charge that was not fulfilled. During the Class Period, Garza made materially false and misleading statements and omissions.

37.     Holmes, Patsley, Angelilli, Lawry, Rao, Turner, and Garza collectively are the "Individual Defendants." Each of the Individual Defendants was at MoneyGram before DPA I was agreed to and Defendants Holmes, Patsley, Rao, and Lawry were at MoneyGram before the 2009 FTC Order. Accordingly, all of the Defendants were well aware of MoneyGram's compliance problems and the specific remedial actions that MoneyGram was required to implement during the Class Period. The Defendants thus acted with severe recklessness in allowing MoneyGram to issue the blatantly false and misleading statements and omissions during the Class Period.

38.     Because of the Individual Defendants' respective positions with the Company, they had access to adverse undisclosed information about the Company's business, operations, internal audits, compliance, technology, present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management, sales and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.

## IV. SUBSTANTIVE ALLEGATIONS

### A. MoneyGram's Business Model Offers an Attractive Target to Fraudsters

39.     MoneyGram is a global money transfer business.

40.     MoneyGram money transfer services are provided by third-party agents at a range of locations, from small "mom-and-pop" shops to large, multinational retailers. Throughout the

Class Period, Walmart was the largest MoneyGram agent, accounting for between 17% and 22% of total revenue.

41. Consumers that wish to send a money transfer through MoneyGram initiate a transaction, and the recipient can go to a MoneyGram location to collect the transfer amount.

42. MoneyGram receives a transfer fee on each money transfer purchased from the Company, based on the transfer amount and the destination location.

43. The speed and anonymity of MoneyGram's money transfer model creates a fertile environment for fraudsters. The FTC has found that "[m]oney transfers are a preferred method of payment for fraudsters because money sent through money transfer systems can be picked up quickly at locations all over the world, and once the money is paid out, it is all but impossible for consumers to get their money back. The systems also often allow scam artists to remain anonymous when receiving money from their victims."

44. Consumers that believed they had been defrauded could submit complaints to MoneyGram's call center, which compiled the information into Consumer Fraud Reports and sent those reports to MoneyGram departments specifically charged with monitoring agents and investigating fraud and money laundering, including the Financial Intelligence Unit and the Regional Compliance Team.

45. Although fraud and money laundering were major known risks in the money transfer industry, MoneyGram failed to implement adequate compliance measures. The Company's dereliction of its legal and regulatory obligations drew the attention of the federal government beginning in 2009.

**B.     In 2009 the FTC Finds MoneyGram Engaged in Fraudulently Induced Money Transfers and Directs Specific Remedial Actions**

46.     On October 20, 2009, the Federal Trade Commission announced that MoneyGram settled FTC charges that the Company knowingly permitted fraud to flourish across its network ("2009 FTC Order").  The FTC alleged that MoneyGram agents helped con artists trick U.S. consumers into executing over $84 million in fraudulent wire transfers.

47.     The FTC stated that "MoneyGram knew that its system was being used to defraud people but did very little about it, and that in some cases its agents in Canada actually participated in these schemes." The FTC also alleged that MoneyGram "ignored warnings from law enforcement officials and even its own employees that widespread fraud was being conducted over its network" and "even discouraged its employees from enforcing its own fraud prevention policies," by disciplining or firing employees that raised concerns.

48.     As part of the settlement MoneyGram agreed to specific improvements in its anti-fraud program.  Under the 2009 FTC Order, MoneyGram's obligations included conducting timely investigations of agents to ensure they were meeting certain fraud thresholds, taking all reasonable steps to identify agents involved in fraud, firing or suspending agents who did not take appropriate steps to stop fraudulent money transfers, and developing and implementing a system for receiving consumer complaints and data.

49.     In addition to the remedial actions, MoneyGram was required to pay $18 million for consumer redress.

50.     The FTC's allegations were resolved in a Stipulated Order for Permanent Injunction and Final Judgment, entered by the District Court for the Northern District of Illinois and signed by U.S. District Judge John F. Grady.

51.     For a five-year period following entry of the 2009 FTC Order, MoneyGram was required to distribute a copy of the Order to all principals, officers, directors, and managers and obtained a signed receipt of acknowledgement from each recipient.

52.     All of the Defendants were at MoneyGram at the time the 2009 FTC Order was entered or joined the Company within that five-year period.

53.     Despite MoneyGram's agreement with the FTC to transform its anti-fraud programs, only a few years later MoneyGram was once again in trouble with the government, this time with criminal ramifications, for failing to prevent the exact same fraud.

> **C.     In 2012, MoneyGram's Failure to Remedy Problems Identified in the 2009 FTC Order Leads to the Entry of a Deferred Prosecution Agreement with the Department of Justice**

54.     On November 9, 2012, the DOJ filed a felony criminal information against MoneyGram for failing to prevent fraud and money laundering and announced that it had entered into a Deferred Prosecution Agreement with MoneyGram ("DPA I") to resolve these allegations. DPA I was entered by the District Court for the Middle District of Pennsylvania.

55.     The felony criminal information alleged MoneyGram's involvement in a fraudulent wire transfer scheme from as early as 2003 through 2009. DOJ alleged that MoneyGram knew that MoneyGram agents were involved in criminal schemes inducing consumers to send money to MoneyGram outlets across the world based on false promises of future financial benefits (e.g. large cash prizes, lottery winnings, fictitious loans, high ticket items at deep discounts) but did not terminate agents. Instead, senior management rejected its own Fraud Department's recommendations to shut down certain agents and outlets, and even "actively assisted" agents engaged in these fraudulent schemes by increasing the number of transactions they could process

each day, allowing those problem agents to expand their operations and increase their compensation.

56.     DOJ also alleged that in 2008 MoneyGram set extraordinarily high thresholds before an agent would be terminated for fraud.   Termination did not occur unless an agent had greater than one percent of *all consumer fraud complaints worldwide.*

57.     Finally, DOJ alleged that MoneyGram "***profited from the fraud schemes*** by, among other ways, collecting fees and other revenues on each fraudulent transaction initiated by" the agents and other perpetrators.

58.     In DPA I, MoneyGram admitted responsibility for failing to prevent fraud, including failing to close "the worst of the worst" agents.

59.     DPA I required MoneyGram to make substantial changes to its fraud prevention and compliance programs.  These steps included the formation of the Compliance Committee of MoneyGram's Board, which was designed to ensure the end of fraudulent money transfers at MoneyGram.  The Compliance Committee included Defendants Rao, Lawry, Garza, and Turner. The Compliance Committee's charter charged that group with "oversee[ing] the Corporation's compliance with responsibilities and obligations imposed by the Deferred Prosecution Agreement entered into among the Corporation and the U.S. Department of Justice and the U.S. Attorney's Office for the Middle District of Pennsylvania (the 'DPA')," including:

> a.      "Review[ing] the Compliance Program and assess[ing] management's implementation of such program,"
>
> b.      "Advis[ing] the Board with respect to the Compliance Program as it relates to non-financial matters,"

c. "Request[ing] from the CCO [Chief Compliance Officer] such reports as the Committee deems necessary or appropriate in fulfilling its responsibilities," and

d. "Oversee[ing] the Corporation's compliance with all aspects of the DPA."

60. Additionally, under DPA I, MoneyGram had five years to complete a series of clearly enumerated improvements to the compliance program, including:

a. Implementing a global audit program to ensure adherence to anti-fraud and anti-money laundering standards,

b. Implementing a due diligence program for MoneyGram agents with more than one complaint in a thirty-day period,

c. Developing improved transaction monitoring,

d. Providing the FTC with monthly updates of all consumer complaints about alleged fraud-induced money transfers,

e. Ensuring "that the maximum number of transactions feasible, originating in the United States, regardless of the destination, will be reviewed by the Company's Anti-Fraud Alert System to identify potentially fraudulent transactions," and

f. "[T]ruthfully disclos[ing] all factual information . . . concerning all matters related to fraud-induced money transfers, money laundering, and its anti-money laundering program about which the Company has any knowledge or about which the [DOJ] may inquire."

61. During this five-year period, MoneyGram had to appoint the Monitor who would provide recommendations and reports to MoneyGram's Board, the Compliance Committee, and

the DOJ. The Monitor was Aaron Marcu, an attorney at the law firm Freshfields Bruckhaus Deringer. The Monitor provided five annual reports during the course of DPA I.

62. In addition to the specific compliance enhancements, MoneyGram forfeited to DOJ $100 million, which the DOJ would restore to victims of MoneyGram's fraudulent schemes.

63. At the time that MoneyGram entered into DPA I, *all* of the Individual Defendants were at the Company and Defendants Patsley, Rao, Lawry, Garza, and Turner were on the Board. Defendant Patsley signed DPA I with the Board's authorization, admitting to the facts alleged therein. Each of these Defendants was therefore well aware that breaching the terms of DPA I would have serious consequences for MoneyGram, including subjecting the Company to prosecution for federal criminal violations.

> **D. Throughout the Class Period, Defendants Falsely Touted MoneyGram's Compliance Efforts, the Positive Impact of its Compliance Efforts on Revenue, the Efficacy of MoneyGram's Fraud Prevention Systems and Technology, and Dropping Fraud Losses**

64. MoneyGram professed that it had established systems and programs to comply with DPA I, even before the Class Period began. The Company claimed to have launched a Compliance Enhancement Program in December 2013 that was "focused on improving our services for the consumers and completing the programs recommended in adherence with the DPA."

65. Throughout the Class Period, Defendants falsely led investors to believe that the Company was in compliance with its obligations under the 2009 FTC Order and DPA I, compliance efforts had a positive impact on revenue, MoneyGram had effective fraud prevention systems and technology, and fraud losses were dropping. At no point did Defendants reveal that the Company was in breach of the 2009 FTC Order or DPA I or warn that the Company was unable to comply with the terms of those orders. To the contrary, Defendants reassured investors that effective fraud prevention was ongoing and having a positive impact on revenue. By way of

example, the following statements created a successive drumbeat of assurances to investors about MoneyGram's compliance efforts.

