**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KHONG MENG CHEW, Individually and on Behalf of All Others Similarly Situated, | Case No: 1:18-cv-07537 |
| Plaintiff, | <u>CLASS ACTION</u> |
| vs. | Honorable Joan Humphrey Lefkow |
| MONEYGRAM INTERNATIONAL, INC., W. ALEXANDER HOLMES, PAMELA H. PATSLEY, LAWRENCE ANGELILLI, GANESH B. RAO, ANTONIO O. GARZA, SETH W. LAWRY, AND W. BRUCE TURNER, | |
| Defendants. | |

**<u>DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS</u>**

## **<u>TABLE OF CONTENTS</u>**

**Page**

INTRODUCTION ............................................................................................................ 1

FACTUAL ALLEGATIONS ........................................................................................... 3

ARGUMENT AND AUTHORITIES .............................................................................. 10

I.     SECURITIES FRAUD COMPLAINTS ARE SUBJECT TO RIGOROUS
PLEADING REQUIREMENTS AND ARE ROUTINELY DISMISSED .................. 10

II.    CLAIMS ARISING FROM ALLEGED COMPLIANCE AND CONTROL
DEFICIENCIES ARE ROUTINELY DISMISSED ........................................... 11

III.   PLAINTIFFS HAVE FAILED TO ALLEGE A MATERIALLY MISLEADING
STATEMENT, LET ALONE WITH SCIENTER ......................................... 13

      A.    There Is No Liability for Unchallenged Factual Statements ............................. 15

      B.    The Other Statements Are Not Materially and Actionably Misleading ............. 16

      C.    Plaintiffs' "Omissions" Claims Also Fail ........................................................... 19

IV.   THERE IS NO STRONG INFERENCE OF SCIENTER ............................... 21

V.    PLAINTIFFS HAVE NOT PLED A SECTION 20(A) CLAIM .................................. 25

CONCLUSION ................................................................................................................ 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Allscripts, Inc. Secs. Litig.*,
  No 00 C 6796, 2001 WL 743411 (N.D. Ill. June 29, 2001) ...............................................24, 25

*Anderson v. Abbott Labs.*,
  140 F. Supp. 2d 894 (N.D. Ill.), *aff'd sub nom.* 269 F.3d 806 (7th Cir. 2001) .................19, 20

*Anderson v. Spirit AeroSystems Holdings, Inc.*,
  105 F. Supp. 3d 1246 (D. Kan. 2015), *aff'd*, 827 F.3d 1229 (10th Cir. 2016) .......................20

*In re Bally Total Fitness Sec. Litig.*,
  No. 04 C 3530, 2007 WL 551574 (N.D. Ill. Feb. 20, 2007).....................................................22

*In re Bausch & Lomb, Inc. Secs. Litig.*,
  592 F. Supp. 2d 323 (W.D.N.Y. 2008)......................................................................................25

*Bell Atl. Corp. v. Twombly*,
  127 S. Ct. 1955 (2007)...............................................................................................................10

*In re BHP Billiton Ltd. Secs. Litig.*,
  276 F. Supp. 3d 65 (S.D.N.Y. 2017)..........................................................................................21

*Bien v. LifeLock Inc.*,
  No. CV-14-00416-PHX-SRB, 2014 WL 7641546 (D. Ariz. Dec. 17, 2014),
  *aff'd, In re Lifelock, Inc. Secs. Litig.*, 690 Fed. Appx. 947, 955 (9th Cir. 2017)....................19

*In re Career Educ. Corp. Secs. Litig.*,
  No. 03 C 8884, 2006 WL 999988 (N.D. Ill. Mar. 28, 2006) .....................................................23

*In re Centerline Holdings Co. Secs. Litig.*,
  613 F. Supp. 2d 394 (S.D.N.Y. 2009)........................................................................................21

*City of Livonia Empls. Ret. Sys. and Local 295/Local 851 v. Boeing Co.*,
  711 F.3d 754 (7th Cir. 2013) ............................................................................................. *passim*

*City of Warwick Mun. Empls. Pension Fund v. Rackspace Hosting, Inc.*,
  No. 17 Civ. 3501 (JFK), 2019 WL 452051 (S.D.N.Y. Feb. 5, 2019)......................................17

*Cornielsen v. Infinium Capital Mgmt., LLC*,
  916 F.3d 589 (7th Cir. 2019) .................................................................................................2, 22

*Cho v. UCBH Holdings, Inc.*,
  No. C 09-4208 JSW, 2011 WL 3809903 (N.D. Cal. May 17, 2011)........................................22

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
  No. 16 CIV 3495, 2017 WL 4049253 (S.D.N.Y. June 28, 2017), *aff'd sub
  nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55 (2d Cir.
  2018) ...........................................................................................................................................11

*In re EDAP TMS S.A. Sec. Litig.*,
  No. 14 Civ. 6069 (LGS), 2015 WL 5326166 (S.D.N.Y. Sept. 14, 2015)................................17

*Fannon v. Guidant Corp.*,
  583 F.3d 995 (7th Cir. 2009) ...........................................................................................25

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*,
  2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010)..................................................................17

*In re Foxhollow Techs., Inc.*,
  No. C 06-4595 PJH, 2008 WL 2220600 (S.D. Cal. May 27, 2008), *aff'd sub
  nom. In re Foxhollow Techs., Inc. Sec. Litig.*, 359 F. App'x 802 (9th Cir.
  2009) ...................................................................................................................................20

*Gallagher v. Abbott Laboratories*,
  269 F.3d 806 (7th Cir. 2001) .........................................................................................3, 12

*Gamboa v. Citizens, Inc.*,
  A-17-CV-241-RP, 2018 WL 2107205 (W.D. Tex. May 7, 2018).......................................21

*In re Gentiva Sec. Litig.*,
  932 F. Supp. 2d 352 (E.D.N.Y. 2013) ...............................................................................17

*In re GeoPharma, Inc. Secs. Litig.*,
  411 F. Supp. 2d 434 (S.D.N.Y. 2006).................................................................................21

*In re Guidant Corp. Secs. Litig.*,
  536 F. Supp. 2d 913 (S.D. Ind. 2008) ...........................................................................19, 25

*U.S. ex rel. Heathcote Holdings Corp., Inc. v. William K. Walthers, Inc.*,
  779 F. Supp. 2d 735 (N.D. Ill. 2011) .................................................................................22

*Higgonbotham v. Baxter Int'l Inc.*,
  495 F.3d 753 (7th Cir. 2007) .........................................................................................3, 12

*Ho v. Flotek Indus., Inc.*,
  248 F. Supp. 3d 847 (S.D. Tex. 2017), *aff'd sub nom. Alaska Elec. Pension
  Fund v. Flotek Indus., Inc.*, 915 F.3d 975 (5th Cir. 2019) .................................................21

*Howe v. Shchekin*,
  238 F. Supp. 3d 1046 (N.D. Ill. 2017) .................................................................................4

*In re Int'l Bus. Mach. Corp. Secs. Litig.*,
  163 F.3d 102 (2d Cir. 1998) ...............................................................................................20

*In re ITT Educ. Servs., Inc. Sec. Litig.*,
  34 F. Supp. 3d 298 (S.D.N.Y. 2014)...................................................................................22

*Iron Workers Local No. 25 Pension Fund v. Oshkosh Corp.*,
  No. 08-C-797, 2010 WL 1287058 (E.D. Wisc. Mar. 30, 2010) ..........................................24

*Johnson v. Tellabs, Inc.*,
  262 F. Supp. 2d 937 (N.D. Ill. 2003) ..................................................................................25

ii

*Karam v. Corinthian Colls., Inc.*,
   No. CV 10-6523-GHK, 2012 WL 8499135 (C.D. Cal. Aug. 20, 2012) ..................................17

*Kriendler v. Chem. Waste Mgmt., Inc.*,
   877 F. Supp. 1140 (N.D. Ill. 1995) ....................................................................................20

*Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund v. Diodes, Inc.*,
   67 F. Supp. 3d 782 (E.D. Tex. 2014), *aff'd*, 810 F.3d 951 (5th Cir. 2016) ............................13

*Lomingkit v. Apollo Educ. Grp. Inc.*,
   2017 WL 633148 (D. Ariz. Feb. 16, 2017) ..........................................................................17

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
   363 F. Supp. 3d 476 (D. Del. 2019) ....................................................................................17

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
   26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015) ......................12

*Magro v. Freeport-McMoran Inc.*,
   No. CV-16-00186-PHX-DJH, No. CV-16-00186-PHX-DJH, 2018 WL
   3725781 (D. Ariz. Aug. 3, 2018) ........................................................................................17

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) ..............................................................................................11

*Mandalevy v. BofI Holding, Inc.*,
   No. 3:17-cv-00667, 2018 WL 3032588 (S.D. Cal. June 19, 2018) ........................................11

*Material Yard Workers Local 1175 Ben. Funds v. Men's Wearhouse, Inc.*,
   No. H–09–3265, 2011 WL 3059229 (S.D. Tex. July 22, 2011) ............................................23

*Messner v. USA Techs., Inc.*,
   No. 15-5427, 2016 WL 5122569 (E.D. Pa. Sept. 19, 2016) ....................................................5

*In re Midway Games, Inc. Secs. Litig.*,
   332 F. Supp. 2d 1152 (N.D. Ill. 2004) ................................................................................16

*NECA-IBEW Fund v. Northern Trust Corp.*,
   2013 WL 1290202 (N.D. Ill. Mar. 28, 2013) ......................................................................16

*In re NVIDIA Corp. Secs. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) ............................................................................................12

*In re Ocwen Fin. Corp. Sec. Litig.*,
   2015 WL 12780960 (S.D. Fla. Sept. 4, 2015) ......................................................................17

*Okla. Firefighters Pension & Ret. Sys. v. Ixia*,
   50 F. Supp. 3d 1328 (C.D. Cal. 2014) ................................................................................12

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015) ................................................................................................18, 19