66. On February 11, 2014 (the first day of the Class Period), MoneyGram issued a press release on Form 8-K filed with the SEC touting MoneyGram's compliance investments and prevention of fraud losses since 2009, stating that "[t]he Company will **continue to advance its leadership in global compliance**." The Company also emphasized its compliance investments and fraud prevention statistics, stating "*MoneyGram has **invested more than $120 million in its compliance and anti-fraud programs and has successfully prevented more than $365 million in fraud losses, with $135 million prevented in 2013***."

67. On May 2, 2014, August 6, 2014, and November 13, 2014 as well as throughout the Class Period, in Forms 10-Q filed with the SEC, MoneyGram stated that its "**compliance enhancement program is focused on …completing the programs recommended in adherence with our settlement with the MDPA and U.S. DOJ.**

68. On May 1, 2015, Defendant Patsley stated in a press release filed by the Company on Form 8-K with the SEC that MoneyGram had made "**significant progress**" on the compliance enhancement initiatives with the April 2015 launch of a "new **market-leading compliance system**" and that the Company's "**investment in** emerging markets and **innovative new technologies**" positioned the Company for a "**return to double-digit growth in the fourth quarter**."

69. The market reacted positively, climbing from $7.75 per share the previous day to $8.30 per share by close on May 1, 2015, with trading volume more than doubling from the previous day.

70. On October 30, 2015, MoneyGram held a quarterly earnings call, during which Defendant Patsley repeatedly attributed MoneyGram's financial success to its strong compliance

technology. She said MoneyGram's "*impressive results*" in the third quarter show that the Company's "*strategies are on course and we're doing what we said we would do*," that *"our technological capabilities led to great results in the third quarter,"* and that the Company has "a *world-class compliance engine* that is *not only core to our business but a true competitive advantage that we can leverage in the future.*" Holmes added:

> *Being a leader in compliance is so critical for us and not just for compliance with our DPA but also for relationships with banks and global initiatives around the world. We will continue to invest until we get it right, but we feel good about the outlook we have right now.*

71.    On February 11, 2016, MoneyGram held an evening quarterly earnings call, during which Holmes again reassured investors about the Company's progress in meeting its compliance obligations. He stated that during 2015 the Company made "*steady progress on our compliance enhancement program activities and rolled out key functionality*" and that he was "*extremely pleased with all of the progress that we have made*," emphasizing the Company's investments in its "*core compliance*" and other technology.

72.    MoneyGram's stock jumped on the next trading day by 18.5%, from a close of $4.75 per share on February 11, 2016 to $5.63 per share by close on February 12, 2016. Trading volume increased significantly, as well, from 272,800 shares traded on February 11, 2016 to 626,700 shares traded on February 12, 2016.

73.    On October 28, 2016, MoneyGram held a quarterly earnings call, during which Holmes emphasized that the Company's compliance investments were having a positive impact on the Company's finances. Holmes explained to investors that the Company replaced its fraud interdiction system (with no explanation of the reason for the replacement) and that the new system had a *"fantastic impact on our business"* and was "*freeing up more transactions*." He also

assured investors that the Monitor was "***checking things off the list***," suggesting that MoneyGram not only was in compliance with DPA I, but also that DPA I was nearing a successful conclusion.

74.     The marketplace responded favorably to this news. The stock price increased 9.4% from a close of $6.05 per share on October 27, 2016 to $6.62 per share at close on October 28, 2016. Trading volume also increased significantly, from 71,300 shares traded on October 27, 2016 to 128,300 traded on October 28, 2016.

75.     Analysts took note, too. An October 28, 2016 William Blair analyst report concluded that the Company appeared to be materially undervalued and the analyst predicted "mid-to upper-single-digit revenue growth and slightly faster EBITDA growth in coming years." The report further noted its expectation that "unusual compliance costs are near an end," that the government monitor team would be gone by the end of 2017, and the "removal of the monitor should be positive for investor psychology."

> **E.     As the Truth Begins to Emerge, MoneyGram's Stock Price Spirals Down**

76.     After years of reassurances, beginning in fall 2017 it gradually became apparent that Defendants' positive statements regarding their compliance efforts and the impact of compliance efforts on revenue were not true. As the bad news spilled out, MoneyGram's stock price steadily fell.

77.     Instead of DPA I expiring on schedule in November 2017, DPA I was extended seven times while the DOJ and MoneyGram discussed whether MoneyGram was in compliance with DPA I.

78.     The first extension was on November 2, 2017 when the Company announced in a Form 10-Q filing with the SEC that DPA I would be extended to February 6, 2018.

24

79.     That same day, Defendants Holmes acknowledged that implementation of compliance efforts did not generate revenue, as Defendants previously insisted, but rather reduced revenue.  He was quoted in a press release filed by MoneyGram with the SEC on Form 8-K, stating that "*[t]he complexity of global compliance requirements is also affecting revenue as we implement enhanced solutions to comply with increasingly stringent AML and consumer fraud measures to protect our customers and the integrity of our network*."

80.     The stock price dropped from a closing price of $15.38 per share on November 2, 2017 to $14.54 per share on November 3, 2017 and trading volume leapt from 356,000 shares traded on November 2, 2017 to 1,101,600 shares traded on November 3, 2017.

81.     On March 16, 2018, the Company revealed that there may be substantial additional costs associated with DPA I.  In a press release filed with the SEC on Form 8-K, MoneyGram announced that the Company reserved $85 million in connection with the possible resolution of DPA I.

82.     The stock price dropped from a closing price of $9.52 per share on March 16, 2018 to $9.35 per share on March 19, 2018.

83.     On May 7, 2018, MoneyGram filed with the SEC a Form 8-K, announcing another extension of DPA I and revealing the major negative impact of compliance efforts on revenue. The press release attached to the Form 8-K quoted Defendant Holmes stating that the Company's newly implemented compliance standards were "*expected to adversely impact transactions and revenue in 2018.*"

84.     Holmes elaborated on the May 8, 2018 earnings call, acknowledging that "revenue headwinds from new compliance standards" would impact the year's results and that recently tightened compliance measures had an "impact on revenue." He also stated that given the new

compliance rules they anticipated the "elimination of revenue associated with historically high dollar band or increased transaction frequency in certain markets." Analyst Robert Paul Napoli from William Blair & Company L.L.C. wondered why MoneyGram was having so many more challenges than competitors after investing lots of time and effort, and whether "the systems and compliance and controls were light years behind the competition 3 years ago." In response, Defendant Holmes downplayed the analyst's concerns, stating that DPA I's requirements "are pretty well defined" and the Company has "made great progress, I think, particularly in the last couple of years."

85.     MoneyGram's share price tumbled on this news, falling from a close of $8.60 per share on May 7, 2018 to a close of $7.55 per share on May 8, 2018; it then dropped to a close of $6.57 per share on May 9, 2018. Trading volume spiked over those three days from 363,700 shares traded on May 7, 2018 to 1,224,500 shares traded on May 8, 2018 to 1,584,700 shares traded on May 9, 2018.

86.     On August 3, 2018, MoneyGram announced in Form 10-Q filed with the SEC that it had increased reserves from $85 million to $95 million in connection with the possible resolution of DPA I.

87.     That day, the share price fell from a close of $6.59 per share on August 2, 2018 to a close of $6.10 per share on August 3, 2018.

### F.     In November 2018, the Truth is Fully Revealed: MoneyGram Enters into DPA II with the Government, Admitting That the Company Failed to Fulfill the Remedial Requirements of DPA I and the 2009 FTC Order

88.     Finally, on November 8, 2018, the DOJ and FTC revealed that MoneyGram had been in breach of DPA I and the 2009 FTC Order and that because of these breaches MoneyGram agreed to pay a $125 million forfeiture and DPA I was extended for an additional three years. The

violations identified by the DOJ and FTC extended back to the beginning of the Class Period. MoneyGram also disclosed in its Form 8-K filing with the SEC that the recent (delayed) implementation of compliance measures negatively affected revenue, noting that third-quarter revenue was down by 15% due to implementation of "higher compliance standards" and new controls for certain geographic areas – thus revealing MoneyGram's failure to effectively prevent fraudulent transfers during the Class Period artificially inflated the revenue.

89.     On the November 9, 2018 earnings call, Holmes acknowledged the negative impact of the Company's delayed implementation of compliance measures on revenue, stating, "for the most part, *the decreased outlook on revenue is associated with general changes in our compliance policies* and general changes in our outlook on specific markets and corridors and business that we want to undertake as an organization."

90.     The adverse reaction of MoneyGram's common stock price on November 9, 2018 was dramatic.  MoneyGram's common stock price cratered by *49%* to close at $2.27 per share on November 9, 2018, down from $4.47 per share the previous day, on exceptionally heavy volume of 4,485,500 (up from 148,800 on November 7, 2018 and 988,300 on November 8, 2018).

91.     The DOJ and FTC's November 2018 orders also revealed that unfortunately for public investors in MoneyGram, Defendant's statements during the Class Period were blatantly false.

**G.     The DOJ and FTC's Findings in November 2018 Reveal the Falsity of Defendants' Class Period Statements**

92.     The November 2018 FTC Order and DPA II showed that contrary to MoneyGram's Class Period statements, throughout the Class Period MoneyGram failed to take the remedial actions specifically required under DPA I and the 2009 FTC Order.  Instead of taking the required remedial steps, MoneyGram implemented policies and procedures that allowed fraud to proliferate

27

throughout its system.  MoneyGram tried to conceal this lack of compliance by adopting a double standard that shielded its highest-volume agents from detection and discipline when they engaged in fraudulent behavior, while instead targeting lower-volume "mom-and-pop" shops.

93.    In this climate of ineffective fraud prevention, and despite Defendants' praise for their "world-class compliance engine," complaints of fraudulently induced money transfers soared during the Class Period.  Between 2012 and 2016, consumer fraud complaints to MoneyGram *nearly tripled* from 26,485 in 2012 to 75,628 in 2016; from January 1, 2013 to April 30, 2018, consumer fraud transactions skyrocketed to a total of ***295,775*** complaints.