*Ong v. Chipotle Mexican Grill, Inc.*,
   294 F. Supp. 3d 199 (S.D.N.Y. 2018) ................................................................................21

iii

*Pehlivanian v. China Gerui Advanced Materials Group, Ltd.*,
   153 F. Supp. 3d 628 (S.D.N.Y. 2015)...................................................................23

*Pension Trust Fund for Operating Engineers v. DeVry Educ. Grp., Inc.*,
   No. 16 C 5198, 2017 WL 6039926 (N.D. Ill. Dec. 6, 2017) ...................................3

*Pension Trust Fund for Operating Engineers v. Kohl's Corp.*,
   895 F.3d 933 (7th Cir. 2018) ........................................................................2, 11, 25

*Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc.*,
   572 F. App'x 713 (11th Cir. 2014) .......................................................................17

*Plumbers and Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings,
   Inc.*,
   679 F.3d 952 (7th Cir. 2012) ..................................................................................3

*Plumbers and Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v.
   Allscripts-Misys Healthcare Solutions, Inc.*,
   778 F. Supp. 2d 858 (N.D. Ill. 2011) ....................................................................16

*Pugh v. Tribune Co.*,
   521 F.3d 686 (7th Cir. 2008) ...................................................................3, 12, 25

*Reilly v. U.S. Phys. Therapy, Inc.*,
   No. 17 CIV. 2347, 2018 WL 3559089 (S.D.N.Y. July 23, 2018) ..........................24

*Roofer's Pension Fund v. Papa*,
   No. 16-2805, 2018 WL 3601229 (D.N.J. July 27, 2008) ......................................24

*Rosenzweig v. Azurix Corp.*,
   332 F.3d 854 (5th Cir. 2003) ................................................................................17

*Rossbach v. VASCO Data Sec., Int'l Inc.*,
   No. 15-CV-06605, 2018 WL 4699796 (N.D. Ill. Sept. 30, 2018) ..........................22

*Rossy v. Merge Healthcare Inc.*,
   169 F. Supp. 3d 774 (N.D. Ill. March 12, 2015)....................................3, 12, 23

*Rubinstein v. Gonzalez*,
   No. 14-cv-9465, 2016 WL 1213931 (N.D. Ill. Mar. 29, 2016) ...............................3

*Sanders v. AVEO Pharm., Inc.*,
   No. 13-11157-DJC, 2015 WL 1276824 (D. Mass. Mar. 20, 2015).........................21

*Sanders v. John Nuveen & Co., Inc.*,
   554 F.2d 790 (7th Cir. 1977) ...............................................................................11

*In re Sanofi Sec. Litig.*,
   155 F. Supp. 3d 386 (S.D.N.Y. 2016)....................................................................17

*Schaffer v. Horizon Pharma PLC*,
   No. 16-CV-1763 (JMF), 2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) ...................21

*Shemian v. Research In Motion Ltd.*,
No. 11 Civ. 4068, 2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) ....................................13, 20

*In re Siebel Sys., Inc. Secs. Litig.*,
No. C 04-0983, 2005 WL 3555718 (N.D. Cal. Dec. 28, 2005) ..............................................12

*Silverman v. Motorola, Inc.*,
No. 07 C 4507, 2008 WL 4360648 (N.D. Ill. Sept. 23, 2008)...................................................3

*Singh v. Cigna Corp.*,
918 F.3d 57 (2d Cir. 2019)......................................................................................................11

*Smallen v. Western Union Co.*,
No. 17-cv-00474, 2019 WL 1382823 (D. Colo. Mar. 27, 2018) .................................... *passim*

*Societe Generale Secs. Servs., GbmH v. Caterpillar, Inc.*,
No. 17 cv 1713, 2018 WL 4616356 (N.D. Ill. Sept. 26, 2018) ....................................... *passim*

*In re Societe Generale Sec. Litig.*,
No. 08 CIV. 2495 RMB, 2010 WL 3910286 (S.D.N.Y. Sept. 29, 2010) ...............................23

*Stadnick v. Vivint Solar, Inc.*,
861 F.3d 31 (2d Cir. 2017)......................................................................................................21

*Stransky v. Cummins Engine Co., Inc.*,
51 F.3d 1329 (7th Cir. 1995) ..................................................................................................19

*In re SunEdison, Inc. Secs. Litig.*,
300 F. Supp. 3d 444 (S.D.N.Y. 2018)......................................................................................21

*In re Supreme Indus., Inc. Secs. Litig.*,
No. 3:17-CV-143-PPS/MGG, 2019 WL 1436022 (N.D. Ind. Mar. 29, 2019) .................18, 25

*Teamsters Affiliates Pension Plan v. Walgreen Co.*,
No. 08 C 2162, 2010 WL 3894149 (N.D. Ill. Sept. 29, 2010)................................................16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)..............................................................................................................3, 23

*Tharp v. Acacia Communs., Inc.*,
321 F. Supp. 3d 206 (D. Mass. 2018) .....................................................................................21

*Thorpe v. Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336, 1376 (S.D. Fla. 2015)
111 F. Supp. 3d 1336 (S.D. Fla. 2015) ...................................................................................22

*In re UBS AG Secs. Litig.*,
No. 07 Civ. 11225 (RJS), 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012)..............................20

*Vallabhaneni v. Endocyte, Inc.*,
Case No. 1:14-cv-01048, 2016 WL 51260 (S.D. Ind. Jan. 4, 2016)...........................16, 18, 24

*Washtenaw County Empls. Ret. Sys. v. Walgreen Co.*,
No. 15-cv-3187, 2016 WL 5720375 (N.D. Ill. Sept. 30, 2016)..............................................20

*White v. H&R Block Inc.*,
    No. 02 CIV. 8965 (MBM), 2004 WL 1698628 (S.D.N.Y. July 28, 2004) ...............................5

*Wozniak v. Align Technology, Inc.*,
    850 F. Supp. 2d 1029 (N.D. Cal. 2012) ................................................................................13

*Zagami v. Cellceutix Corp.*,
    15 Civ. 7194 (KPF), 2016 WL 3199531 (S.D.N.Y. June 8, 2016).........................................21

Defendants MoneyGram International, Inc. ("MoneyGram" or the "Company"), W. Alexander Holmes, Pamela H. Patsley, Lawrence Angelilli, Ganesh B. Rao, Antonio O. Garza, Seth W. Lawry and W. Bruce Turner (collectively "Defendants") submit this Memorandum in support of their Motion to Dismiss Plaintiffs' First Amended Complaint pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6) as well as the Private Securities Litigation Reform Act ("PSLRA").

## INTRODUCTION

This is a meritless securities class action that follows the same template as numerous others that have been dismissed on the pleadings, including a similar recent case against MoneyGram's competitor, Western Union. MoneyGram is a global money transfer and payment services company. Like all money transfer companies, MoneyGram faces challenges in preventing consumers and third-party agents from abusing its services to commit financial misdeeds. In 2009 and 2012, MoneyGram reached agreements with the Federal Trade Commission ("FTC") and the U.S. Department of Justice ("DOJ"), respectively, to resolve allegations that MoneyGram did not take adequate steps to prevent such abuses. These agreements included a deferred prosecution agreement ("DPA") with the DOJ that required MoneyGram to undertake significant upgrades to its anti-fraud controls over five years while being supervised by an outside compliance monitor.

Between 2009 and 2018, MoneyGram invested more than $250 million in a multitude of compliance enhancements, including a new fraud interdiction software system.[1] The Company disclosed the DPA to investors and made clear that the compliance overhaul would not be an

---

[1] *See* Ex. 1, Mar. 2014 Form 10-K at 8 (showing $120 million invested in compliance and anti-fraud programs since 2009); Ex. 2, Mar. 2015 Form 10-K at 4 (showing $49 million in compliance enhancement program expense for 2014); Ex. 3, Mar. 2016 Form 10-K at 4 (showing $26.5 million in compliance enhancement expense for 2015); Ex. 4, Mar. 2017 Form 10-K at 31 (showing $30.7 million in compliance enhancement investments during 2016); Ex. 5, Mar. 2018 Form 10-K at 28 (showing $28 million in compliance enhancement investments during 2017).

- 1 -

immediate "flip-the-switch" fix, but would instead be a lengthy process taking years to fully implement and may ultimately prove insufficient to satisfy the DPA. Towards the end of the five-year period, the DOJ obtained multiple extensions of the DPA. MoneyGram duly disclosed these extensions and warned that it was reserving substantial funds against the possibility of a future penalty imposed by the Government. There is no allegation that MoneyGram was advised by the monitor, DOJ or FTC before those fully disclosed extensions that MoneyGram was likely to face further sanctions. In November 2018, MoneyGram reached agreement with the Government to extend the DPA by 30 months and to pay an additional $125 million penalty. This suit followed.

Plaintiffs' amended pleading (the "Complaint") fails to state a claim. The allegations here are not meaningfully different from those in the Western Union suit, which involved similar disclosures, similar alleged control deficiencies and a similar Government enforcement sanction. MoneyGram warned investors throughout the alleged class period that upgrading its compliance control systems would be a costly and challenging process and that there was no assurance it would ultimately satisfy the DPA. The handful of generalized optimistic statements that Plaintiffs have cherry-picked were heavily qualified and closely resemble the types of statements rejected as insufficient in the Western Union case and by numerous other courts. Plaintiffs also rely on vague allegations from two low-level, apparently disgruntled individuals touted as "confidential witnesses" and a publicly filed whistleblower complaint from another lower-level individual. These allegations do not satisfy the PSLRA and fail to support a strong inference of scienter.

Courts in this circuit readily grant or affirm Rule 12 dismissals when a securities complaint fails to satisfy the PSLRA's rigorous requirements.[2] This case should meet the same fate.