94.    The true, undisclosed adverse facts that existed at MoneyGram during the Class Period, as found by the DOJ and FTC, include that:

a.    ***MoneyGram's failure to monitor agents allowed criminal rings to use MoneyGram to perpetrate their fraudulent schemes***: The FTC found that MoneyGram failed to effectively monitor agents, thereby allowing rings of fraudsters to conduct numerous suspicious transfers in a geographic area without being detected or stopped.  The FTC found that MoneyGram's failure to monitor violated Section I.D.4 of the 2009 FTC Order, which required implementation of a comprehensive anti-fraud program including agent monitoring.

b.    ***MoneyGram failed to suspend or terminate agents engaged in fraud***: The FTC found that MoneyGram failed to conduct required fraud investigations, suspend implicated locations pending completion of the investigation, or terminate locations that were likely complicit in fraud in violation of Sections III.B.3-4 and III.B.5.b of the 2009 FTC Order, which required

timely investigations of agents meeting certain specified fraud thresholds and termination of locations that "may be complicit" in fraud-induced money transfers.

c. ***MoneyGram created policies and implemented procedures that gave special treatment to large chain agents - its biggest source of revenue:*** The FTC found that MoneyGram had laxer standards for large chain agents – MoneyGram's biggest accounts – than for small "mom-and-pop" operators. The FTC found that MoneyGram was "***aware for years*** of high levels of fraud and suspicious activities" by large chain agents but failed to take the required disciplinary action. From the start of the Class Period until mid-2017, MoneyGram did not suspend *any* locations of a particular large chain agent, even where its locations had high levels of fraud, failed to train employees, or were otherwise non-compliant with MoneyGram's policies and procedures. And from approximately March 2015 until at least March 2016, MoneyGram did not conduct required reviews of certain large chain agents' locations, even though they met the required-review threshold in the 2009 FTC Order; MoneyGram also did not even consider if disciplinary action was necessary at those locations. The FTC also found that MoneyGram established standards for large chain agent discipline that violated the standards required by the 2009 FTC Order. The 2009 FTC Order required terminating any agent location that "may be complicit" in fraud-induced money transfers – but for large chain agents, MoneyGram's policy only terminated if "*the Chain Agent itself*" was complicit in fraud,

rather than assessing each individual location's complicity. The effect of MoneyGram's improper standard was that a single location with a pattern of fraudulent and suspicious activity could continue in its deceitful ways without threat of discipline from MoneyGram. The FTC found that these standards and procedures violated Sections III.B.3-4 and III.B.5.b of the 2009 FTC Order Section which required timely investigations of agents meeting certain specified fraud thresholds (including a separate complicity assessment for "any person authorized to sell money transfer services" from MoneyGram) and termination of locations that "may be complicit" in fraud-induced money transfers. including large chain agents or their individual locations.

d.   ***MoneyGram created written policies that permitted an agent to commit a tremendous amount of fraud before facing suspension or termination:*** The FTC found that the written policies of the MoneyGram's Financial Intelligence Unit ("FIU") – the "primary unit responsible for conducting consumer fraud investigations and taking (or recommending) disciplinary action" – set unreasonably high fraud thresholds for agent suspension and termination. FIU's written policy was to suspend locations once fraud represented ***75%*** of the location's total transaction and to terminate a location when fraud represented ***95%*** of the location's total transactions. The FTC found that these written policies were far more lenient than the standards set in the 2009 FTC Order. The 2009 FTC Order required MoneyGram to terminate, suspend, or restrict agents that have not been

"taking appropriate steps to prevent" fraud-induced money transfers, a standard that the FTC found was satisfied well before greater than 75% of an agent's transactions are determined to be fraudulent. Additionally, the 2009 FTC Order deemed termination appropriate when there "may be complicity at an agent location, which the FTC found is met long before fraud activity exceeds 90% of all transactions.

e.    ***MoneyGram used a defective fraud interdiction computer system – and hid the system's weaknesses from the government***: The FTC and DOJ found – *and MoneyGram admitted* – that from April 2015 to October 2016 the Company's fraud interdiction system failed to block fraudulent transactions. MoneyGram's failure allowed individuals that "***it knew, or should have known, were using its system for fraud***" to continue transacting and defrauding consumers.[4] The DOJ also found – *and MoneyGram admitted* – that the Company hid the weaknesses of the fraud interdiction system from the DOJ, and instead blamed rising consumer fraud on external circumstances. The DOJ found that MoneyGram's use of a defective fraud interdiction system and concealment of that information breached the terms of DPA I. The FTC also found that the defective fraud interdiction system breached Section I.D of the 2009 FTC Order, which

---

[4] The FTC and DOJ's findings – and MoneyGram's admission – were corroborated by customer accounts. A deposition exhibit from whistleblower Juan Lozada-Leoni's case revealed that a store auditor at Schnucks, a grocery store chain, requested that eight individuals be blocked from transacting on September 6, 2016 during the time that the fraud interdiction system was defective. More than three months later, on December 29, 2016, another Schnucks employee wrote the Company to note those individuals had not been blocked and were still transacting and noted that she was making frequent second requests for blocks.

required MoneyGram to implement a comprehensive anti-fraud program that had the "administrative, technical, and physical safeguards appropriate to Defendant's size and complexity, and the nature and scope of Defendant's activities."

f.  ***MoneyGram failed to conduct adequate due diligence on prospective agents****:* The FTC found that MoneyGram failed to conduct thorough due diligence on all agents.  MoneyGram's failure to conduct adequate due diligence meant that in some instances agents who had been shut down by MoneyGram's competitors for fraud could become MoneyGram agents. The FTC found that MoneyGram's failure to conduct due diligence violated Section II.A of the 2009 FTC Order, which required specific, enumerated due diligence measures including reasonable inquiry to ensure prospective agents were not previously closed by another money services business for fraud-related reasons.

g.  ***MoneyGram failed to train agents to prevent fraud and money-laundering****:* The FTC found that "***for years***" MoneyGram failed to train all agents on preventing consumer fraud.  Rather than training all individuals who participated in the wire transfer process, MoneyGram relied on agents to train their own employees and MoneyGram did not ensure that this training occurred.  A 2014 audit of a large chain agent found that 1,863 "primary and secondary" employees who processed money transfers had not done either initial or ongoing training, and 68% of secondary employees had *no training at all.*  Even when MoneyGram implemented a new audit

32

procedure in 2015 that gave stores advance warning of an audit, large chain agents still failed to consistently train their employees. In response, MoneyGram neither suspended those locations nor took disciplinary action against the agents who failed to complete required training. The FTC found that MoneyGram's failure to train violated Sections I.D.3 and III.A of the 2009 FTC Order, which required adequate ongoing training and education for all agents on detecting and preventing consumer fraud.

h.   ***MoneyGram failed to record and share all consumer complaints with the FTC***: The FTC found that MoneyGram failed to record all consumer complaints and share those complaints with the FTC, in violation of Sections III.B.1 and IV.B of the 2009 FTC Order, which required MoneyGram to record all complaints related to fraud-induced transfers and to share that information with the FTC.

## V. ADDITIONAL FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER

### A. As the Government Found, MoneyGram's Own Records Revealed its Violations of the 2009 FTC Order and DPA I

95.   That Defendants acted with scienter is supported by the fact that Defendants had access to information showing a high volume and rapid increase in volume of consumer fraud complaints.

96.   Defendants were aware that the compliance programs and requirements set forth in DPA I and the 2009 FTC Order were not being implemented because they had access to Company records showing high – and increasing – levels of customer complaints regarding fraud and suspicious activity.

97.    Specifically, in the November 2018 FTC Order, the FTC found that "MoneyGram's *own records* demonstrate[] that *it has been aware for years of high levels of fraud and suspicious activities*," including by large chain agents.

98.    Defendants' records would have shown a huge spike in consumer fraud complaints during the Class Period.  Between 2012 and 2016, consumer fraud complaints to MoneyGram nearly tripled from 26,485 in 2012 to 75,628 in 2016.  From January 1, 2013 to April 30, 2018, a bulk of the Class Period, consumer fraud transactions skyrocketed to *295,775* – dwarfing the number of fraud complaints in 2003 to 2009 that led to the 2009 FTC Order.  And, even this number was likely *understated* due to the gross failures of MoneyGram's internal systems during the Class Period.

99.    Defendants were aware of such statistics because, in order to ensure compliance with DPA I and the 2009 FTC Order and to avoid the risk of additional penalties and criminal consequences, it was their responsibility to identify any spikes in consumer fraud complaints and determine whether Defendants' failure to implement effective fraud prevention systems contributed to the spike.  Defendants Patsley, Holmes, and Angelilli knew or should have been aware of this information in the course of their duties as executives and Board members as well as from communications with the Monitor who provided recommendations and reports to the Board on a regular basis regarding compliance issues.  Defendants Rao, Garza, Lawry, and Turner knew or should have been aware of this information because they were specifically charged as members of the Compliance Committee with "oversee[ing] the Corporation's compliance with responsibilities and obligations imposed by the Deferred Prosecution Agreement entered into among the Corporation and the U.S. Department of Justice and the U.S. Attorney's Office for the Middle District of Pennsylvania (the 'DPA')." As members of the Board, they also would have

34

received regular reports from the Monitor regarding compliance. Despite this knowledge, the Individual Defendants issued materially false and misleading statements completely at odds with the true state of the efficacy of MoneyGram's compliance systems.

> **B. MoneyGram Created Institutional Procedures and Written Guidelines Concerning its Core Business that Permitted Fraud, Especially at Large Chain Agents**

100. The Defendants' scienter is evidenced by the fact that MoneyGram created institutional procedures and written guidelines that violated DPA I and the 2009 FTC Order. MoneyGram's violations were not isolated issues or a few rogue employees – rather, its violations were in the "core" area of Defendants' business, were caused by institutional procedures and written guidelines, and occurred at each step of the compliance process (due diligence, training, monitoring, and discipline).

101. For example, as noted by the FTC in 2018, MoneyGram's Financial Intelligence Unit ("FIU") – the "primary unit responsible for conducting consumer fraud investigations and taking (or recommending) disciplinary action"– had written guidelines with unreasonably high fraud thresholds advising suspension when fraud represented *75%* of a location's total transaction and termination when a location when fraud represented *95%* of the location's total transactions – nearly every transaction. The FTC found this was a clear violation of the 2009 FTC Order, which required termination, suspension, or restriction of agents that "have not been 'taking appropriate steps to prevent' fraud-induced money transfers," a standard that "is satisfied long before the point at which *greater than 75 percent* of an agent's transactions are determined to be for fraud."