---

[2] *See, e.g., Cornielsen v. Infinium Capital Mgmt., LLC*, 916 F.3d 589, 597-604 (7th Cir. 2019) (affirming dismissal of securities fraud complaint where investment document "contained ample cautionary language"); *Pension Trust Fund for Operating Engineers v. Kohl's Corp.*, 895 F.3d

## FACTUAL ALLEGATIONS[3]

MoneyGram is a leading global provider of innovative money transfer and financial services.[4]  Many of MoneyGram's consumers are not fully served by traditional banks and look to MoneyGram for essential financial services, including funds transfers between family and friends, bill payment services, check processing and money orders.[5]  As of the most recent Form 10-K

---

933, 939-40 (7th Cir. 2018) (affirming dismissal of initial consolidated securities complaint with prejudice despite significant accounting errors, "aggressive" accounting tactics and stock sales by insiders); *City of Livonia Empls. Ret. Sys. and Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 758 (7th Cir. 2013) (affirming dismissal where allegations failed to show that executives had no reasonable basis to believe problems could be fixed); *Plumbers and Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 953-55 (7th Cir. 2012) (affirming dismissal of Rule 10b-5 claim despite allegations that company downplayed "unacceptably high failure rates" from major product); *Pugh v. Tribune Co.*, 521 F.3d 686, 691-92, 695 (7th Cir. 2008) (affirming dismissal of complaint even though internal investigation revealed inflated circulation numbers ); *Higgonbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 759-60 (7th Cir. 2007) (affirming dismissal despite failure of controls to prevent fraudulent accounting practices by "top managers" in Brazil); *Gallagher v. Abbott Laboratories*, 269 F.3d 806, 807-09 (7th Cir. 2001) (affirming dismissal of securities complaint even though FDA sent multiple letters regarding quality control deficiencies and threatening "severe consequences"); *Societe Generale Secs. Servs., GbmH v. Caterpillar, Inc.*, No. 17 cv 1713, 2018 WL 4616356, at *6-8 (N.D. Ill. Sept. 26, 2018) (dismissing securities fraud claim based on statements that company believed it was complying with tax code; statements were not false or fraudulent where company also disclosed that IRS was investigating issue); *Pension Trust Fund for Operating Engineers v. DeVry Educ. Grp., Inc.*, No. 16 C 5198, 2017 WL 6039926, at *4 (N.D. Ill. Dec. 6, 2017) (dismissing case despite allegations from seven "confidential witnesses"); *Rossy v. Merge Healthcare Inc.*, 169 F. Supp. 3d 774, 778-79 (N.D. Ill. March 12, 2015) (dismissing complaint even though controls failed to prevent  employee from falsifying contracts and despite allegations by confidential witnesses).

[3] In addition to the Complaint, Defendants are relying on the various SEC and court filings cited in the Complaint, which are attached to the accompanying Declaration of Peter Stokes ("Stokes Decl.").  Defendants respectfully request that the Court take judicial notice of these documents and consider them in deciding the motion to dismiss.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007) (courts must consider judicially noticeable documents when evaluating motions to dismiss in securities cases); *Rubinstein v. Gonzalez*, No. 14-cv-9465, 2016 WL 1213931, at *1 (N.D. Ill. Mar. 29, 2016) (considering documents quoted in securities fraud complaint on motion to dismiss and granting dismissal); *Silverman v. Motorola, Inc.*, No. 07 C 4507, 2008 WL 4360648, at *1 (N.D. Ill. Sept. 23, 2008) (court may judicially notice SEC filings).

[4] Compl. ¶ 29; Ex. 5, March 2018 Form 10-K at 3.

[5] Ex. 5, March 2018 Form 10-K at 3.

cited in the Complaint (March 2018), MoneyGram offered services at approximately 350,000 locations spanning more than 200 countries and territories, with total annual revenue exceeding $1.6 billion.[6] Most of the 350,000 locations are operated by third-party agents.[7]

While the overwhelming majority of transactions initiated through MoneyGram are legitimate, MoneyGram's services are sometimes abused by criminals to perpetrate financial scams. MoneyGram deploys numerous security mechanisms to prevent fraudulent activities and is usually successful in preventing or blocking illicit transfers.[8] As the Seventh Circuit has recognized, however, no anti-fraud system "is so foolproof that it cannot be evaded,"[9] and MoneyGram's fraud controls have at times been the subject of recommended enhancements by government regulators. In October 2009, MoneyGram reached an agreement with the FTC (the "FTC Order") to enhance its consumer anti-fraud program and to refund $18 million to consumers who experienced third-party fraud.[10] In November 2012, MoneyGram entered into the DPA with the DOJ, which had filed a criminal complaint alleging that certain U.S. and Canadian agents had engaged in misconduct during 2003-09.[11] MoneyGram's conduct during that time is outside the statute of repose and is not the basis for Plaintiff's claims.[12] The DPA imposed a $100 million

---

[6] Ex. 5 March 2018 Form 10-K at 3, 26. Most of this revenue comes from fees charged in connection with money transfers. *Id.* at 3.

[7] *Id.* at 3.

[8] *See* Ex. 1, Mar. 2014 Form 10-K at 29 (noting MoneyGram's success in preventing more than $365 million in fraudulent transactions since 2009).

[9] *Higginbotham*, 495 F.3d at 760.

[10] *See* Compl. ¶¶ 46-49.

[11] *See* Compl. ¶¶ 54-58.

[12] *See Howe v. Shchekin*, 238 F. Supp. 3d 1046, 1050 (N.D. Ill. 2017) (applying five-year statute of repose on motion to dismiss).

financial penalty and required MoneyGram to undertake "substantial changes to its fraud prevention and compliance programs" while supervised by an outside compliance monitor.[13]

Plaintiffs do not and cannot dispute that the 2009 and 2012 matters were publicly disclosed before and during the alleged class period.[14] As Plaintiffs acknowledge, the "substantial changes" required by the DPA were not an immediate "flip the switch" fix, but involved the "implement[ation]" of numerous major upgrades that "MoneyGram had five years to complete" as well as continuous obligations that must be met each year.[15] The DPA criteria were highly subjective, including an obligation to "design and implement a remediation plan" to improve due diligence of MoneyGram agents and an obligation to "develop and implement a risk-based program, using the best tools available, to test and verify the accuracy of the sender and receiver biographical and identification data entered into the transaction database by MoneyGram Agents" to prevent fraud.[16] The DPA also imposed substantial reporting and oversight requirements, including reports by the monitor, annual meetings between the monitor and the DOJ and an obligation by the monitor to report "significant violation[s] of law" to the DOJ, which in turn could prosecute the Company at any point during the DPA term.[17]

---

[13] *See* Compl. ¶¶ 59-62.

[14] *See id.* ¶¶ 3 n. 1, 4 n. 2 (citing publicly filed DPA and FTC Order, which are attached hereto as Exhibits 6 and 7, respectively); *see also* Ex. 1, Mar. 2014 Form 10-K at 8 (disclosing DPA); Ex. 2, Mar. 2015 Form 10-K at 4, 9 (same); Ex. 3, Mar. 2016 Form 10-K at 4, 8 (same); Ex. 4, 2017 Form 10-K at 7, 16 (same); Ex. 5, 2018 Form 10-K at 7, 14 (same); Ex. 21 at 8-9. These proceedings are thus part of the total mix of information available to investors. *See White v. H&R Block Inc.*, No. 02 CIV. 8965 (MBM), 2004 WL 1698628, at *6 (S.D.N.Y. July 28, 2004) (allegations in public court filings are "inherently public information"); *Messner v. USA Techs., Inc.*, No. 15-5427, 2016 WL 5122569, at *4 (E.D. Pa. Sept. 19, 2016) ("The exercise of reasonable diligence includes a search of public records such as those on PACER that are not under seal").

[15] Compl. ¶ 60; Ex. 6, DPA at Attachment C.

[16] *See* Ex. 6, DPA at Attachment C ¶¶ 6, 9

[17] *See* Ex. 6, DPA Attachment D ¶ 8; *see also* DPA ¶¶ 16-18.

MoneyGram made clear to investors throughout the alleged class period that its compliance enhancement efforts were costly and fraught with risk. The Company never guaranteed that it would be able to satisfy the DPA and repeatedly warned that compliance was not assured, cautioning that MoneyGram faces "possible uncertainties relating to compliance with and the impact of the [DPA]" and could face serious adverse consequences "[i]f the Company fails to make progress towards its compliance obligations under the DPA" or "fails to comply with the DPA," including the risk of criminal prosecution and substantial penalties.[18] The disclosures also cautioned investors regarding the "substantial" costs required to implement the DPA anti-fraud enhancements, which likewise "could have an adverse impact on the Company's operations."[19] MoneyGram also warned investors that it was frequently targeted by persons intending to commit fraud (including consumers and agents), that it was not always successful in preventing such fraud and that implementing new software systems was risky.[20]

---

[18] *See* Ex. 1, Mar. 2014 Form 10-K at 15; Ex. 2, Mar. 2015 Form 10-K at 17; Ex. 3, Mar. 2016 Form 10-K at 16-17; Ex. 4, Mar. 2017 Form 10-K at 16; Ex. 5, Mar. 2018 Form 10-K at 14.

[19] *See id.*; *see also supra* note 1 (listing disclosures of more than $250 million in total costs).

[20] *See* Ex. 1, Mar. 2014 Form 10-K at 13 ("We face fraud risks that could adversely affect our business. . . . Certain former retail agents have also engaged in fraud against consumers or us, and existing agents could engage in fraud against consumers or us. We use a variety of tools to protect against fraud; however, these tools may not always be successful"; also warning of risks from "[f]ailure to comply with" applicable laws and regulations); *id.* at 18 (warning about risk of "software defects, development delays and installation difficulties"); *id.* at 51 (warning that MoneyGram's ability to meet business projections depended on "our ability to manage fraud risks from consumers or agents," "the ability of us and our agents to comply with U.S. and international laws and regulations. . . .," and "possible uncertainties relating to compliance with and the impact of the DPA"; Ex. 2, Mar. 2015 Form 10-K at 14 (warning of risk regarding agents' "unwillingness or inability to comply with our standards or legal requirements, including those related to compliance with anti-money laundering regulations, anti-fraud measures or agent monitoring"; "Consumer fraud could adversely affect our business, financial condition and results of operations. Criminals are using increasingly sophisticated methods to engage in illegal activities such as paper instrument counterfeiting, fraud and identity theft. As we make more of our services available over the internet and other digital media, we subject ourselves to new types of consumer fraud risk because requirements relating to consumer authentication are more complex with internet

On November 2, 2017, MoneyGram announced that it entered a stipulation with the DOJ to extend the DPA "for 90 days to February 6, 2018, during which the Company and the Government can discuss whether the Company is in compliance with the DPA. There can be no assurance that the Company and the Government will continue to be able to negotiate a mutually satisfactory outcome during such 90 day period (or any further short term extension of the DPA) or that such outcome will not include a further extension of the DPA, financial penalties" or other adverse consequences, including "criminal prosecution."[21] MoneyGram thus warned investors that there was sufficient doubt at that stage about whether the Company would be found in compliance that the Government required an extension of the DPA period.