102. Additionally, MoneyGram had numerous policies and procedures that gave special treatment to large chain agents, which provided the largest source of revenue to MoneyGram, including:

a.    Creating a policy to avoid terminating a large chain agent if one of its locations was complicit in fraud, unless the Chain Agent itself was also complicit;

b.    Leaving fraud prevention training up to the chain, rather than taking responsibility for it, and declining to take disciplinary action when that training was not performed; and

c.    Allowing large chain agents to continue transacting even when MoneyGram was aware of high levels of fraud and suspicious activity.

103.    These provisions directly contradict the 2009 FTC Order, as discussed above.

104.    Because MoneyGram created these procedures, it was aware of its noncompliance.

105.    Furthermore, Defendants were aware of their violations of the 2009 FTC Order and DPA I because those orders concerned MoneyGram's core business.  Defendants referenced the government orders as "core" to MoneyGram's business and therefore, oversaw compliance systems not only because it was required by those orders, but also because they were central to MoneyGram's business operations and purportedly created "a competitive advantage" for the Company.

106.    Defendants were knowledgeable about the compliance program.  For example, on October 28, 2016, Defendant Holmes mentioned the replacement of the fraud interdiction system during a quarterly earnings call (but failed to reveal that replacement was necessitated by the prior system's failure to block fraudulent transactions).

107.    The fact that the violations of the 2009 FTC Order and DPA I stem from institutional procedures and written guidelines regarding all aspects of MoneyGram's "core" program supports a further inference of scienter.

36

     **C.**    **Confidential Witnesses Confirms Government Findings That MoneyGram Used a Defective Fraud Interdiction System and Failed to Terminate Agents Despite Violations of Fraud Prevention Policies**

108.   Confidential witnesses formerly employed at MoneyGram confirmed the DOJ and FTC's finding that MoneyGram used a defective fraud interdiction system and failed to terminate agents despite their violation of fraud prevention policies. To protect these witnesses' identities, they are identified as men, regardless of actual gender. These witnesses' common personal experiences – despite working in different departments – demonstrate the prevalence and knowledge about these problems within MoneyGram, and further support an inference of scienter.

109.   **Confidential Witness 1** worked in MoneyGram's Compliance Monitoring Department from August 2013 until September 2017. He started in the Money Transfer Department, focusing on suspicious money transfer activity in the United States; moved to the Consumer Confirmed Fraud Department, determining the need to file a Suspicious Activity Report ("SAR") and managing the timely filing of SARs; and ended his tenure as Supervisor of Compliance for SAR filing and the CTR Filing Department. His supervisor showed him an excerpt of a Monitor report that had been provided to the supervisor because it was relevant to that person's work with the fraud interdiction system and preventing fraud and money laundering.

110.   Confidential Witness 1 reported that he encountered regular problems with the fraud interdiction system. MoneyGram compliance and monitoring analysts reported to him that they would try to block an individual suspected of engaging in fraudulent transactions from using MoneyGram, but the computer system would not actually block that individual – they would still be permitted to execute a transaction. CW 1 would look into these reports that individuals were not effectively blocked. CW 1 also had the same problem when he attempted to block individuals

– that the company system would not actually block that individual and they would still be permitted to execute a transaction.

111.    Confidential Witness 1 saw a report prepared by the outside monitor team from Freshfields because it was shown to him by his supervisor.  That report mentioned a Company employee saying that the fraud interdiction system did not work.

112.    **Confidential Witness 2** worked in MoneyGram's sales department from January 2006 through April 2019. Confidential Witness 2 started as a Regional Sales Associate for the Northeast Region and became the Partnership Development Manager for New York where he worked with both key accounts that had more than seven locations and small mom-and-pop shops.

113.    Confidential Witness 2 reported that MoneyGram agents routinely complained that they asked MoneyGram to block individuals from transacting due to fraud concerns, but those individuals would still be able to transact. He described that as a "top complaint" from MoneyGram agents.  I&B Check Cashing was one of the agents that frequently made this complaint.

114.    Confidential Witness 2 also reported that his efforts to enforce compliance standards were overruled. For example, about a year and a half ago, he discovered that a pharmacy in Brooklyn that processed money orders had no compliance program, no training, and no annual review. He submitted a request to close that agent's MoneyGram account.  With no discussion, Confidential Witness 2's supervisor, Johnny Rosario (Regional Head of Sales, U.S. East) overrode his decision and requested that the account be reactivated.  It is Confidential Witness 2's understanding that the account was in fact reactivated.

115.    Confidential Witness 2 stated that Rosario discouraged him and other sales employees from putting any concerns about compliance issues in writing (including via email or text message).

**D.    Defendants Patsley and Holmes Were Motivated to Make False and Misleading Statements Since It Allowed Them to Profit from Insider Sales at Inflated Prices**

116.    That Defendants acted with scienter is further bolstered by the fact that, during the Class Period, Defendants Patsley and Holmes engaged in unusual and significant sales of their MoneyGram shares while in possession of material non-public information regarding the Company's breaches of DPA I and the 2009 FTC Order.

117.    None of these Defendants' sales was made pursuant to a 10b5-1 plan.

118.    Each Defendant sold MoneyGram stock—sometimes large quantities—at prices artificially inflated above $2.11, the 90-day average for the period from November 9, 2018 to February 6, 2019.

119.    During the Class Period, Defendant Patsley made gross proceeds of $5,073,561.26 after selling 513,752 shares at inflated prices between $5.30 and $20.08 per share.    Patsley's largest sale – over $2 million – was just a few months after the Company had announced temporary extensions of DPA I, and just six months before the Company finally admitted its egregious breaches of DPA I and the 2009 FTC Order.  Patsley had not sold any shares of her MoneyGram stock for at least 4 years before the Class Period.  Patsley's Class Period sales are set forth below:

| Officer | Date of Transaction | Number of Shares | Price per Share | Sale Proceeds |
|---|---|---|---|---|
| Patsley, Pamela H | 2/2/2018 | 186,354 | $11.65 | $2,171,024.10 |
| Patsley, Pamela H | 2/24/2017 | 19,364 | $12.77 | $247,278.28 |
| Patsley, Pamela H | 2/25/2017 | 90,303 | $12.79 | $1,154,975.37 |
| Patsley, Pamela H | 2/23/2017 | 31,966 | $12.75 | $407,566.50 |
| Patsley, Pamela H | 2/24/2016 | 19,480 | $5.32 | $103,633.60 |
| Patsley, Pamela H | 2/25/2016 | 90,302 | $5.30 | $478,600.60 |
| Patsley, Pamela H | 2/12/2016 | 55,047 | $5.63 | $309,914.61 |
| Patsley, Pamela H | 2/24/2015 | 19,132 | $8.59 | $164,343.88 |
| Patsley, Pamela H | 2/24/2014 | 1,804 | $20.08 | $36,224.32 |
| **TOTAL:** | | **513,752** | | **$5,073,561.26** |

120.    During the Class Period, Defendant Holmes made $2,107,830.90 in gross proceeds after the sale of 195,109 shares of MoneyGram common stock at between $5.30 and $20.08 per share.  Holmes's trades began to accelerate rapidly in 2016, while the fraud interdiction software was failing, and continued through early 2018, just a few months after the Company had announced temporary extension of DPA I, and just six months before the Company was forced to admit it had breached DPA I and 2009 Order.  Holmes had not sold any shares for at least 2 years before the Class Period.  Holmes's Class Period sales are set forth below:

| Officer | Date of Transaction | Number of Shares | Price per Share | Sale Proceeds |
|---|---|---|---|---|
| Holmes, W. Alexander | 2/22/2018 | 20,545 | $11.31 | $232,363.95 |
| Holmes, W. Alexander | 2/23/2018 | 44,592 | $11.27 | $502,551.84 |
| Holmes, W. Alexander | 2/25/2018 | 19,107 | $11.33 | $216,482.31 |
| Holmes, W. Alexander | 2/24/2017 | 3,926 | $12.77 | $50,135.02 |
| Holmes, W. Alexander | 2/25/2017 | 20,340 | $12.79 | $260,148.60 |
| Holmes, W. Alexander | 2/23/2017 | 47,538 | $12.75 | $606,109.50 |
| Holmes, W. Alexander | 2/24/2016 | 3,949 | $5.32 | $21,008.68 |
| Holmes, W. Alexander | 2/25/2016 | 20,340 | $5.30 | $107,802.00 |
| Holmes, W. Alexander | 2/12/2016 | 10,819 | $5.63 | $60,910.97 |
| Holmes, W. Alexander | 2/24/2015 | 2,529 | $8.59 | $21,724.11 |
| Holmes, W. Alexander | 2/24/2014 | 1,424 | $20.08 | $28,593.92 |
| **TOTAL:** | | **195,109** | | **$2,107,830.90** |

**E.    Defendants were Motivated to Conceal the Problems to Encourage a Successful Sale of the Company**

121.    During the Class Period, MoneyGram entertained two acquisition offers.  On January 26, 2017, Alipay offered to buy MoneyGram for $880 million.  Then on March 14, 2017, EuroNet offered to buy MoneyGram for $935 million, topping Alibaba's offer.[5]

---

[5] The Alipay merger was ultimately blocked by the United States government due to national security concerns and the Euronet merger did not come to pass.

122.     For the potential Alipay sale, the April 4, 2017 Preliminary Proxy stated that each of the Defendants would receive compensation for their shares at the price of $13.25 per share – a number inflated far above $2.11, the 90-day average for the period from November 9, 2018 to February 6, 2019.

123.     Disclosing the truth about MoneyGram's compliance problems, the impact of compliance efforts on revenue, the efficacy of MoneyGram's fraud prevention systems and technology, and the spike in fraudulently induced money transfers would have negatively impacted the stock price and likely discouraged major buyers for MoneyGram.  The sale opportunities therefore further support a finding of scienter.

### F.     Former Employee Whistleblower Confirms DOJ and FTC's Findings

124.     Finally, that the Defendants acted with scienter is supported by Juan Lozada-Leoni's whistleblower suit filed with the Department of Labor on September 28, 2017 and in federal court on January 23, 2019.[6] Mr. Lozada-Leoni is a former Senior Manager for the U.S. Regional Compliance Team at MoneyGram.  The complaint and sworn deposition testimony raise many of the same problems identified by the DOJ and FTC and corroborated by Confidential Witness 1, including MoneyGram's failure to monitor agents (including high-risk agents), problems with the fraud interdiction system and pressure to conceal information from the monitor.