The Amended Complaint is devoid of any particularized allegations that any individual Defendant[22] was aware prior to late 2017 that the DOJ or FTC was likely to demand additional penalties. Even though the monitor and MoneyGram were required to make periodic reports to the DOJ (including an obligation by the monitor to report "substantial violation[s] of law" to the DOJ), there is no allegation that the Government or the monitor advised MoneyGram prior to late

---

services"); *see id.* at 14, 21, 52-53 (similar disclosures as in 2014 Form 10-K); Ex. 3, Mar. 2016 Form 10-K at 14, 20, 49 (same); Ex. 4, Mar. 2017 Form 10-K at 13, 19 (same; "Certain former agents have also engaged in fraud against consumers, and existing agents could engage in fraud against consumers"), 48 (same); Ex. 5, Mar. 2018 Form 10-K at 12, 18, 44-45 (same).

[21] *See* Ex. 8, Nov. 2017 Form 10-Q at 16-17; Compl. ¶¶ 78-79.

[22] The individual defendants are listed in paragraphs 30-36 of the Complaint. They include Pamela H. Patsley (who served as Chairman and CEO from September 2009 through December 2016 and served as Executive Chairman from January 2017 through February 1, 2018); W. Alexander Holmes (who became Executive Vice President and Chief Financial Officer in March 2012, added the role of Chief Operating Officer in February 2014, became Chief Executive Officer in January 2016 and was also named Chairman of the Board in February 2018); Lawrence Angelilli (who served as Senior Vice President of Corporate Finance during 2014-15 and as Executive Vice President and Chief Financial Officer since January 1, 2016); Seth W. Lawry (who has served as a director since April 2008); Ganesh B. Rao (who has served as a director since November 2008); Antonio O. Garza (who has served as a director since April 2012); and W. Bruce Turner (who has served as a director since 2010).

2017 that MoneyGram would face any additional penalties. Neither of the two purported "confidential witnesses," nor the purported "whistleblower," makes any allegation that any individual defendant knew of any specific alleged noncompliance, let alone that MoneyGram was likely to face further sanctions from the DOJ or FTC. And again, there is no allegation that MoneyGram represented it was (or would be) in compliance with the DPA or FTC Order.

During 2018, MoneyGram announced multiple additional extensions to the DPA and disclosed that it was reserving substantial sums (initially $85 million, which increased to $95 million) for a potential resolution relating to the DPA compliance issues.[23] MoneyGram thus communicated to investors the potential that the Government would be sufficiently unconvinced at this stage of MoneyGram's progress toward compliance that a near-$100 million financial penalty (or more) was reasonably likely. Again, there is no particularized allegation that any individual Defendant knew prior to these disclosures that MoneyGram was likely to face substantial additional financial penalties.

On November 8, 2018, the DOJ announced that MoneyGram would be required to pay a $125 million forfeiture and extend the DPA by 30 additional months.[24] The DOJ noted that MoneyGram "has made progress during the term of the Agreement to comply with the requirements of the Agreement and to improve its anti-money laundering and anti-fraud compliance programs," while the FTC similarly noted that MoneyGram "has made some

---

[23] See Compl. ¶¶ 81-87; Ex. 5, Mar. 2018 Form 10-K at 14 (disclosing additional 45-day extension of DPA and "an $85.0 million accrual in connection with a possible resolution of this matter, based on the facts and circumstances known at the time"; "no assurance can be given that future costs and payments made in connection with this matter will not exceed the amount currently recorded"); Ex. 9, Mar. 21, 2018 Form 8-K (announcing additional 45-day extension); Ex. 10, May 7, 2018 Form 8-K (announcing additional 45-day extension); Ex. 11, Aug. 3, 2018 Form 10-Q at 18 (announcing additional 90-day extension and increasing accrual to $95 million, again with "no assurance" that actual payments and sanctions may exceed this amount).

[24] Compl. ¶ 88; Ex. 12, Nov. 8, 2018 DOJ Motion.

8

enhancements to its agent oversight and anti-fraud program," though not enough to be deemed to be in full compliance yet.[25]  Both the FTC and the DOJ observed that while MoneyGram implemented a new fraud interdiction software system "that was supposed to enhance its ability to automatically hold and prevent the payout of money transfers that likely were fraud-induced, this interdiction system failed to function properly from approximately April 2015 through October 2016" and did not prevent substantial volumes of fraud-induced money transfers, which allegedly contributed to a significant increase in the number of fraud complaints during that time.[26]  The FTC sought further improvements from MoneyGram  in training, diligencing or disciplining an unspecified number of the Company's 350,000 worldwide agents, as well as improvements in compliance  with all reporting requirements and using guidelines during 2013 in its Financial Intelligence Unit that were insufficiently rigorous in imposing suspensions or terminations on agents with high fraud activity.[27]  The FTC noted, however, that "[d]uring the FTC's investigation . . ., MoneyGram began taking more meaningful disciplinary actions against agents – especially large chain agents – and complaints went down significantly in 2017."[28]  Similarly, the DOJ noted that MoneyGram "took steps to remediate the deficiencies in the newly implemented, but ineffective, fraud interdiction system by replacing it with an altogether new fraud interdiction system on October 11, 2016.  This system remediated many of the deficiencies caused by the earlier interdiction system.  During the same time period, the Company also made enhancements to its anti-money laundering and anti-fraud compliance programs, including dedicating substantial resources to these programs and engaging a national consulting firm to assist the Company in

---

[25] *See* Ex. 12, Nov. 8, 2018 DOJ Motion at ¶ 4; Ex. 13, Nov. 8, 2018 FTC Motion at 3.

[26] Ex. 13, Nov. 8, 2018 FTC Motion at 4; Ex. 12, Nov. 8, 2018 DOJ Motion at ¶¶ 5-6.

[27] Ex. 13, Nov. 8, 2018 FTC Motion at 4-12.

[28] *See* Ex. 13, Nov. 8, 2018 FTC Motion at 13.

developing and executing a risk-based plan to ensure that the Company's compliance programs satisfy the Agreement."[29]

In other words, while MoneyGram experienced setbacks (particularly with respect to the implementation of a new software system in 2015 that did not work as well as hoped and which MoneyGram replaced with a more effective system in 2016), the DOJ and FTC recognized that MoneyGram had worked to remediate these issues. MoneyGram never assured it was in full compliance and consistently warned it faced significant risks. Many of the DPA requirements are highly subjective and were to be judged based on progress over the full five-year term. The allegations wholly fail to state a claim, let alone with the particularity required by the PSLRA.

## ARGUMENT AND AUTHORITIES

### I.    SECURITIES FRAUD COMPLAINTS ARE SUBJECT TO RIGOROUS PLEADING REQUIREMENTS AND ARE ROUTINELY DISMISSED

As set forth in footnote 2 above, securities fraud plaintiffs face a "heavy burden" to survive a motion to dismiss in this circuit.[30] A Rule 10b-5 complaint must be dismissed if a plaintiff fails to plead particularized facts showing an actionable material misstatement or fails to allege specific facts supporting a strong inference of scienter that is cogent and at least as compelling as the inference that the defendants did not act fraudulently.[31] Plaintiffs must "show," rather than merely "say," that Defendants made materially misleading statements.[32] Scienter requires more than "inexcusable negligence," but instead "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant

---

[29] *See* Ex. 12, Nov. 8, 2018 DOJ Motion at ¶ 6.

[30] *See City of Livonia*, 711 F.3d at 757.

[31] *See id.* at 756-57; *Societe Generale Secs. Servs.*, 2018 WL 4616356, at *3-4, 7.

[32] *See Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965–66 & n.3 (2007) (complaint must "show" that pleader is entitled to relief).

or is so obvious that the actor must have been aware of it."[33]  Allegations that merely show "careless mistakes at the management level" are insufficient to plead scienter.[34]

## II. CASES ARISING FROM ALLEGED COMPLIANCE AND CONTROL DEFICIENCIES ARE ROUTINELY DISMISSED

Securities fraud suits premised on allegations of compliance and control shortcomings are routinely dismissed.  The *Western Union* litigation, for example, included similar allegations that the company made generalized optimistic statements about its "market leadership" in compliance that were later allegedly proven false when the company admitted to criminal violations and announced a $586 million penalty to the FTC and other regulators.[35]  Numerous other securities fraud complaints arising from alleged failures to enforce anti-fraud or anti-money-laundering rules have similarly been dismissed for failure to allege an actionable misstatement or a failure to allege scienter.[36]  The Seventh Circuit and district courts in this circuit have repeatedly rejected securities

---

[33] *Sanders v. John Nuveen & Co., Inc.*, 554 F.2d 790, 793 (7th Cir. 1977) (failure to conduct appropriate investigation deemed negligence and not recklessness) (internal quotations omitted).

[34] *See Kohl's*, 895 F.3d at 939 (complaint fails "if it is more likely that the errors resulted from 'careless mistakes at the management level' than from 'an intent to deceive or a reckless indifference to whether the statements were misleading'") (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008)).

[35] *See Smallen v. Western Union Co.*, No. 17-cv-00474, 2019 WL 1382823, at *2, 15-24 (D. Colo. Mar. 27, 2018).  As a proportion of overall revenue, the penalty was similar to MoneyGram's.