125.     Additionally, in his complaint, Mr. Lozada-Leoni alleges that he was terminated in retaliation for expressing concerns about MoneyGram's compliance with DPA I (including failure to block fraudsters and adequately monitor agents) and that MoneyGram discouraged employees from speaking candidly with the monitor team.  He testified that Head of Compliance for the

---

[6] *Juan Lozada-Leoni v. MoneyGram*, No. 2018-SOX-00004 (Dept. of Labor Sept. 28, 2017); *Juan Lozada-Leoni v. MoneyGram*, No. 5:19-cv-00011-RWS-CMC (E.D. Tex. Jan. 23, 2019).

Americas, Juan Manuel Gonzalez, boasted to Head of Global Programs Eli Morillo about excluding the monitor team from a meeting with Walmart (a major MoneyGram client). Mr. Lozada-Leoni also said that Gonzalez encouraged compliance members to "shape the message" to the monitor team during joint fraud and money laundering audit visits.

126. Lozada-Leoni's independent corroboration of these events *prior to* the issuance of DPA II and the 2018 FTC Order, including the role of MoneyGram managers in concealing information from the monitor team, supports a further inference of scienter.

## VI. FALSE AND MISLEADING STATEMENTS AND OMISSIONS

127. Despite MoneyGram's compliance problems stretching back well before the Class Period even began, throughout the Class Period Defendants misled investors by issuing a series of false and misleading statements and omissions of material fact concerning MoneyGram's compliance efforts, the impact of compliance efforts on revenue, the efficacy of MoneyGram's fraud prevention systems and technology, and the spike in fraudulently induced money transfers.

128. Defendants made the following false and misleading statements during the Class Period:

### A. False and Misleading Statements and Omissions in 2014

129. On February 11, 2014 (the first day of the Class Period), MoneyGram issued a press release on Form 8-K filed with the SEC and signed by Defendant Patsley touting MoneyGram's compliance investments and prevention of fraud losses, stating:

> *Since 2009, MoneyGram has invested more than $120 million in its compliance and anti-fraud programs and has successfully prevented more than $365 million in fraud losses, with $135 million prevented in 2013*. The Company will *continue to advance its leadership in global compliance* by implementing market-leading systems, technology, and processes, and increasing agent oversight around the world.

130.     The bold statement in the foregoing that MoneyGram has "*invested more than $120 million in its compliance and anti-fraud programs and has successfully prevented more than $365 million in fraud losses, with $135 million prevented in 2013*" was false and/or misleading and omitted material facts.   This statement implies that MoneyGram has made the necessary investments to prevent fraud and in fact is successfully preventing fraud, but at the time this statement was made, fifteen months had elapsed since the entry of DPA I and five years since the 2009 FTC Order, yet MoneyGram was still woefully deficient in its compliance programs – which the Company described as its "core" systems. Indeed, MoneyGram was in breach of numerous requirements of the 2009 FTC Order and DPA I, as was later revealed by the FTC and DOJ, because the Company:

    a.   failed to conduct requisite fraud investigations, suspend implicated locations pending completion of the investigation, or terminate locations that were likely complicit in fraud,
    b.   implemented lesser standards for small "mom-and-pop" operators than for large chains – MoneyGram's largest clients,
    c.   established disciplinary standards for large chain agents that were unsupported by the 2009 FTC Order, terminating a large chain agent only if the Chain Agent itself was complicit in fraud, rather than individually reviewing each location, assessing its individual compliance, and disciplining it if appropriate,
    d.   created guidelines for the Financial Intelligence Unit that had unreasonably high thresholds for agent suspension and termination,
    e.   failed to monitor agent transfer activity and thus allowed known fraud rings to operate at MoneyGram locations,
    f.   did not discipline agents who were ordered to conduct consumer fraud training as a remedial measure but failed to complete the training,
    g.   failed to conduct comprehensive due diligence, which allowed agents to work with MoneyGram even if they had been shut down by MoneyGram's competitors for fraud,
    h.   failed to record all consumer complaints and share those complaints with the FTC,
    i.   did not suspend *any* locations of a particularly large chain agent from before the Class Period until mid-2017, even where locations had high levels of fraud, failed to train employees, or were otherwise non-compliant with MoneyGram's policies and procedures, and
    j.   failed to train all agents on preventing consumer fraud, as demonstrated by a 2014 audit of a large chain agent showing that 1,863 "primary and secondary" employees

who processed money transfers had not completed either initial or ongoing training, and 68% of secondary employees had no training at all.

131.    The bold statement in the foregoing paragraph that the Company was "*continu[ing] to advance its leadership in global compliance*" was false and/or misleading and omitted material facts.  To "continue" to be a leader in global compliance implies that MoneyGram *is already* a leader in global compliance, but in fact, at the time this statement was made, fifteen months had elapsed since the entry of DPA I and five years since the 2009 FTC Order, yet MoneyGram was still woefully deficient in its compliance programs – which the Company described as its "core" systems.  Indeed, MoneyGram was in breach of numerous requirements of the 2009 FTC Order and DPA I, as was later revealed by the FTC and DOJ, as enumerated in paragraph 130, a-j.

132.    On March 3, 2014 in a Form 10-K filed with the SEC and signed by Defendants Patsley, Holmes, Garza, Lawry, Rao, and Turner, MoneyGram stated:

> **Since 2009 we have invested over $120.0 million in our compliance and anti-fraud programs and prevented more than $365.0 million in fraud losses during the same time period**
> **. . .**
> **In December of 2013, we launched our Compliance Enhancement Program, which is focused on** *improving our services for the consumers and* **completing the programs recommended in adherence with the DPA**.

133.    The bold statement in the foregoing paragraph that MoneyGram has "invested over $120.0 million" in compliance and anti-fraud programs and "prevented more than $365.0 million in fraud losses" from 2009 to present was false and/or misleading and omitted material facts because it suggests MoneyGram is investing sufficient funds and taking adequate measures to effectively prevent fraud. At the time this statement was made, however, nearly two years had elapsed since the entry of DPA I and MoneyGram was still woefully deficient in its compliance programs – which the Company described as "core" systems -- and in breach of numerous

requirements of the 2009 FTC Order and DPA I, as was later revealed by the FTC and DOJ, as enumerated in paragraph 130, a-j.

134.    The bold statement in the foregoing paragraph that MoneyGram's "*Compliance Enhancement Program is focused on . . . completing the programs recommended in adherence with the DPA*" was false and/or misleading and omitted material facts because it suggests MoneyGram is taking appropriate measures to ensure compliance with DPA I.  At the time this statement was made, however, nearly two years had elapsed since the entry of DPA I and MoneyGram was still woefully deficient in its compliance programs – which the Company described as "core" systems -- and in breach of numerous requirements of the 2009 FTC Order and DPA I, as was later revealed by the FTC and DOJ, as enumerated in paragraph 130, a-j.

135.    On May 2, 2014 in a Form 10-Q filed with the SEC and signed by Holmes, MoneyGram stated:

> **Our compliance enhancement program is focused on** *improving our services for the consumers and* **completing the programs recommended in adherence with our settlement with the MDPA and U.S. DOJ.**

136.    The bold statement in the foregoing paragraph that MoneyGram's "compliance enhancement program is focused on . . . completing the programs recommended in adherence with our settlement with the MDPA and U.S. DOJ" was false and/or misleading and omitted material facts because it suggests MoneyGram is taking appropriate measures to ensure compliance with DPA I.  At the time this statement was made, however, nearly two years had elapsed since the entry of DPA I and MoneyGram was still woefully deficient in its compliance programs – which the Company described as "core" systems -- and in breach of numerous requirements of the 2009 FTC Order and DPA I, as was later revealed by the FTC and DOJ, as enumerated in paragraph 130, a-j.

137.    On August 6, 2014 in a Form 10-Q filed with the SEC and signed by Holmes, MoneyGram stated:

>    ***Our compliance enhancement program is focused on*** *improving our services for the consumers and* ***completing the programs recommended in adherence with our settlement with the MDPA and U.S. DOJ.***

138.    The bold statement in the foregoing paragraph that MoneyGram's "compliance enhancement program is focused on . . . completing the programs recommended in adherence with our settlement with the MDPA and U.S. DOJ" was false and/or misleading and omitted material facts because it suggests MoneyGram is taking appropriate measures to ensure compliance with DPA I.  At the time this statement was made, however, nearly two years had elapsed since the entry of DPA I and MoneyGram was still woefully deficient in its compliance programs – which the Company described as "core" systems -- and in breach of numerous requirements of the 2009 FTC Order and DPA I, as was later revealed by the FTC and DOJ, as enumerated in paragraph 130, a-j.

139.    On October 31, 2014 in a press release filed with the SEC on Form 8-K signed by Holmes, Patsley was quoted that MoneyGram's **compliance programs were "*executing well*" and the Company was "*pleased with the progress*" on complia**nce initiatives.

140.    The bold statements in the foregoing paragraph that compliance programs were "executing well" and the Company was "pleased with the progress" were false and/or misleading and omitted material facts.  At the time these statements were made, nearly two years had elapsed since the entry of DPA I and MoneyGram was still woefully deficient in its compliance programs – which the Company described as "core" systems -- and in breach of numerous requirements of the 2009 FTC Order and DPA I, as was later revealed by the FTC and DOJ, as enumerated in paragraph 130, a-j.

141.    On November 13, 2014, in a Form 10-Q filed with the SEC and signed by Holmes, MoneyGram stated:

> *Our compliance enhancement program is focused on* improving our services for the consumers and *completing the programs recommended in adherence with our settlement with the MDPA and U.S. DOJ.*

142.    The bold statement in the foregoing paragraph that MoneyGram's "compliance enhancement program is focused on . . . completing the programs recommended in adherence with our settlement with the MDPA and U.S. DOJ" was false and/or misleading and omitted material facts because it suggests MoneyGram is taking appropriate measures to ensure compliance with DPA I.  At the time this statement was made, however, two years had elapsed since the entry of DPA I and MoneyGram was still woefully deficient in its compliance programs – which the Company described as "core" systems -- and in breach of numerous requirements of the 2009 FTC Order and DPA I, as was later revealed by the FTC and DOJ, as enumerated in paragraph 130, a-j.