[36] *See In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, No. 16 CIV 3495, 2017 WL 4049253, at *8 (S.D.N.Y. June 28, 2017) (allegations attempting to draw a connection between prior government investigations and AML violations provided no evidence of scienter, and failures of Deutsche Bank's control systems despite its statements that it was committed to strengthening its compliance functions suggested an inference of potentially poor management rather than a strong inference of scienter), *aff'd sub nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55 (2d Cir. 2018) (summary order); *Singh v. Cigna Corp.*, 918 F.3d 57, 63-64 (2d Cir. 2019) (general statements regarding regulatory compliance and a company's code of ethics are not material statements of fact that can sustain a Section 10(b) claim); *Mandalevy v. BofI Holding, Inc.*, No. 3:17-cv-00667, 2018 WL 3032588 (S.D. Cal. June 19, 2018) (statements in SEC filings regarding BofI's regulatory compliance and code of ethics were not actionable under Section 10(b) despite alleged AML violations).

fraud complaints arising from alleged control lapses that failed to prevent others in the company from committing fraud, as well as cases arising from noncompliance with FDA and IRS requirements and quality control problems with major products.[37]   Courts in other circuits have likewise routinely rejected complaints premised on compliance or control defects.[38]   Complaints involving problems with new software (such as the fraud interdiction system implemented in 2015 and replaced in 2016) are likewise routinely dismissed.[39]   This lawsuit is replete with the same fundamental deficiencies that link together the cases cited above and should meet the same fate.

---

[37] *See Higginbotham*, 495 F.3d at 759-60 (affirming dismissal despite failure of internal controls to prevent fraudulent accounting practices by "top managers" in Brazil); *Gallagher*, 269 F.3d at 807-09 (affirming dismissal of securities complaint even though FDA sent multiple letters regarding quality control deficiencies and threatening "severe consequences"); *see also Pugh*, 521 F.3d at 691-92, 695 (affirming dismissal of securities complaint even though internal investigation revealed inflated circulation numbers); *City of Livonia*, 711 F.3d at 758-760 (affirming dismissal of Rule 10b-5 suit despite alleged conflict between optimistic statements about Dreamliner development and problematic test results; allegations failed to show that executives had no reasonable basis to believe problems could be fixed); *Societe Generale Secs. Servs.*, 2018 WL 4616356, at *6-8 (dismissing securities fraud claim based on statements that company believed it was complying with tax code; statements were not false or fraudulent where company also disclosed that IRS was investigating issue); *Rossy*, 169 F. Supp. 3d at 778-79 (dismissing complaint even though internal control deficiencies failed to prevent defendant's employee from falsifying contracts and causing material errors to financial statements, and despite allegations by confidential witnesses); *Roth v. OfficeMax, Inc.*, 527 F. Supp. 2d 791, 801-02 (N.D. Ill. 2007) ("An allegation that defendants should have known about internal control deficiencies based on nothing more than later acknowledgement of such weaknesses amounts to pleading fraud by hindsight").

[38] *See, e.g., In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 297-99 (S.D.N.Y. 2014) (disclosure of "numerous" (thirteen) material weaknesses and dismissal of outside auditor insufficient to show scienter), *aff'd*, 616 F. App'x 442 (2d Cir. 2015); *Okla. Firefighters Pension & Ret. Sys. v. Ixia*, 50 F. Supp. 3d 1328, 1364 (C.D. Cal. 2014) ("Mere allegations that Ixia had deficient internal controls are insufficient to give rise to a strong inference of scienter.").

[39] *See In re Siebel Sys., Inc. Secs. Litig.*, No. C 04-0983, 2005 WL 3555718, at *4 (N.D. Cal. Dec. 28, 2005) (dismissing securities complaint despite allegations that new software product "was a disaster"; "***That a new [software] program has kinks does not make a positive statement about the [software] false.  If that were the case, the federal securities laws would prevent software companies from making any positive statements about new software***") (emphasis added); *see also In re NVIDIA Corp. Secs. Litig.*, 768 F.3d 1046, 1048 (9th Cir. 2014) (no scienter despite serious defects in two major products leading to $150 million earnings charge and 31% stock price decline, even though complaint included allegations from former employees stating that company

## III.   PLAINTIFFS HAVE FAILED TO ALLEGE A MATERIALLY MISLEADING STATEMENT, LET ALONE WITH SCIENTER

Plaintiffs' allegations wholly fail to state a claim.  The alleged "misstatements," which are recited in paragraphs 129-177 of the Complaint, consist entirely of: (i) factual statements that Plaintiffs do not dispute are true (*e.g.*, "Since 2009, MoneyGram has invested more than $120 million in its compliance and anti-fraud programs and has successfully prevented more than $365 million in fraud losses. . . .")[40] and (ii) various statements of opinion, forward-looking statements and generalized statements of optimism cherry-picked from the disclosures, including:

- A February 11, 2014 statement that MoneyGram would "continue to advance its leadership in global compliance by implementing market-leading systems, technology, and processes, and increasing agent oversight around the world."[41]

- Recurring statements that "[i]n December of 2013, we launched our Compliance Enhancement Program, which is focused on improving our services for the consumers and completing the programs recommended in adherence with the DPA" (a statement that recurred in similar format through most of MoneyGram's periodic financial filings).[42]

---

knew of problems for at least a year before they were revealed to the public); *Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund v. Diodes, Inc.*, 67 F. Supp. 3d 782, 789 (E.D. Tex. 2014) (rejecting fraud allegations regarding defective chips), *aff'd*, 810 F.3d 951 (5th Cir. 2016); *Shemian v. Research In Motion Ltd.*, No. 11 Civ. 4068, 2013 WL 1285779, at *19 (S.D.N.Y. Mar. 29, 2013) (rejecting securities fraud complaint based on delayed launch of new operating system; allegations that defendants "miscalculated and poorly executed on the development of new products" insufficient to show fraud); *Wozniak v. Align Technology, Inc.*, 850 F. Supp. 2d 1029, 1037 (N.D. Cal. 2012) (dismissing complaint despite allegation from "confidential witness" that CEO knew new software product was ineffective).

[40] Compl. ¶ 129; *see also id.* ¶¶ 132 (similar statements regarding investment in compliance), 169 ("[o]ur fraud losses have dropped tremendously internally" as of October 28, 2016, which plaintiff does not contest had occurred), 149-50 ("We . . . posted the largest number of money transfer transactions in our history . . . ."), 162 ("[W]e delivered on our expectations for double-digit constant currency revenue and adjusted EBITDA. . . ."), 175 ("In 2016, the increase in money transfer fee and other revenue was primarily driven by increased Non-U.S. and U.S. outbound money transfer volume . . . .").

[41] *See* Compl. ¶ 129.

[42] *Id.* ¶¶ 132, 135, 137, 141, 147, 155, 175.

- A statement by Patsley on October 31, 2014 that "[w]e are executing well and are pleased with the progress we have made on these initiatives" (a statement made in reference to MoneyGram's overall global transformation program, which spanned multiple business initiatives).[43]

- A statement by Patsley on May 1, 2015 that "our investment in emerging markets and innovative new technologies are successfully positioning MoneyGram for a return to double-digit growth in the fourth quarter" and that "We have made significant progress on our global transformation initiative with the April launch of the first module in our new market-leading compliance system and the opening of our new global business center in Poland. . . . Midway through the [global transformation program], I am pleased with our progress and recent success."[44]

- A statement by Holmes on July 31, 2015 that "[w]e believe the systems and program changes we're implementing position MoneyGram at the forefront of compliance programs in the money transfer industry."[45]

- Statements by Patsley on October 30, 2015 that "our strategies are on course and we're doing what we said we would do" (which was prefaced by the statement "onto the impressive results for the third quarter" and thus modify that generalized and unchallenged statement of strong overall performance); that "[w]e are investing in a world-class compliance engine that is not only core to our business but a true competitive advantage that we can leverage in the future," and that "our strategic focus of growing in emerging markets, along with our technological capabilities, led to great results in the third quarter," and a statement by Holmes during the same earnings call that "[b]eing a leader in compliance is so critical for us, and not just for compliance with our DPA but also for relationships with banks and global initiatives around the world. We will continue to invest until we get it right, but we feel good about the outlook we have right now."[46]

- Statements by Holmes during a February 11, 2016 earnings call that "[i]n 2015, we continued to make steady progress on our compliance enhancement program activities and rolled out key functionality," that MoneyGram "continued to invest" in multiple initiatives (including "compliance"), and that "I am extremely pleased with all of the progress that we have made" (a statement that referenced MoneyGram's overall business transformation). Plaintiffs misleadingly excised multiple portions of the "[i]n 2015" paragraph. The first sentence reads: "On the compliance front, as you know, the current regulatory environment *isn't getting any easier*, and this is an area in which we must invest." The sentence after "key

---

[43] *Id.* ¶ 139; Ex. 14, Oct. 31, 2014 Form 8-K.

[44] Compl. ¶ 143; Ex. 15, May 1, 2015 Form 8-K.

[45] Compl. ¶ 152; Ex. 16, July 31, 2015 Earnings Transcript at 8.

[46] Compl. ¶¶ 157-61; Ex. 17, October 30, 2015 Earnings Transcript at 4, 6, 8, 10-11.

functionality" states that "[w]hile **we still have a lot of work to do to complete the program,** I know that we are making the right investments and that the **end result** of this project will position MoneyGram at the forefront of our industry."  On page 9 of the transcript, Holmes reiterates that "[w]e **still have a lot left to do**, but we're continuing to be hopeful about where that's going."[47]

- A statement by Holmes on October 28, 2016 that "[w]e're making some significant progress on our compliance program," that "when you put new things in, I think they tend to hit a little bit harder than intended as we tune them and then try to get the pieces right," that "[w]e actually just put in some new changes to a lot of our global compliance screening technology, just a few weeks ago, which has had a fantastic impact on our business, and is really kind of freeing up more transactions than we had before," and that "[w]e've reached a point with the monitor where they begin kind of looking at what we've implemented.  They're just doing some testing of certain systems and checking things off the list.  So I think we're making good progress there."[48]

As set forth below, the allegations fail to show **any** actionable misstatements or omissions, let alone any that are so blatantly deficient as to support a strong inference of fraud.  **Notably, Plaintiffs do not appear to allege that any of MoneyGram's statements after March 16, 2017 are misleading**, apparently conceding that MoneyGram made sufficient disclosures from April 2017 until November 2018 (which includes the interval where MoneyGram disclosed the multiple extensions to the DPA and reserved substantial funds for a possible resolution).[49]

### A.    There Is No Liability for Unchallenged Factual Statements

Plaintiffs have alleged no facts contesting the veracity of MoneyGram's statements about the size of MoneyGram's compliance investments, the amount of fraudulent transactions prevented, the fact that fraud losses fell significantly in late October 2016 (after the fraud interdiction software installed in 2015 was replaced) and the other statements regarding

---

[47] Compl. ¶¶ 162-66; Ex. 18, February 11, 2016 Earnings Transcript at 4, 6, 9.