### B.    False and Misleading Statements and Omissions in 2015

143.    On May 1, 2015, MoneyGram filed with the SEC a Form 8-K, signed by Defendant Holmes, attaching a Press Release.  The Press Release quoted Defendant Patsley, stating:

> Our financial results reflect the impact from a full quarter of both our new U.S.-to-U.S. low pricing and the grow-over of the competitive product, which significantly reduced revenue and cash flow in the first quarter.  However, the resilience of our U.S. Outbound and Non-U.S. sends *along with our investment* in emerging *markets and **innovative new technologies are successfully positioning MoneyGram for a return to double-digit growth in the fourth quarter* . . .
> . . .
> We have made **significant progress** on our global transformation initiative with the April launch of the first module in our new **market-leading compliance system** and the opening of our new global business center in Poland earlier this year," said Patsley.

> "*The global transformation program we announced in February of last year is a complex initiative requiring significant investment, steadfast dedication and broad coordination across the entire organization.* **Midway through the program, I am pleased with our progress and recent success***. When fully implemented, this program will result in a more efficient company with enhanced global compliance capabilities. The entire MoneyGram team is energized and focused.*

144.    The bold statement in the foregoing paragraph regarding the Company's April 2015 launch of a new "market-leading compliance system" was false and/or misleading and omitted material facts.  "[M]arket-leading compliance system" suggests an effective system but that was not the case; at the time this statement was made, the Company's new fraud interdiction system implemented in April 2015 failed to block a substantial number of fraudulent transactions and was not replaced until October 2016, resulting in the Company processing at least $125 million in additional consumer fraud transactions between April 2015 and October 2016.

145.    The bold statement in the foregoing paragraph attributing financial success to MoneyGram's "investment in … innovative new technologies" was false and/or misleading and omitted material facts.  At the time this statement was made the Company's revenue and other metrics were inflated because the fraud interdiction system – a major new piece of technology supporting the compliance function – failed to block at least $125 million worth of fraudulent transactions between April 2015 and October 2016; because MoneyGram receives a transfer fee on each money transfer, even fraudulent transfers, its revenue numbers are artificially boosted by fraudulent transactions it should have blocked but allowed to proceed.  The financial, transaction, and growth numbers reflect MoneyGram's failed fraud interdiction system, not investments in innovative technology.

146.    Additionally, the bold statements in the foregoing paragraph regarding the Company's "significant progress" and "recent success" in compliance initiatives were each false

and/or misleading and omitted material facts. At the time these statements were made, two-and-a-half years had elapsed since DPA I and six years since the 2009 FTC Order, yet MoneyGram was still woefully deficient in its compliance programs and in breach of numerous requirements of the 2009 FTC Order and DPA I, as was later revealed by the FTC and DOJ, as enumerated in paragraph 130, a-j, and because MoneyGram:

> k.    Did not review certain large chain agents' locations from approximately March 2015 until at least March 2016, even though they met the required-review threshold in the 2009 FTC Order and did not even consider if disciplinary action was necessary at those locations,
>
> l.    changed the audit policy in 2015 to warn stores that they would be audited, but large chain agents still failed to consistently train their employees – and MoneyGram did not suspend those locations or take disciplinary action against the agents who failed to complete required training, and
>
> m.    implemented a new fraud interdiction system in April 2015 that failed to block a substantial number of fraudulent transactions and which they did not replace until October 2016, resulting in the Company processing at least $125 million in additional consumer fraud transactions between April 2015 and October 2016.

147.    On May 4, 2015, MoneyGram filed a Form 10-Q with the SEC, signed by Holmes, stating:

> ***Our compliance enhancement program is focused on*** *improving our services for the consumers and* ***completing the programs recommended in adherence with our settlement with the MDPA and U.S. DOJ.***

148.    The bold statement in the foregoing paragraph that MoneyGram's "compliance enhancement program is focused on . . . completing the programs recommended in adherence with our settlement with the MDPA and U.S. DOJ" was false and/or misleading and omitted material facts because it suggests MoneyGram is taking appropriate measures to ensure compliance with DPA I. At the time this statement was made, however, over two years had elapsed since the entry of DPA I and MoneyGram was still woefully deficient in its compliance programs – which the Company described as "core" systems -- and in breach of numerous requirements of the 2009 FTC

Order and DPA I, as was later revealed by the FTC and DOJ, as enumerated in paragraph 130, a-j, and paragraph 146, k-m.

149.    On July 31, 2015, the Company conducted a quarterly earnings call to discuss its Q2 2015 financial results.  Defendants Patsley and Holmes spoke during the call, and repeatedly touted the Company's impressive financial results for the quarter.  Patsley stated:

> *this was a really solid quarter for MoneyGram.  Our results reflect significant progress MoneyGram has made toward executing the strategic initiative we outlined at the beginning of the year*.  We returned to constant currency growth, *posted the largest number of money transfer transactions in our history*, and accelerated both our self-service revenue and transaction growth.

150.    Patsley further stated that "*[t]otal money transfer transactions this quarter were the highest in our history*, growing 6% year over year.  This is a significant improvement from flat year-over-year transaction growth last quarter."   Regarding U.S. outbound and non-U.S. categories, Patsley noted growth of 14% percent, concluding "[c]learly this is *exceptional growth on a large business base*."

151.    Holmes agreed, adding that:

> *the second quarter represents an **inflection point for MoneyGram's top line***, and we delivered results that were slightly ahead of our internal expectations.  We saw an impressive acceleration in our money transfer business and returned to total Company constant currency revenue growth in the quarter.

152.    Finally, Holmes noted, with respect to the Company's compliance enhancement program, "*[w]e believe the systems and program changes we're implementing position MoneyGram at the forefront of compliance programs in the money transfer industry*."

153.    The bold statements in the foregoing paragraphs regarding the Company's "exceptional" growth on a "large business base," positive financial results, positive transaction numbers, and "inflection point for MoneyGram's top line" were false and/or misleading and

omitted material facts. At the time these statements were made, the Company's revenue and other metrics were inflated because the fraud interdiction system failed to block at least $125 million worth of fraudulent transactions between April 2015 and October 2016; because MoneyGram receives a transfer fee on each money transfer, even fraudulent transfers, its revenue numbers are artificially boosted by fraudulent transactions it should have blocked but allowed to proceed. The financial, transaction, and growth numbers reflect MoneyGram's failed fraud interdiction system – they are not the result of a "large business base" and do not represent an "inflection point for MoneyGram's top line."

154. Additionally, the bold statements in the foregoing paragraph that MoneyGram's "systems and program changes" placed MoneyGram at the "forefront of compliance in the money transfer industry" were false and/or misleading and omitted material facts. At the time this statement was made, two-and-a-half years had elapsed since DPA I and MoneyGram was still woefully deficient in its compliance programs and in breach of numerous requirements of the 2009 FTC Order and DPA I, as enumerated in paragraph 130, a-j, and paragraph 146, k-m.

155. On August 3, 2015, MoneyGram filed a Form 10-Q with the SEC, signed by Holmes, stating:

> ***Our compliance enhancement program is focused on*** *improving our services for the consumers and* ***completing the programs recommended in adherence with our settlement with the MDPA and U.S. DOJ.***

156. The bold statement in the foregoing paragraph that MoneyGram's "compliance enhancement program is focused on . . . completing the programs recommended in adherence with our settlement with the MDPA and U.S. DOJ" was false and/or misleading and omitted material facts because it suggests MoneyGram is taking appropriate measures to ensure compliance with DPA I. At the time this statement was made, however, nearly three years had elapsed since the

51

entry of DPA I and MoneyGram was still woefully deficient in its compliance programs – which the Company described as "core" systems -- and in breach of numerous requirements of the 2009 FTC Order and DPA I, as was later revealed by the FTC and DOJ, as enumerated in paragraph 130, a-j, and paragraph 146, k-m.

157. On October 30, 2015, the Company conducted a quarterly earnings call to discuss its Q2 2015 financial results. Defendants Patsley and Holmes spoke during the call, and repeatedly touted the Company's impressive financial results for the quarter. Patsley stated: "*Now onto the* ***impressive results for the third quarter****, which show that our* ***strategies are on course and we're doing what we said we would do.***" Patsley further stated that "*[w]e are investing in a* ***world-class compliance engine that is not only core to our business but a true competitive advantage that we can leverage in the future***." Patsley closed her formal comments by saying, "Overall our strategic focus of growing in emerging markets ***along with our technological capabilities led to great results in the third quarter*** *and strongly positions us for future success*."

158. Holmes added:

> ***Being a leader in compliance*** *is so critical for us and not just for compliance with our DPA but also for relationships with banks and global initiatives around the world. We will continue to invest until we get it right, but we feel good about the outlook we have right now.*

159. The bold statements in the foregoing paragraph by Patsley that "our technological capabilities led to great results in the third quarter" and "impressive results for the fourth quarter" showing that "our strategies are on course and we're doing what we said we would do" were false and/or misleading and omitted material facts. At the time this statement was made, the Company's revenue and other metrics were inflated because the fraud interdiction system failed to block at least $125 million worth of fraudulent transactions between April 2015 and October 2016; because

MoneyGram receives a transfer fee on each money transfer, even fraudulent transfers, its revenue numbers are artificially boosted by fraudulent transactions it should have blocked but allowed to proceed. The fourth quarter results reflect artificial inflation caused by MoneyGram's failed fraud interdiction system, not positive financial growth from technological capabilities or "strategies" that are "on course" or the Company "doing what we said we would do."

160. The bolded statement in the foregoing paragraph by Patsley that the Company's investment in a "world-class compliance engine" provided a "true competitive advantage," were each false and/or misleading and omitted material facts. A "world-class compliance engine" that provides a "true competitive advantage" suggests that MoneyGram has an effective compliance engine, but at the time this statement was made the Company did not have a world-class compliance engine that provided a competitive advantage; it had a defective fraud interdiction system that failed to block fraudulent transactions.