[48] Compl. ¶¶ 169-74; Ex. 19, October 28, 2016 Earnings Transcript at 12.

[49] *See* Compl. ¶¶ 175-77 (last allegation in "alleged false statements" section).  To the extent Plaintiffs do purport to assert claims based on statements during this interval, Plaintiffs have not identified such statements with particularity as required by the PSLRA and Fed. R. Civ. P. 9(b).

MoneyGram's financial performance listed in footnotes 41-48. A securities fraud plaintiff must allege facts showing that a statement is materially false.[50] That MoneyGram was ultimately subjected to additional penalties under the DPA does not render inaccurate MoneyGram's statements about the amount of funds invested in compliance, the volume of fraudulent transactions blocked and the fact that MoneyGram's revenues were increasing.[51]

### B. The Other Statements Are Not Materially and Actionably Misleading

The other statements identified in the Complaint – including the generalized positive statements, opinions and predictions cited above – are equally inactionable. This court has previously recognized that "general statements of optimism" will not support a claim.[52] Statements that companies have "robust," "effective" and "best-of-class" compliance programs are routinely held immaterial as a matter of law (particularly when, as here, they do not promise that full compliance will be achieved and are accompanied by more sobering disclosures, such as the disclosures here that MoneyGram's controls were previously found insufficient and that the

---

[50] *See, e.g., Societe Generale Secs. Servs.*, 2018 WL 4616356, at *6 (granting dismissal where the "complaint does not plausibly allege that any of those statements were false and were known to be false when made").

[51] *See Plumbers and Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Allscripts-Misys Healthcare Solutions, Inc.*, 778 F. Supp. 2d 858, 881 (N.D. Ill. 2011) (allegation that software implementation had bugs does not render statement about increased demand misleading).

[52] *See In re Midway Games, Inc. Secs. Litig.*, 332 F. Supp. 2d 1152, 1165 (N.D. Ill. 2004) (Lefkow, J.) (dismissing claims based on "general statements of optimism," including statement that company's "products will produce record home video game results in 2002"); *NECA-IBEW Fund v. Northern Trust Corp.*, 2013 WL 1290202, at *5 (N.D. Ill. Mar. 28, 2013) (Lefkow, J.) ("[W]hile the defendants described Northern Trust's portfolio as 'pristine' and 'strong,' an examination of the full context of their statements reveals that the chacterizations were made along with warnings that market conditions were deteriorating. . . ."). Other judges have reached similar conclusions. *See Vallabhaneni v. Endocyte, Inc.*, Case No. 1:14-cv-01048, 2016 WL 51260, at *15-16 (S.D. Ind. Jan. 4, 2016) ("vague statements about industry leadership, unquantified growth, and expressions of optimism" held inactionable); *Teamsters Affiliates Pension Plan v. Walgreen Co.*, No. 08 C 2162, 2010 WL 3894149, at *4-5 (N.D. Ill. Sept. 29, 2010) (statement that "generics are very positive" and that company "remains happy" with negotiations held immaterial).

Company faced significant risk and uncertainty as to whether it would fully satisfy the DPA).[53] Statements that a company is making "steady progress" or "good progress" toward a long-term goal are likewise routinely held inactionable.[54] In *Western Union*, the district court found Western Union's statements that it had "good monitoring systems in place," a "multi-faceted program to prevent consumer fraud" and was a "market leader," and that "compliance culture is in our DNA" to be inactionable.[55] Plaintiffs cannot meaningfully distinguish MoneyGram's statements from those made by Western Union and have pled no facts showing that MoneyGram was not a "leader"

---

[53] *See Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc.*, 572 F. App'x 713, 716 (11th Cir. 2014) (statements about "rigorous" processes and "effective" training were not material); *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, 487-88 (D. Del. 2019) (statements that company had "robust compliance driven culture," "very strong compliance culture," "demonstrated compliance infrastructure" and "rigorous training programs" held inactionable puffery); *Lomingkit v. Apollo Educ. Grp. Inc.*, 2017 WL 633148, at *7, 23 (D. Ariz. Feb. 16, 2017) (compliance statements held inactionable); *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 401 (S.D.N.Y. 2016) (statement that company "maintain[s] an effective compliance organization" is corporate puffery); *In re Ocwen Fin. Corp. Sec. Litig.*, 2015 WL 12780960, at *7 (S.D. Fla. Sept. 4, 2015) (statement that company had "'robust' compliance controls" inactionable); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 370 (E.D.N.Y. 2013) (description of compliance program as "robust" or "best-of-class" is puffery); *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, 2010 WL 3790810, at *24 (S.D.N.Y. Sept. 28, 2010) (statement that company is "maintaining a very strong internal control environment" inactionable); *Karam v. Corinthian Colls., Inc.*, No. CV 10-6523-GHK (PJWx), 2012 WL 8499135, at *10 (C.D. Cal. Aug. 20, 2012) (statement that "compliance . . . has really been job one for us" was inactionable).

[54] *See, e.g., Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 870 (5th Cir. 2003) (statement that company was "making steady progress" inactionable); *City of Warwick Mun. Empls. Pension Fund v. Rackspace Hosting, Inc.*, No. 17 Civ. 3501 (JFK), 2019 WL 452051, at *5 (S.D.N.Y. Feb. 5, 2019) (statement that company has made "good progress" puffery); *Magro v. Freeport-McMoran Inc.*, No. CV-16-00186-PHX-DJH, No. CV-16-00186-PHX-DJH, 2018 WL 3725781, at *5 (D. Ariz. Aug. 3, 2018) (statements that "we're making good progress" in negotiation "easily fall under the category of puffery"); *In re EDAP TMS S.A. Sec. Litig.*, No. 14 Civ. 6069 (LGS), 2015 WL 5326166, at *9–10 (S.D.N.Y. Sept. 14, 2015) (statements indicating "that the [FDA approval] process was 'on track' and making continued 'progress,'" or declaring "[defendants'] belief that they were 'moving through the approval process in a timely manner . . .'" were inactionable).

[55] *See Western Union*, 2019 WL 1382823, at *15-16.

in compliance or that MoneyGram's generalized statements about "progress" were false.[56]  Indeed, the fact that MoneyGram's most well-known global competitor (Western Union) experienced similar compliance setbacks only confirms that MoneyGram's statements about compliance "leadership" are, at a minimum, not actionably false.  *See id.*

Many of the challenged statements are also statements of opinion (*e.g.*, "I think we are making good progress;" "I am extremely pleased with the progress. . . ."), forward-looking statements (*e.g.,* MoneyGram would "continue to advance its leadership in global compliance by implementing market-leading systems") or both.  Plaintiffs may not engage in "Monday morning quarterbacking of a company's opinions,"[57] which are not actionable absent specific facts showing that the defendants did not believe the opinion or had no reasonable basis for offering it.[58]  The opinions at issue here were highly generalized and were heavily qualified by cautionary language warning that compliance with the DPA was not assured and that MoneyGram still had "a lot of work to do."  The PSLRA also establishes a statutory safe harbor that bars liability for forward-looking statements (including liability for omissions made in connection therewith) if there is sufficient cautionary language or if the complaint fails to allege specific facts showing that defendants had actual knowledge the prediction was false.[59]  As set forth on pages 5-6 above,

[56] *See id.* at *15 ("Plaintiffs provide no allegations that, despite any problems Western Union may have been experiencing, the company was not still a market leader in this realm").

[57] *See In re Supreme Indus., Inc. Secs. Litig.*, No. 3:17-CV-143-PPS/MGG, 2019 WL 1436022, at *8 (N.D. Ind. Mar. 29, 2019); *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015); *City of Livonia*, 711 F.3d at 758.

[58] *See Vallabhaneni*, 2016 WL 51260, at *15 (plaintiff failed to plead facts showing that opinion was not "reasonable" or was not "honestly believed") (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1332 (2015)); *Societe Generale Secs. Servs.*, 2018 WL 4616356, at *6 (allegations failed to show "that Caterpillar did not believe that it complied with tax laws and was cooperating with the investigation").

[59] *See In re Supreme Indus.*, 2019 WL 1436022, at *7-8 (dismissing claims based on safe harbor); *Societe Generale Secs. Servs.*, 2018 WL 4616356, at *5 (same).

MoneyGram cautioned investors about the risk that its compliance initiatives may not succeed. And again, the allegations do not show that Defendants' generalized statements were false.

### C. Plaintiffs' "Omissions" Claims Also Fail

The Complaint similarly fails to show that Defendants made any actionable omissions. An alleged failure to disclose noncompliance with a government order is inactionable when, as here, the company made no assurance of compliance and warned that it may not be found in compliance.[60] Defendants have no freestanding duty to disclose adverse material facts unless Plaintiffs establish through specific factual allegations that the omission renders an affirmative statement misleading or violates a legal duty.[61] Companies are not required to make confessions of uncharged crimes or unadjudicated violations.[62] Nor do generalized statements of optimism

---

[60] *See Bien v. LifeLock Inc.*, No. CV-14-00416-PHX-SRB, 2014 WL 7641546, at *5 (D. Ariz. Dec. 17, 2014) ("Because the statement at issue" [which, as here, did not guarantee compliance and warned about risk of noncompliance] "does not misrepresent LifeLock's compliance with the FTC Order, LifeLock was not obligated every company action that may have violated the FTC Order"), *aff'd, In re Lifelock, Inc. Secs. Litig.*, 690 Fed. Appx. 947, 955 (9th Cir. 2017) (fact that FTC subsequently moved for contempt failed to show that LifeLock's disclosures were misleading).