161. The bold statement in the foregoing paragraph by Holmes that the Company is a "leader in compliance" was false and/or omitted material facts. At the time this statement was made, nearly three years had elapsed since DPA I and MoneyGram was still woefully deficient in its compliance programs and in breach of numerous requirements of the 2009 FTC Order and DPA I, as enumerated in paragraph 130, a-j, and paragraph 146, k-m.

## C. False and Misleading Statements and Omissions in 2016

162. On February 11, 2016, the Company conducted a quarterly earnings call to discuss its Q4 2015 financial results. Defendant Holmes spoke during the call, and again touted the Company's impressive financial results for the quarter. Holmes stated:

> *2015 was a transition year for the Company as we repositioned our US to US business and **continued to invest** in Digital/Self-Service products, global consumer acquisition strategies, **compliance**, and agent productivity. Within this context, I'm pleased to say **we***

> *delivered on our expectations for double-digit constant currency revenue and adjusted EBITDA growth for the quarter*.  *We posted double-digit transaction growth in US outbound and non-US sends and we also returned to transaction growth in US to US sends for the fourth quarter*.

163.    Holmes further stated that, "[i]n 2015 we continued to make **steady progress on our compliance enhancement program activities and rolled out key functionality**."  Finally, Holmes stated:

> *Looking back over the past couple of years, I am **extremely pleased with all of the progress that we have made**.  We've completely overhauled our on-line experience, launched kiosks, added millions of mobile wallets, connected to almost 2 billion bank accounts and **made investments into our core compliance and point of sale technology**.*

164.     The bold statements in the foregoing paragraph that because the Company "continued to invest in … compliance" it "delivered on [its] expectations for" growth were false and/or misleading and omitted material facts.  At the time these statements were made, over three years had elapsed since DPA I and MoneyGram was still woefully deficient in its compliance programs and in breach of numerous requirements of the 2009 FTC Order and DPA I, as was later revealed by the FTC and DOJ, as enumerated in paragraph 130, a-j, and paragraph 146, k-m, and the Company's revenue and other metrics were inflated because the fraud interdiction system failed to block at least $125 million worth of fraudulent transactions between April 2015 and October 2016; because MoneyGram receives a transfer fee on each money transfer, even fraudulent transfers, its revenue numbers are artificially boosted by fraudulent transactions it should have blocked but allowed to proceed.  The financial, transaction, and growth numbers reflect artificial inflation caused by MoneyGram's failed fraud interdiction system – they are not the result of compliance investments.

165. Additionally, the bolded statements in the foregoing paragraph that the Company was making "steady progress" on compliance and rolling out "key functionality" with respect to its compliance enhancement program were false and/or misleading and omitted material facts. At the time these statements were made, over three years had elapsed since DPA I and MoneyGram was still woefully deficient in its compliance programs and in breach of numerous requirements of the 2009 FTC Order and DPA I, as was later revealed by the FTC and DOJ, as enumerated in paragraph 130, a-j, and paragraph 146, k-m.

166. Finally, the bolded statement that Holmes is "pleased with all of the progress" including "investments into our core compliance" function is false and/or misleading and omitted material facts. At the time this statement was made, over three years had elapsed since DPA I and MoneyGram was still woefully deficient in its compliance programs and in breach of numerous requirements of the 2009 FTC Order and DPA I, as was later revealed by the FTC and DOJ, as enumerated in paragraph 130, a-j, and paragraph 146, k-m.

167. On March 2, 2016, MoneyGram filed a Form 10-K with the SEC, signed by Holmes, Patsley, Angelilli, Garza, Lawry, Rao, and Turner, stating:

> *Our compliance enhancement program is focused on* improving our services for the consumers and *completing the programs recommended in adherence with our settlement with the U.S. Attorney's Office for the Middle District of Pennsylvania ("MDPA") and the Asset Forfeiture and Money Laundering Section of the Criminal Division of the Department of Justice ("U.S. DOJ").*

168. The bold statement in the foregoing paragraph that MoneyGram's "compliance enhancement program is focused on . . . completing the programs recommended in adherence with" DPA I was false and/or misleading and omitted material facts because it suggests MoneyGram is taking appropriate measures to ensure compliance with DPA I. At the time this

statement was made, however, over three years had elapsed since the entry of DPA I and MoneyGram was still woefully deficient in its compliance programs – which the Company described as "core" systems -- and in breach of numerous requirements of the 2009 FTC Order and DPA I, as was later revealed by the FTC and DOJ, as enumerated in paragraph 130, a-j, and paragraph 146, k-m.

169.   On October 28, 2016, the Company conducted a quarterly earnings call to discuss its Q3 2015 financial results ("Q3 2016 Earnings Call").  Defendant Holmes spoke during the call, repeatedly touting the Company's revenue growth and the positive progress with the Company's compliance program.  Holmes stated:

> *We're making some significant progress on our compliance program, and as always, it's important to recognize the hard work internally by all of the employees.  As we have changed our systems and added new functionality, one of the things I have talked about a little bit over the last couple of years has been the tuning of the system.  And when you put new things in, I think they tend to hit a little bit harder than intended as we tune them and then try to get the pieces right.*
>
> *We actually just put in some new changes to a lot of our global compliance screening technology just a few weeks ago, which has had a fantastic impact on our business, and is really freeing up more transactions than we had before and really isolating the variables down to those transactions that are more risk and of more concern to us.  So we are very excited about that.  Our fraud losses have dropped tremendously internally, and that is not online risk management fraud, but this is consumer scam fraud, which is obviously something that we fight hard against and is a big concern to state and federal government agencies who are looking at ensuring that money transfer companies are reducing fraud at an accelerated rate and protecting consumers in more dynamic ways.*
>
> *. . .*
>
> *We have reached a point with the monitor where they have – begun kind of looking at what we have implemented.  They are doing testing of certain systems and checking things off the list.  So I think we are making good progress there.*

. . .

> *What's fantastic about it is that I think all of the* **hard work is being**
> **recognized by governments around the world . . .** *I think [this] will*
> *put us in a very unique position…***a competitive advantage for us as**
> **we move into the next cycle here.**

170.    The bolded statements in the foregoing paragraph that the "new changes" to the global compliance screening technology have "had a fantastic impact on our business, and is really freeing up more transactions than we had before" were each false and/or misleading and omitted material facts.  This change references the replacement of the defective fraud interdiction system implemented in April 2015 and which the Company did not replace until October 2016 (the month of this statement).  MoneyGram admitted that the defective fraud interdiction system resulted in the Company processing at least $125 million in additional consumer fraud transactions between April 2015 and October 2016; because MoneyGram receives a transfer fee on each money transfer, even fraudulent transfers, its revenue numbers are artificially boosted by fraudulent transactions it should have blocked but allowed to proceed.  The new system referenced in Holmes's statement was actually effective at blocking fraudulent transactions; the new system did not "free[] up more transactions," but rather the exact opposite -- the new program *caught and blocked more* fraudulent transactions.  The new system therefore did not have a "fantastic impact on [MoneyGram's] business;" MoneyGram's revenue and other metrics had been artificially inflated due to the Company's failure to prevent fraud effectively, and switching to a system that caught and blocked more fraudulent transactions resulted in processing fewer MoneyGram transactions, thus causing MoneyGram's money transfer fees and revenue to go down.

171.    The bolded statement in the foregoing paragraph that the global compliance screening technology had been "tune[d]" was false and/or misleading and omitted material facts. The changes to the Company's fraud interdiction system in October 2016 were couched as fine

"tuning" but at the time this statement was made, the Company was forced to switch to an *entirely new* screening program due to the catastrophic failure of the previous technology between April 2015 to October 2016.

172.    The bolded statements in the foregoing paragraph concerning fraud losses dropping "tremendously" because of the changes to the global compliance screening technology is false and/or misleading and omitted material facts.  The statement omits that MoneyGram experienced a tremendous *spike* in fraud from 2012 to 2016 due to MoneyGram's failure to prevent fraud, including that the fraud interdiction system was defective from April 2015 to October 2016.  The statement omits that overall revenue would be negatively impacted because for the last eighteen months it was artificially inflated by the failed fraud interdiction system, a trend that would reverse after the system was replaced in October 2016.

173.    The bolded statements that the monitor was "checking things off the list" and MoneyGram was "making good progress" were false and/or misleading and omitted material facts. At the time this statement was made, nearly four years had elapsed since DPA I and MoneyGram was still woefully deficient in its compliance programs and in breach of numerous requirements of the 2009 FTC Order and DPA I, as enumerated in paragraph 130, a-j and paragraph 146, k-l. Indeed, that very month MoneyGram replaced its fraud interdiction system because it was defective from April 2015 to October 2016.

174.    Finally, the bolded statement that MoneyGram's "hard work" was being recognized by "governments around the world" and that the Company's compliance programs provided a unique "competitive advantage" were false and/or misleading and omitted material facts.  At the time this statement was made, nearly four years had elapsed since DPA I and MoneyGram was still woefully deficient in its compliance programs and in breach of numerous requirements of the

2009 FTC Order and DPA I, as enumerated in paragraph 130, a-j, and paragraph 146, k-l. Indeed, that very month MoneyGram replaced its fraud interdiction system because it was defective from April 2015 to October 2016.And MoneyGram did not have a "competitive advantage" – it had a major problem that caused the stock price to crater and the Company to pay a $125 million and undergo additional years of monitoring and mandatory compliance reforms.

### D.  False and Misleading Statements and Omissions in 2017

175.  On March 16, 2017, the Company filed a Form 10-K with the SEC, which provided the Company's financial results and position for the fiscal year ended December 31, 2016 (the "2016 10-K").  The 2016 10-K was signed by Defendants Holmes, Patsley, Angelilli, Garza, Lawry, Turner, and Rao.  The 2016 10-K stated:

> In 2016, **the increase in money transfer fee and other revenue was primarily driven by increased Non-U.S. and U.S. outbound money transfer volume** discussed further below and a positive change in corridor mix, partially offset by the stronger U.S. dollar compared to prior year.
> . . .
> **Our compliance enhancement program is focused on** improving our services for consumers and **completing the programs recommended in adherence with the DPA.**

176.  The bold statements in the foregoing paragraph stating that increased revenue in 2016 was caused by increased outbound money transfer volume was false and/or misleading and omitted material facts.  During 2016, the Company's fraud interdiction system failed to block at least $125 million worth of fraudulent transactions between April 2015 and October 2016; because MoneyGram receives a transfer fee on each money transfer, even fraudulent transfers, its revenue numbers are artificially boosted by fraudulent transactions it should have blocked but allowed to proceed.  The increased money transfer fees and volume reflect *artificial inflation* caused by

MoneyGram's failed fraud interdiction system (which Defendants omitted to mention), not positive business growth, as Defendants suggest.