[61] *See Omnicare*, 135 S.Ct. at 1332 (plaintiff "must identify particular (and material) facts going to the basis for the issuer's opinion – facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have – whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context. . . . That is no small task for an investor"); *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1331 (7th Cir. 1995) ("Mere silence about even material information is not fraudulent absent a duty to speak"); *In re Guidant Corp. Secs. Litig.*, 536 F. Supp. 2d 913, 926-27 (S.D. Ind. 2008) ("A firm generally has no independent duty to disclose all information that might influence the price of its stock"); *id.* at 928 ("[T]here is *no* affirmative independent duty for a company to disclose all information that could potentially affect its stock price, unless such silence renders an affirmative statement misleading").

[62] *See Western Union*, 2019 WL 1382823, at *13 (no duty to confess wrongdoing); *Societe Generale Secs. Servs.*, 2018 WL 4616356, at *5 (no "confession of guilt" to "uncharged, unadjudicated claims" required); *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 906 (N.D. Ill.), *aff'd sub nom.* 269 F.3d 806 (7th Cir. 2001) (no "duty to confess contested charges").

19

like those at issue here trigger a duty to disclose adverse facts.[63] There is no allegation that the DOJ or FTC had determined by March 2017 that MoneyGram was in breach of the DPA. Read fairly and in context, the disclosures offered no assurance of compliance and were not misleading.

Plaintiffs also assert that Defendants had an affirmative duty to disclose the alleged shortcomings in their compliance program under Item 303 of Regulation S-K.[64] Courts within this district, however, have repeatedly held that Item 303 does not provide a private right of action under Section 10(b).[65] Even if it did, Item 303 does not require anything beyond MoneyGram's existing disclosures regarding the risks associated with fraud and noncompliance with the DPA

---

[63] *See Shemian v. Research in Motion Ltd.*, No. 11 Civ. 4068 (RJS), 2013 WL 1285779, at *20 (S.D.N.Y. Mar. 29, 2013) (holding that "general" positive statements are "too vague and inconsequential to give rise to any duty to disclose" unfavorable facts); *In re UBS AG Secs. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *31 (S.D.N.Y. Sept. 28, 2012) (because affirmative statements were "puffery," defendant "had no further duty to disclose"); *Anderson v. Spirit AeroSystems Holdings, Inc.*, 105 F. Supp. 3d 1246, 1260-61 (D. Kan. 2015) (statement that company is "making substantial improvements in our cost curves" is "too vague and indefinite to trigger a duty to disclose contrary information"), *aff'd*, 827 F.3d 1229 (10th Cir. 2016) (internal citations omitted); *In re Foxhollow Techs., Inc.*, No. C 06-4595 PJH, 2008 WL 2220600, at *26 (S.D. Cal. May 27, 2008) ("General positive statements do not give rise to a duty to disclose the details of internal corporate disputes"), *aff'd sub nom. In re Foxhollow Techs., Inc. Sec. Litig.*, 359 F. App'x 802 (9th Cir. 2009); *see also In re Int'l Bus. Mach. Corp. Secs. Litig.*, 163 F.3d 102, 110 (2d Cir. 1998) ("[T]here is no duty to update vague statements of optimism. . . .").

[64] *See* Compl. ¶¶ 178-81.

[65] *See Washtenaw County Empls. Ret. Sys. v. Walgreen Co.*, No. 15-cv-3187, 2016 WL 5720375, at *14 (N.D. Ill. Sept. 30, 2016) ("Within this district, however, it has been recognized that S-K 303(a) does not give rise to a private right of action under [Rule 10b-5]."); *Anderson*, 140 F. Supp. 2d at 909; *Kriendler v. Chem. Waste Mgmt., Inc.*, 877 F. Supp. 1140, 1157 (N.D. Ill. 1995) (Item 303 cannot be imported as a surrogate for Section 10(b)).

and FTC Order.[66]  Nor does Plaintiff adequately allege that the severity of the compliance issues were known to Defendants or were reasonably likely to cause a material financial impact.[67]

## IV.     THERE IS NO STRONG INFERENCE OF SCIENTER

The allegations also fail to demonstrate scienter for the reasons set forth in Sections I-III *supra*.  Even if MoneyGram's cautious and heavily qualified disclosures were misleading (which they were not), they were certainly not so blatantly and inarguably deficient as to be fraudulent.[68]

---

[66] *See Zagami v. Cellceutix Corp.*, 15 Civ. 7194 (KPF), 2016 WL 3199531, at *14-15 (S.D.N.Y. June 8, 2016) ("Plaintiff has not cited to case law suggesting that Item 303 requires this level of specificity" where company generally disclosed fact that clinical trials were capital-intensive and uncertain); *see also Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 39 (2d Cir. 2017) (Item 303 satisfied with disclosure that company was "generally vulnerable to changing regulations" in Hawaii); *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 235-36 (S.D.N.Y. 2018) (granting dismissal of Item 303/503 disclosure claim where company made general disclosure that its restaurants "have been associated with customer illness" on a "small number of occasions"); *Schaffer v. Horizon Pharma PLC*, No. 16-CV-1763 (JMF), 2018 WL 481883, at *14 (S.D.N.Y. Jan. 18, 2018) (dismissing Item 303/503 claims because existing risk disclosures were sufficient); *Tharp v. Acacia Communs., Inc.*, 321 F. Supp. 3d 206, 225 (D. Mass. 2018) (Item 303 satisfied by reference to "economic slowdown in China"); *In re SunEdison, Inc. Secs. Litig.*, 300 F. Supp. 3d 444, 467-68 (S.D.N.Y. 2018) (disclosures that company's "significant indebtedness" was "expect[ed] to continue" and required "significant cash flow" held sufficient).

[67] *See In re BHP Billiton Ltd. Secs. Litig.*, 276 F. Supp. 3d 65, 88-89 (S.D.N.Y. 2017) (even though BHP knew of significant risks to dam, plaintiffs failed to show that risk was likely to have material adverse effect on financials).

[68] *See In re Centerline Holdings Co. Secs. Litig.*, 613 F. Supp. 2d 394, 404 (S.D.N.Y. 2009) (alleged omissions are not "highly unreasonable" or reckless "when it is arguable that [the defendants] did not have a duty to disclose such information before they actually did"); *In re GeoPharma, Inc. Secs. Litig.*, 411 F. Supp. 2d 434, 448 (S.D.N.Y. 2006) ("To infer scienter from an arguably material omission, in the face of allegations that cut against such an inference, and in the absence of valid motive allegations, would be to expand the anti-fraud provisions of the securities laws beyond their intended scope"); *Sanders v. AVEO Pharm., Inc.*, No. 13-11157-DJC, 2015 WL 1276824, at *10 (D. Mass. Mar. 20, 2015) (no strong inference of scienter even if statements are arguably misleading when sufficiency of disclosures is "at least debatable"); *Ho v. Flotek Indus., Inc.*, 248 F. Supp. 3d 847, 857 (S.D. Tex. 2017) ("Even if Flotek could have provided clearer disclosures . . . Flotek's actual disclosures are not so blatantly misleading as to be severely reckless"), *aff'd*, 915 F.3d 975 (5th Cir. 2019); *Gamboa v. Citizens, Inc.*, A-17-CV-241-RP, 2018 WL 2107205, at *3 (W.D. Tex. May 7, 2018) (plaintiff "must show more than that it is debatable whether the disclosures were adequate").

Moreover, as in *Western Union*, Plaintiffs "make very few particularized allegations [indeed, there are none] about what the executives themselves knew at any given time" regarding any specific compliance shortcomings, let alone whether each Defendant knew at any specific point before the last challenged disclosure in March 2017 that the Government was likely to impose additional penalties.[69] Plaintiffs cannot rely on "group pleading" and must separately allege each defendant's role in each alleged misstatement and establish scienter separately for each party.[70] Plaintiffs likewise cannot allege "collective corporate scienter" and must establish that a specific individual made materially false disclosures with scienter to plead scienter as to MoneyGram.[71] The fact that the DOJ and FTC imposed sanctions and made assertions regarding MoneyGram's level of compliance does not constitute a particularized allegation of scienter.[72]

---

[69] *See Western Union*, 2019 WL 1382823, at *35.

[70] *See Cornielsen*, 916 F.3d at 600-01; *Rossbach v. VASCO Data Sec., Int'l Inc.*, No. 15-CV-06605, 2018 WL 4699796, at *9 (N.D. Ill. Sept. 30, 2018) (noting that Seventh Circuit has rejected group pleading and requires strong inference of scienter as to each defendant).

[71] *See U.S. ex rel. Heathcote Holdings Corp., Inc. v. William K. Walthers, Inc.*, 779 F. Supp. 2d 735, 738-39 (N.D. Ill. 2011) (rejecting "collective scienter" theory) (citing multiple cases for proposition that plaintiffs must personally establish scienter as to the corporate officer making the alleged misstatement); *Davis v. SPSS, Inc.*, 431 F. Supp. 2d 823, (N.D. Ill. 2006) .

[72] *See Alaska Elec. Pension Fnd. v. Asar*, -- Fed. Appx. --, 2019 WL 1567766, at * (5th Cir. Apr. 10, 2019) (affirming dismissal despite conclusion of independent Audit Committee investigation that "[named defendant CFO] and others had 'engaged in inappropriate historical accounting practices,' "'set an appropriate 'tone at the top'" and made certain accounting adjustments for the purpose of enhancing company's financial results); *Thorpe v. Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336, 1376 (S.D. Fla. 2015) (explaining that, "as state of mind is the key issue in analyzing scienter, unless [a government] investigation reveals each defendant's state of mind for the alleged fraud, the effect of the investigation on the scienter analysis is limited"); *In re ITT Educ. Servs., Inc. Sec. Litig.*, 34 F. Supp. 3d 298, 309 (S.D.N.Y. 2014) (stating that government investigations are "not tremendously probative" of scienter absent particularized findings of scienter); *Cho v. UCBH Holdings, Inc.*, No. C 09-4208 JSW, 2011 WL 3809903, at *12-13 (N.D. Cal. May 17, 2011) (holding that an FDIC report concluding that "UCB senior executives" engaged in "intentional misconduct" was insufficiently particularized to show scienter as to the CFO); *In re Bally Total Fitness Sec. Litig.*, No. 04 C 3530, 2007 WL 551574, at *2 (N.D. Ill. Feb. 20, 2007) ("vague and unspecific" Audit Committee findings insufficient to show scienter).