177.  The bold statement in the foregoing paragraph that MoneyGram's "compliance enhancement program is focused on . . . completing the programs recommended in adherence with" DPA I was false and/or misleading and omitted material facts because it suggests MoneyGram is taking appropriate measures to ensure compliance with DPA I.  At the time this statement was made, however, nearly two years had elapsed since the entry of DPA I and MoneyGram was still woefully deficient in its compliance programs – which the Company described as "core" systems -- and in breach of numerous requirements of the 2009 FTC Order and DPA I, as was later revealed by the FTC and DOJ, as enumerated in paragraph 130, a-j, and paragraph 146, k-l.

## VII. ITEM 303 OF SEC REGULATION S-K, 17 C.F.R. § 229.303

178.  Pursuant to Item 303 and the SEC's related interpretive guidance, an issuer is required to disclose known trends, uncertainties or risks that have had, or are reasonably likely to have, a materially adverse impact on net sales or revenues or income from continuing operations. Such disclosure is required by an issuer in the management's discussion and analysis section of annual and quarterly filings, such as Form 10-K and 10-Q filings for domestic issuers.

179.  In May 1989, the SEC issued an interpretive release on Item 303 which set forth the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required.

(2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results is not reasonably likely to occur.

180.　　Throughout the Class Period, Item 303 required Defendants to disclose:

a. that MoneyGram's belated efforts to comply with DPA I would lead to lower profits, transactions, and revenue;

b. the dramatic increase in consumer fraud complaints between 2012 and 2016;

c. the known failure of the Company's fraud interdiction system between April 2015 and October 2016;

d. the failure to place any restriction on any locations of a certain large chain until approximately May 2017, even when the locations had high levels of fraud;

e. the failure to take disciplinary action against large chain agents despite "a range of suspicious activities";

f. that the Company established ineffective standards for disciplinary actions involving large chain agents;

g. the failure to appropriately and adequately monitor agent activity to prevent fraud-induced money transfers;

h. the failure to provide appropriate training to all agents and to ensure agents were properly training all of their own employees:

i. the failure to ensure that high-fraud agent locations promptly trained their employees to prevent future consumer fraud;

j. the failure to perform proper due diligence on all agents;

k. the failure to record all complaints relating to fraud-induced money transfers, and to share information about them with the FTC;

l. the failure to detect and prevent consumer fraud;

m. that from March 2015 until at least March 2016, the Company failed to "conduct the required individual reviews of agent locations for certain large chain agents that met the review thresholds" and failed to "even consider whether any type of disciplinary action was necessary at those locations"; and

n. the effects of the foregoing on compliance with regulatory and legal requirements, including DPA I and the 2009 FTC Order.

181.　　Each of the foregoing constituted a known trend, demand, commitment, event, or uncertainty which was reasonably likely to, and ultimately did, have a material adverse impact on the Company's net sales, revenues, or income as the Company was forced to expend at least hundreds of millions of dollars in connection with DPA II and the 2018 FTC Order.

## VIII. CLASS ACTION ALLEGATIONS

180. Lead Plaintiffs bring this class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on their own behalf and on behalf of:

> All persons and entities, their agents, successors in interest, assigns, heirs, executors, and administrators who purchased MoneyGram securities during the period between February 11, 2014 through and including November 8, 2018, and who were damaged thereby (the "Class"). Excluded from the Class are defendants and their families, the officers and directors and affiliates of defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

182. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of members of the Class is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by MoneyGram or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

183. Lead Plaintiffs' claims are typical of the claims of the Class in that all Class members were damaged by the same wrongful conduct of Defendants as alleged herein, and the relief sought is common to the Class.

184. Numerous questions of law or fact arise from Defendants' conduct that is common to the Class, including but not limited to:

    a. whether the federal securities laws were violated by Defendants' acts during the Class Period, as alleged herein;

    b. whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and legal/regulatory compliance of MoneyGram;

> c. whether the price of MoneyGram securities was artificially inflated and/or maintained during the Class Period; and
>
> d. to what extent the members of the Class have sustained damages and the proper measure of damages.

185. These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

186. Lead Plaintiffs will fairly and adequately represent the interests of the Class in that they have no conflict with any other members of the Class. Furthermore, Lead Plaintiffs have retained competent counsel experienced in class action and other complex litigation.

187. Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

188. This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

189. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## IX. LOSS CAUSATION AND ECONOMIC LOSS

190. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated and/or maintained the price of MoneyGram securities and operated as a fraud or deceit on Class Period purchasers of MoneyGram securities by failing to disclose and misrepresenting the adverse facts detailed herein. As Defendants' prior misrepresentations, omissions, and fraudulent conduct were disclosed through a series of partial corrective disclosures and became apparent to the market, the price of

MoneyGram securities declined significantly as the prior artificial inflation came out of MoneyGram's common stock price.

191.    As a result of their purchases of MoneyGram securities during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.* damages, under the federal securities laws.

192.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the Company, including that Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about the Company's fraud prevention systems, compliance with the 2009 FTC Order and DPA I, and the impact of fraud on MoneyGram's revenue.  When the truth about MoneyGram was revealed to the market through a series of partial corrective disclosures, the price of MoneyGram common stock fell significantly.  This decline removed the inflation from the price of MoneyGram securities, causing real economic loss to investors who had purchased MoneyGram securities during the Class Period.

193.    The economic loss, *i.e.* damages, suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate and/or maintain the price of MoneyGram securities and the subsequent decline in the value of the securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE—FRAUD ON THE MARKET DOCTRINE AND *AFFILIATED UTE* ALLEGATIONS

194.    Lead Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

195.    In the alternative, Lead Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for MoneyGram securities was an efficient market for the following reasons, among others:

    a.   MoneyGram common stock met the requirements for listing, and was listed and actively traded, on the Nasdaq, a highly efficient, electronic stock market;

    b.   As a regulated issuer, MoneyGram filed periodic public reports with Nasdaq;

    c.   MoneyGram regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    d.   MoneyGram was followed by securities analysts employed by major brokerage firms, including JPMorgan, Wells Fargo Securities, LLC, and Compass Point Research & Trading LLC, who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

## XI. NO SAFE HARBOR

196.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pled in this Amended Complaint.

197.    Either the statements complained of herein were not forward-looking statements, but rather were historical statements or statements of purportedly current facts and conditions at the time the statements were made, or to the extent there were any forward-looking statements, MoneyGram's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

198.    Furthermore, the statutory safe harbor does not apply to statements included in financial statements that purportedly were made in accordance with GAAP, such as MoneyGram's Forms 10-K and 10-Q issued throughout the Class Period.

199.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

200.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, Defendants are liable for those false or misleading statements because, at the time each such statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of MoneyGram who knew that the forward-looking statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## XII. CAUSES OF ACTION

### COUNT ONE

**Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
(Against All Defendants)**

201.    Lead Plaintiffs repeat and re-allege the above paragraphs as though fully set forth herein.

202. During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

203. Defendants:

    a. employed devices, schemes, and artifices to defraud;

    b. made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and

    c. engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

204. Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for MoneyGram securities. Lead Plaintiffs and the Class would not have purchased MoneyGram securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

205. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of MoneyGram securities during the Class Period.

## COUNT TWO
### Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

206. Lead Plaintiffs repeat and re-allege the above paragraphs as though fully set forth herein.

207. The Individual Defendants acted as controlling persons of MoneyGram within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as

officers and/or directors of MoneyGram, and their ownership of MoneyGram securities, and their culpable participation, as alleged above, the Individual Defendants had the power and authority to cause MoneyGram to engage in the wrongful conduct complained of herein.

208.   By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XIII. JURY TRIAL DEMAND

209.   Pursuant to Federal Rule of Civil Procedure 38(b), Lead Plaintiffs demands a trial by jury of all of the claims asserted in this Amended Complaint so triable.

## XIV. PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs pray that the Court enter judgment on their behalf and on behalf of the Class herein, adjudging and decreeing that:

A.   This action may proceed as a class action, with Lead Plaintiffs as the designated Class representatives and Lead Plaintiffs' counsel designated as Class Counsel;

B.   Lead Plaintiffs and the members of the Class recover damages sustained by them, as provided by law, and that a judgment in favor of Lead Plaintiffs and the Class be entered against the Defendants, jointly and severally, in an amount permitted pursuant to such law;

C.   Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the conduct alleged herein;

D.   Lead Plaintiffs and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

E.     Lead Plaintiffs and members of the Class recover their reasonable costs and expenses of this suit, including attorneys' fees and expert fees; and

F.     Lead Plaintiffs and members of the Class receive such other and further relief as may be just and proper.


Dated: April 5, 2019

Respectfully submitted,

**COHEN MILSTEIN SELLERS & TOLL PLLC**

*/s/ Carol V. Gilden*
Carol V. Gilden (Bar No. 06185530)
190 South LaSalle Street, Suite 1705
Chicago, IL 60603
Phone: (312) 357-0370
cgilden@cohemilstein.com

Julie Goldsmith Reiser (*admitted pro hac vice*)
Eric S. Berelovich (*admitted pro hac vice*)
Molly J. Bowen (*pro hac vice pending*)
1100 New York Avenue, N.W., Suite 500
Washington, DC 20005
Phone: (202) 408-4600
jreiser@cohenmilstein.com
eberelovich@cohenmilstein.com

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (*admitted pro hac vice*)
733 Summer Street
Suite 304
Stamford, CT 06901
Phone: (203) 992-4523
shopkins@zlk.com

*Co-Lead Counsel for the Class*

**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
Anthony F. Fata
150 S. Wacker, Suite 3000
Chicago, IL 60606

Phone: (312) 782-4880
afata@caffertyclobes.com

*Counsel for Lead Plaintiffs*