There is not a single specific allegation in the Complaint regarding the purported knowledge of Patsley, Holmes or any other Defendant regarding the alleged compliance shortcomings, nor do Plaintiffs allege that any other Defendant did anything other than sign SEC filings.[73] The two "confidential witnesses" – who are subject to a "heavy discount" in evaluating scienter[74] – purport only to be low-level members of MoneyGram's compliance or sales staff and provide no detail as to the timing or magnitude of the issues they describe, let alone allege any awareness by any Defendant at any particular time regarding any alleged shortcomings.[75] There is likewise no allegation that Juan Lozada-Leoni (the "whistleblower" cited in the Complaint) has any insight (or has even made any accusation) regarding any individual Defendant's personal awareness of any specific problems.[76] The criteria set forth in the DPA and FTC Order moreover are highly subjective,[77] which further weighs against any inference that Defendants knew

---

[73] *See, e.g., Pehlivanian v. China Gerui Advanced Materials Group, Ltd.*, 153 F. Supp. 3d 628, 653 (S.D.N.Y. 2015) ("To the extent that plaintiffs assert that defendants had access to contrary facts, the complaint must 'specifically identify the reports or statements containing this information.'") (citations omitted); *In re Societe Generale Sec. Litig.*, No. 08 CIV. 2495 RMB, 2010 WL 3910286, at *7 (S.D.N.Y. Sept. 29, 2010) ("***Plaintiffs must allege with particularity that defendants 'actually were aware of such [contrary] facts'***") (emphasis added).

[74] *See City of Livonia*, 711 F.3d at 759; *Material Yard Workers Local 1175 Ben. Funds v. Men's Wearhouse, Inc.,* No. H–09–3265, 2011 WL 3059229, at *6 (S.D. Tex. July 22, 2011) ("A party who presents the stories of unnamed people is neither giving the court nor the defendant a plain statement of the facts. . . . A secret witness is not far above a false witness.").

[75] *See* Compl. ¶¶ 108-115; *Rossy*, 169 F. Supp. 3d at 781 (rejecting CW allegations that "attribute no specific knowledge or conduct to any defendant that suggests he deliberately ignored an obvious risk that any of his statements was false"); *In re Career Educ. Corp. Secs. Litig.*, No. 03 C 8884, 2006 WL 999988, at *6 (N.D. Ill. Mar. 28, 2006) (Lefkow, J.) (rejecting allegations from 22 confidential witnesses "because plaintiff failed to identify the time period when any of the alleged activities at issue occurred or quantify in a meaningful manner the effects. . . .").

[76] *See* Compl. ¶ 124. Plaintiffs do not allege that Mr. Lozada had any communications or contact with any named Defendant or has any other specific insight as to any Defendant's state of mind.

[77] *See, e.g.,* Ex. 6, DPA Attachment C ¶¶ 3 (requirement to "design and implement a risk-based program"), 6-7 (requirement to "design and implement a remediation plan" to ensure "proper due diligence" and "enhanced due diligence"), 8 (requirement to review "maximum number of

MoneyGram would likely face additional penalties.[78]  Indeed, the absence of any assertion that the DOJ or FTC advised MoneyGram at any point before late 2017 that MoneyGram was in breach of its obligations (despite provisions in the DPA and FTC Order requiring regular reporting to the Government and allowing immediate Government action in event of improper activity) significantly weakens any inference that the individual Defendants knew MoneyGram would face additional penalties.[79]  The fact that MoneyGram invested $250 million in compliance upgrades since 2009 and was commended in the November 2018 DOJ and FTC filings for improving its compliance system further undercuts any inference that MoneyGram intended to commit fraud.

Plaintiffs' motive allegations are equally lacking.  The allegation that Patsley and Holmes "sold" stock at annual intervals each February (which, as reflected by the "Code F" designation

---

transactions feasible"), 9 (requirement to implement "risk-based program" using "best tools available"); *id.* Attachment D ¶ 5 (allowing MoneyGram to decline to implement recommendations from monitor that are "unduly burdensome," "impractical, costly or otherwise inadvisable"); Ex. 7, FTC Order pp. 7-8 (requirement to implement "comprehensive anti-fraud program that is reasonably designed to protect Consumers by detecting and preventing Fraud-Induced Money Transfers" and perform "due diligence," "adequate education and training" and "[p]rompt disciplinary action" against agents "where reasonably necessary" to prevent fraud).

[78] *See In re Allscripts, Inc. Secs. Litig.*, No 00 C 6796, 2001 WL 743411, at *11 (N.D. Ill. June 29, 2001) (rejecting scienter inference from alleged noncompliance with accounting rules that "involve complex calculations about which reasonable people can differ in opinion"); *Iron Workers Local No. 25 Pension Fund v. Oshkosh Corp.*, No. 08-C-797, 2010 WL 1287058, at *23 (E.D. Wisc. Mar. 30, 2010) (rejecting scienter allegations regarding analysis that was "highly subjective and [was] based on a number of factors"); *Reilly v. U.S. Phys. Therapy, Inc.*, No. 17 CIV. 2347, 2018 WL 3559089, at *19 (S.D.N.Y. July 23, 2018) (scienter allegations weak where relevant accounting standards "were complex and difficult to apply").

[79] *See Tellabs*, 551 U.S. at 326 ("omissions and ambiguities count against inferring scienter"); *Roofer's Pension Fund v. Papa*, No. 16-2805, 2018 WL 3601229, at *20 (D.N.J. July 27, 2008) (auditor approval of accounting method weighs against scienter); *Vallabhaneni*, 2016 WL 51260, at *13, 20 (fact that FDA allowed testing to proceed despite alleged concerns undermines scienter). The fact that MoneyGram was under close scrutiny by the monitor and the Government makes it even less compelling to infer that MoneyGram would knowingly make false public statements about its compliance status given the potential adverse consequence from the Government of an inaccurate public disclosure.  The strongest inference by far is that MoneyGram's cautious disclosures were reasonable and, at a minimum, nonfraudulent.

and footnotes in their Form 4 filings, were simply annual withholdings made by MoneyGram for the payment of tax liabilities in connection with the annual vesting of equity compensation awards, the timing of which was fixed years earlier) does not demonstrates scienter.[80]  The assertion that Defendants wanted to complete a merger and receive the highest price for their shares is likewise unavailing.[81]  Viewed holistically, the allegations do not support a strong inference of scienter.

## V.  PLAINTIFFS HAVE NOT PLED A SECTION 20(A) CLAIM

Having failed to plead a primary liability claim, Plaintiffs' control person claim fails.[82] Plaintiffs have also failed to allege sufficient facts showing that directors Lawry, Rao, Garza and Turner were control persons with respect to any specific alleged misstatements.[83]

## CONCLUSION

The Complaint should thus be dismissed with prejudice.  Dismissal of an initial consolidated complaint with prejudice is appropriate when, as here, the alleged misstatements are not actionable as a matter of law, making further amendment futile.  *See Kohl's*, 895 F.3d at 939-42 (affirming dismissal of initial consolidated securities complaint with prejudice); *Fannon v. Guidant Corp.*, 583 F.3d 995, 1001-02 (7th Cir. 2009) (same).

---

[80] *See* Compl. ¶¶ 119-20; Ex. 20 (Form 4 filings); *Pugh*, 521 F.3d at 695 ("because executives sell stock all the time, stock sales must generally be unusual or suspicious" to support scienter); *In re Supreme Indus.*, 2019 WL 1436022, at *10 (same; plaintiffs must also allege that sales are "dramatically out of line with prior trading practices") (internal quotations omitted); *In re Bausch & Lomb, Inc. Secs. Litig.*, 592 F. Supp. 2d 323, 344 (W.D.N.Y. 2008) (fact that sales occurred at "regular intervals" undercut inference of scienter; collecting cases).

[81] *See In re Guidant*, 536 F. Supp. 2d at 932 n. 20 (desire to complete pending merger does not create strong inference of fraud); *In Allscripts*, 2001 WL 743411, at *11 (alleged motive to complete acquisitions held insufficient).

[82] *See In re Allscripts*, 2001 WL 743411, at *12.

[83] *See Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937, 958-59 (N.D. Ill. 2003) (dismissing Section 20(a) claims against outside director and holding that allegation of director status is insufficient to plead control person liability).

RESPECTFULLY SUBMITTED,

GROTEFELD HOFFMAN LLP

By: /s/ Peter A. Stokes
    Howard L. Lieber (Bar ID# 6185701)
    311 South Wacker Drive, Suite 1500
    Chicago, Illinois 60606
    Telephone:  (312) 551-0200
    Email:  hlieber@ghlaw-llp.com

NORTON ROSE FULBRIGHT US LLP

    Scott P. Drake
    2200 Ross Avenue, Suite 3600
    Dallas, Texas 75201
    Telephone:  (214) 855-8341
    Email:
    scott.drake@nortonrosefulbright.com

    Gerard G. Pecht
    1301 McKinney, Suite 5100
    Houston, Texas 77010
    Telephone:  (713) 651-5243
    Email:
    gerard.pecht@nortonrosefulbright.com

    Peter A. Stokes
    98 San Jacinto Boulevard, Suite 1100
    Austin, Texas 78701-4255
    Telephone:  (512) 536-5287
    Email:
    peter.stokes@nortonrosefulbright.com

*Attorneys for Defendants*

26

## CERTIFICATE OF SERVICE

I certify that I filed this document on May 16, 2019 through the Court's ECF system, which automatically transmits the filing to all counsel of record for all parties in this litigation.

/s/ Peter A. Stokes