## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

KHONG MENG CHEW, et al.,
individually and on behalf of all others
similarly situated,

        Plaintiffs,

        v.

MONEYGRAM INTERNATIONAL,
INC., W. ALEXANDER HOLMES,
PAMELA H. PATSLEY, LAWRENCE
ANGELILLI, GANESH B. RAO,
ANTONIO O. GARZA, SETH W.
LAWRY, and W. BRUCE TURNER,

        Defendants.

Case No. 18-cv-7537

Judge Martha M. Pacold

## MEMORANDUM OPINION AND ORDER

Lead plaintiffs Norfolk County Retirement System and Ozgur Karakurt filed this lawsuit against MoneyGram International, Inc., three of its executives, Lawrence Angelilli, W. Alexander Holmes, and Pamela H. Patsley, and four of its directors, Seth W. Lawry, Ganesh B. Rao, W. Bruce Turner, and Antonio O. Garza, alleging violations of SEC Rule 10b-5 and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. Plaintiffs bring this suit on behalf of themselves and a putative class of others who purchased MoneyGram securities between February 11, 2014, and November 8, 2018. Defendants move to dismiss plaintiffs' amended complaint under Federal Rule of Civil Procedure 12(b)(6). [62]. For the reasons described below, defendants' motion is granted. The amended complaint, [55], is dismissed without prejudice.

## BACKGROUND

For purposes of defendants' motion to dismiss, the court accepts as true the well-pleaded factual allegations in plaintiffs' amended complaint, [55],[1] and draws all reasonable inferences in plaintiffs' favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). The court also considers the documents attached to the complaint, documents that are critical to the complaint and referred to in it, information that is

---

[1] Bracketed numbers refer to docket entries and are followed by page and / or paragraph citations. Page numbers refer to the CM/ECF page number.

subject to proper judicial notice, and additional facts set forth in plaintiffs' opposition to the motion to dismiss, to the extent those facts are consistent with the pleadings. *See Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013); *Larkin v. Bd. of Educ. of City of Chicago*, No. 17-cv-09298, 2020 WL 1904087, at *1–2 (N.D. Ill. Apr. 17, 2020).

## I.    MoneyGram's Organization

MoneyGram International, Inc. ("MoneyGram") is a global provider of financial services, including money transfer services. [55] ¶ 2. MoneyGram's money transfer services are provided by third-party agents at locations ranging from small "mom-and-pop" shops to multinational retailers like Walmart. *Id.* ¶ 40. Consumers who wish to transfer money through MoneyGram initiate a transaction, and the recipient may then collect the transferred funds from a MoneyGram location. *Id.* ¶ 41. In connection with each transfer, MoneyGram collects a fee based on the amount of funds transferred and the destination of the transfer. *Id.* ¶ 42.

The individual defendants held various positions within MoneyGram during the period relevant to plaintiffs' claims. Defendant Pamela H. Patsley served as Executive Chairman, then as Chairman and CEO, and then as Executive Chairman of the Board. *Id.* ¶ 30. Defendant W. Alexander Holmes served as Executive Vice President and CFO, then as Executive Vice President, CFO, and COO, then became CEO after Patsley, and later became Chairman of the Board. *Id.* ¶ 31. Defendant Lawrence Angelilli served as Senior Vice President, Treasurer, Senior Vice President of Corporate Finance, and then as Executive Vice President and CFO after Holmes became CEO. *Id.* ¶ 32. Defendants Seth W. Lawry, Ganesh B. Rao, W. Bruce Turner, and Antonio O. Garza joined MoneyGram's Board of Directors in April 2008, November 2008, May 2010, and April 2012, respectively. *Id.* ¶¶ 33–36.

## II.    MoneyGram's Agreements with Government Agencies

Money transfer services like MoneyGram's are attractive methods of payment for individuals engaged in fraud. *Id.* ¶ 43. This suit centers on MoneyGram's efforts to prevent such fraud. Years before the period from which plaintiffs' claims in this case allegedly arise, the Federal Trade Commission ("FTC") and the Department of Justice ("DOJ") investigated MoneyGram's fraud prevention systems based on allegations that the systems did not adequately protect consumers. *Id.* ¶¶ 3–4, 45–47, 54–55. To resolve those investigations, MoneyGram reached agreements with the agencies: an October 20, 2009 settlement with the FTC (the "2009 FTC Order") and a five-year deferred prosecution agreement ("DPA") with the DOJ that was announced on November 9, 2012. *Id.* ¶¶ 3–4. The agreements generally concluded that between 2003 and 2009, MoneyGram failed to adequately prevent or deter fraudulent activity despite knowing that its systems were being used to defraud consumers on a large scale. *Id.* The DPA additionally concluded that MoneyGram

was criminally culpable for this failure. *Id.* ¶¶ 4, 6. To resolve the agencies' allegations regarding MoneyGram's earlier activities, the company agreed to forfeit substantial sums of money—$18 million in connection with the 2009 FTC Order and $100 million in connection with the 2012 DPA. *Id.* ¶¶ 3, 6–7. MoneyGram also committed to undertaking remedial fraud prevention efforts. *Id.*

The 2009 FTC Order required MoneyGram to improve its anti-fraud program by taking steps that included enhancing investigations of MoneyGram agents who may be involved in fraud, firing or suspending agents who did not adequately prevent fraudulent money transfers, and developing a new system for receiving consumer complaints and data. *Id.* ¶ 48. The DPA gave MoneyGram five years to implement a series of improvements, including designing and implementing programs to comply with anti-fraud and anti-money laundering standards, improving transaction monitoring, and implementing a due-diligence program for MoneyGram agents who were the subject of more than one complaint in a 30-day period. *Id.* ¶ 60. The DPA also required MoneyGram to ensure that MoneyGram's anti-fraud system reviewed the "maximum number of transactions feasible" that originated in the United States. *Id.* And it required the company to provide the FTC with monthly updates of all consumer complaints alleging fraud-induced money transfers, and to broadly disclose to the DOJ any information related to fraud-induced money transfers, money laundering, and the company's anti-money laundering program. *Id.*

Additionally, to ensure that MoneyGram complied with its obligations, the DPA required MoneyGram to create an internal Compliance Committee and to appoint an external Monitor. *Id.* ¶¶ 59, 61. The Committee was chaired by Defendant Garza and included Defendants Lawry, Rao, and Turner. *Id.* ¶¶ 33–36, 59. It was tasked with overseeing MoneyGram's compliance with the DPA, reviewing the company's compliance program, receiving reports from MoneyGram's compliance employees, and advising the Board with respect to the compliance program. *Id.* ¶ 59. The Monitor was an attorney from an outside law firm who provided recommendations and reports to MoneyGram's Board, the Compliance Committee, and the DOJ. *Id.* ¶ 61. The Monitor provided five annual reports during the five-year duration of the DPA. *Id.*

## III.   Defendants' Allegedly Fraudulent Statements

The proposed class of plaintiffs in this putative class action consists of investors who purchased MoneyGram securities between February 11, 2014 and November 8, 2018 (the "class period"). *Id.* ¶ 1. Plaintiffs allege that, during that period, defendants made a series of materially false or misleading statements about MoneyGram's fraud-prevention efforts and the company's compliance with its obligations under the 2009 FTC order and the DPA. The court will discuss the statements more specifically below, but the crux of plaintiffs' allegations is that, through various public statements and filings, defendants assured investors that

MoneyGram's compliance efforts were effective at a time when those efforts were, in fact, deficient. *See id.* ¶¶ 64–75.

Plaintiffs contend that defendants' statements gave investors an unduly rosy picture of MoneyGram's compliance position, causing artificial inflation in MoneyGram's stock price. *Id.* Plaintiffs allege that they purchased MoneyGram's stock at these inflated prices, and that they lost money when the stock price later fell after the truth came out. *Id.* ¶¶ 76–91.

## IV. MoneyGram's Compliance Difficulties Come to Light

While the parties dispute whether any of defendants' statements about MoneyGram's compliance efforts were false or misleading, there is no dispute that MoneyGram's compliance efforts ultimately failed to satisfy the DOJ and the FTC. The first clear and public signs of trouble came in November 2017, when the DOJ did not allow the DPA to expire after the contemplated five years and instead required MoneyGram to agree to extend the DPA. *Id.* ¶¶ 77–78. The DPA was then extended six more times—until September 2018—while the DOJ continued to assess MoneyGram's compliance. *Id.* ¶¶ 14, 77. Throughout this period of extensions, defendants' statements to investors became correspondingly gloomier, reflecting concerns about negative impacts on revenue and disclosing that MoneyGram had reserved $85 million in connection with a possible resolution of the DPA. *See id.* ¶¶ 78–85. MoneyGram later announced that it had increased those reserves from $85 million to $95 million. *Id.* ¶ 86.

Ultimately, on November 8, 2018—the last day of plaintiffs' proposed class period—the DOJ and FTC announced that MoneyGram had breached the 2009 FTC order and the DPA. *Id.* ¶ 88. To rectify these breaches, MoneyGram agreed to pay $125 million in forfeitures and to further extend the DPA for three more years. *Id.*; [55-1]. The FTC and MoneyGram also stipulated to the issuance of a second order. [55-2]. The agencies' conclusions were based on their findings that MoneyGram's anti-fraud policies were not sufficiently rigorous, that the company did not adequately vet or monitor agents to prevent fraud, that the company had not fully complied with its obligation to share all consumer complaints with the FTC, and that the company's fraud interdiction software had been ineffective from April 2015 to October 2016. [55] ¶ 94.

Each of these disclosures was followed by a drop in MoneyGram's stock price. After MoneyGram announced the first short-term extension of the DPA on November 2, 2017, for example, the stock price dropped from a closing price of $15.38 per share on November 2, 2017 to $14.54 per share on November 3, 2017. *Id.* ¶¶ 79–80. After the company announced its reservation of $85 million, the stock price dropped from a closing price of $9.52 per share on March 16, 2018 to $9.35 per share on March 19, 2018. *Id.* ¶¶ 81–82. And, following the DOJ's and FTC's November 8, 2018

announcement, MoneyGram's stock price dropped from a closing price of $4.47 per share on November 8, 2018 to $2.27 per share on November 9, 2018. *Id.* ¶¶ 88–90.

Less than a week after this final announcement, plaintiffs filed this suit, alleging violations of SEC Rule 10b-5 and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). [1]. Plaintiffs later filed an amended complaint. [55]. Defendants move to dismiss under Rule 12(b)(6). [62].

## LEGAL STANDARD

A motion to dismiss pursuant to Rule 12(b)(6) challenges the sufficiency of the complaint. *Hallinan v. Fraternal Ord. of Police Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). When reviewing a motion to dismiss under Rule 12(b)(6), the court "accept[s] as true all factual allegations in the complaint and draw[s] all permissible inferences in plaintiffs' favor." *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 365 (7th Cir. 2018). A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[N]aked assertion[s] devoid of further factual enhancement" are insufficient. *Id.* (quoting *Twombly*, 550 U.S. at 557).

Claims alleging fraud must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure Rule 9(b). That rule requires a party to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "That includes the 'who, what, when, where, and how' of the fraud." *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 634 (N.D. Ill. 2020) (quoting *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 338 (7th Cir. 2019)), *aff'd sub nom. Nat'l Elevator Indus. Pension Fund v. Conagra Brands, Inc.*, No. 21-1155, 2022 WL 1449184 (7th Cir. May 9, 2022). "Each instance of fraud must be alleged with 'precision and some measure of substantiation.'" *Id.* (quoting *Menzies*, 943 F.3d at 338).

Claims alleging securities fraud under the Exchange Act must also meet the "exacting pleading requirements" of the Private Securities Litigation Reform Act ("PSLRA"). *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007) *("Tellabs II")*. Under those requirements, "[a]ny complaint alleging a material misstatement or omission must also 'specify each statement alleged to have been misleading' and the 'reason or reasons why the statement is misleading.'" *Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 599 (7th Cir. 2019) (quoting 15 U.S.C. § 78u-4(b)(1)). The Act also dictates that, "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). And it further requires that "complaints alleging securities fraud 'state with particularity facts giving rise to a strong inference that the defendant acted with the

required state of mind.'" *Cornielsen*, 916 F.3d at 598–99 (quoting 15 U.S.C. § 78u-4(b)(2)(A)).

## ANALYSIS

Plaintiffs' amended complaint alleges violations of § 10(b) of the Exchange Act, *see* 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, *see* 17 C.F.R. § 240.10b-5, as well as violations of § 20(a) of the Exchange Act, *see* 15 U.S.C. § 78t(a).

## I.    Violation of § 10(b) and Rule 10b-5 (Count 1)

Section 10(b) of the Exchange Act provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j; *see Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 156 (2008). Pursuant to § 10(b), the SEC promulgated Rule 10b–5, which makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. "Rule 10b–5 encompasses only conduct already prohibited by § 10(b)." *Stoneridge*, 552 U.S. at 157.

A claim under § 10(b) and Rule 10b-5 requires: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id*.

Defendants' motion to dismiss argues that plaintiffs have not adequately alleged that defendants made material misrepresentations or omissions. Defendants also argue that plaintiffs' allegations do not support a strong inference that defendants acted with scienter. The court will consider each argument in turn.

## A.      Material Misstatements or Omissions

To state a claim under § 10(b) and Rule 10b-5, the complaint must specify each statement or omission alleged to be false or misleading and the reasons why it is false or misleading. *Cornielsen*, 916 F.3d at 599; 15 U.S.C. § 78u-4(b)(1). Merely claiming that a particular statement was false or misleading is not enough; plaintiffs must explain, with particularity, the factual basis for their assertion that the statement was false or misleading. *See Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 933 (N.D. Ill. 2015).

Not all omissions are actionable under § 10(b) and Rule 10b-5. Rule 10b–5(b) "prohibits omitting material facts necessary to make the 'statements made . . . not misleading,'" but it "does not proscribe pure omissions." *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 264 (2024) (alteration in original). In other words, "§ 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information." *Id.* (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011); *see also Chandler v. Ulta Beauty, Inc.*, No. 18-CV-1577, 2022 WL 952441, at *6 (N.D. Ill. Mar. 30, 2022) ("A company does 'not have a freestanding legal duty to disclose . . . scandal, no matter how unseemly the scandal was and no matter how significant the scandal would have been to the market.'" (omission in original) (quoting *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 752 (S.D.N.Y. 2017))). Instead, "[d]isclosure is required under these provisions only when necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading." *Macquarie*, 601 U.S. at 264 (internal quotation omitted) (quoting *Matrixx Initiatives*, 563 U.S. at 44).

On a motion to dismiss, "the relevant question for deciding whether a statement is misleading is 'whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission.'" *W. Palm Beach Firefighters' Pension Fund*, 495 F. Supp. 3d at 638 (quoting *Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006), *rev'd on other grounds by Tellabs II*, 551 U.S. 308 (2007)). Whether a statement is misleading "depends on the perspective of a reasonable investor: The inquiry . . . is objective." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186–87 (2015).

Determining whether a statement was false or misleading becomes more complicated when the statement is an expression of opinion. Some statements are "pure statements of opinion"—statements that communicate only the content of the speaker's belief. *Omnicare*, 575 U.S. at 183–84, 186. Others "contain embedded

statements of fact," such as if the CEO of a TV manufacturer said, "I believe our TVs have the highest resolution available *because we use a patented technology to which our competitors do not have access*." *Id.* at 185 (emphasis added). Despite beginning with the phrase "I believe," the latter statement "may be read to affirm not only the speaker's state of mind . . . , but also an underlying fact: that the company uses a patented technology." *Id.* (citing *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1109 (1991) (Scalia, J., concurring in part and concurring in the judgment)).[2]

A pure statement of opinion is actionably false only if the opinion was not "honestly held" by the speaker. *Id.* at 186. In other words, "a sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong." *Id.* In contrast, an opinion statement that contains an embedded factual assertion may be actionable "not only if the speaker did not hold the belief she professed but also if the supporting fact she supplied were untrue." *Id.* at 185–86.

Under some circumstances, an opinion statement may also be rendered actionably misleading by the omission of facts that contradict or severely undermine the belief. If, for example, an issuer made the statement, "we believe our conduct is lawful," a reasonable investor might "expect[] such an assertion to rest on some meaningful legal inquiry." *Id.* at 188. If it turned out that the issuer had not consulted a lawyer or had made the statement despite receiving legal advice contradicting the statement, a court might find the issuer's opinion statement to be actionably misleading because it did not "fairly align[] with the information in the issuer's possession at the time." *Id.* at 188–89. That said, "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts," and "whether an omission makes an expression of opinion misleading always depends on context." *Id.* at 189–90. To adequately allege liability in such instances, plaintiffs "must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it

---

[2] The Seventh Circuit has not squarely decided whether the reasoning of *Omnicare*, which discussed opinion statements in the context of § 11 of the Securities Act of 1933, also applies to claims brought under § 10(b) of the Exchange Act and Rule 10b-5. The parties do not raise this issue, however, and no party argues that *Omnicare* does not apply in this case. Moreover, the relevant portions of § 11 and Rule 10b-5 "contain virtually identical prohibitions," the Court in *Omnicare* explained that the principles it discussed were "not unique to § 11," and courts have applied *Omnicare* to claims brought under § 10(b) and Rule 10b-5. *See W. Palm Beach Firefighters' Pension Fund*, 495 F. Supp. 3d at 648 (collecting cases and assuming that *Omnicare* applies to claims brought under § 10(b) and Rule 10b-5); *see also Phoenix Ins. Co. v. ATI Physical Therapy, Inc.*, 690 F. Supp. 3d 862, 882 n.11 (N.D. Ill. 2023) (citing *W. Palm Beach Firefighters' Pension Fund* and concluding that *Omnicare* applies to claims under § 10(b) and Rule 10b-5). And the Seventh Circuit has applied *Omnicare* beyond § 11 in at least one instance. *See Smykla v. Molinaroli*, 85 F.4th 1228, 1236–39 (7th Cir. 2023) (applying *Omnicare* in a case brought under § 14(a) of the Exchange Act). The court therefore assumes that *Omnicare* applies here.

did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Smykla v. Molinaroli*, 85 F.4th 1228, 1236 (7th Cir. 2023) (quoting *Omnicare*, 575 U.S. at 194). This is "no small task." *Id.* (quoting *Omnicare*, 575 U.S. at 194).

Even if a statement is false or misleading, it will give rise to liability only if it is false or misleading as to a "*material*" fact. *Matrixx Initiatives*, 563 U.S. at 38 (emphasis in original). A statement is material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Smykla*, 85 F.4th at 1235–36 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). In other words, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 1236 (quoting *TSC Indus.*, 426 U.S. at 449). This standard is objective. *See Omnicare*, 575 U.S. at 186–87. Materiality is normally a question of fact, but it may be resolved as a matter of law "when the information at issue is so obviously unimportant that reasonable minds could not differ." *Smykla*, 85 F.4th at 1236; *see also Vallabhaneni v. Endocyte, Inc.*, No. 1:14-cv-01048-TWP-MJD, 2016 WL 51260, at *15 (S.D. Ind. Jan. 4, 2016) ("Courts frequently consider loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker that no reasonable investor could find them important to the total mix of information available to be immaterial as a matter of law." (citation and internal quotation marks omitted)).

The amended complaint alleges that dozens of defendants' statements and omissions were materially false or misleading. [55] ¶¶ 127–177. The court will analyze the statements by category.

### 1. Statements Reporting MoneyGram's General Business Performance

As described above, plaintiffs' allegations of securities fraud center on MoneyGram's compliance shortcomings. But several of the statements identified by plaintiffs as allegedly misleading had little to do with compliance. Instead, these statements simply described MoneyGram's general financial outlook and performance metrics. *See, e.g.*, [55] ¶ 149 (quoting Defendant Patsley's remarks from a July 31, 2015 earnings call: "[T]his was a really solid quarter for MoneyGram. Our results reflect significant progress MoneyGram has made toward executing the strategic initiative we outlined at the beginning of the year. We returned to constant currency growth, posted the largest number of money transfer transactions in our history, and accelerated both our self-service revenue and transaction growth."); *id.* ¶ 150 (further quoting Patsley's remarks: "[T]otal money transfer transactions this quarter were the highest in our history, growing 6% year over year. This is a significant improvement from flat year-over-year transaction growth last quarter. . . . [C]learly this is exceptional growth on a large business base."); *id.* ¶ 151 (quoting

Defendant Holmes's remarks from the same earnings call: "[T]he second quarter represents an inflection point for MoneyGram's top line, and we delivered results that were slightly ahead of our internal expectations. We saw an impressive acceleration in our money transfer business and returned to total Company constant currency revenue growth in the quarter."); *see also id.* ¶¶ 143, 157, 175 (identifying substantially similar statements).

Plaintiffs do not meaningfully contend that these statements were literally false. Instead, plaintiffs argue that these statements were misleading because, at the time the statements were made, MoneyGram's revenue was allegedly inflated by the transfer fees the company was receiving on fraudulent transactions that it was failing to block. *See id.* ¶¶ 145, 153, 159, 176. According to plaintiffs' argument, given the allegedly deficient nature of MoneyGram's fraud-prevention systems, MoneyGram executives could not tout MoneyGram's general business success without specifically cautioning that some of the success was based on fees the company collected from fraudulent transfers.

This argument is not persuasive. No reasonable investor would have understood these statements regarding the company's overall performance to have any bearing on MoneyGram's compliance outlook. Nor were the statements misleading merely because they did not include a specific disclaimer regarding the company's alleged compliance shortcomings. Indeed, plaintiffs' position, if accepted, would drastically narrow the general rule that "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b–5." *Macquarie*, 601 U.S. at 265 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)). To be sure, defendants did not remain completely silent; they made statements about MoneyGram's overall performance metrics. But the statements bore no meaningful relation to MoneyGram's compliance efforts or fraud-detection systems. If making general statements about a company's performance were sufficient to impose a duty to disclose any and all risks—however remote—that might later negatively impact that performance, nearly every public-facing corporate executive would be regularly liable for securities fraud. *See In re Siebel Sys., Inc. Sec. Litig.*, No. C 04-0983 CRB, 2005 WL 3555718, at *4 (N.D. Cal. Dec. 28, 2005) ("That a new program has kinks does not make a positive statement about the program false. If that were the case, the federal securities laws would prevent software companies from making any positive statements about new software."). While in some cases, where a company is on the brink of disaster, a spokesperson's unqualified celebration of the company's general financial success could conceivably be misleading, nothing in plaintiffs' complaint suggests that this was such a case. Instead, although MoneyGram's compliance initiatives may have been facing some headwinds, the company's risk of noncompliance was not so severe as to render defendants' unrelated statements about the company's general financial results misleading.

## 2. Statements Reporting Compliance Expenditures and Prevented Fraud Losses

Plaintiffs also highlight two of MoneyGram's public filings in which the company claimed to have invested over $120 million in compliance and anti-fraud programs since 2009 and to have prevented more than $365 million in fraud losses over the same period. *See* [55] ¶ 129 (identifying statements in a Form 8-K MoneyGram filed on February 11, 2014); *id.* ¶ 132 (identifying statements in MoneyGram's March 3, 2014 Form 10-K). Plaintiffs do not allege facts suggesting that these descriptions were false. Rather, plaintiffs contend that these descriptions misleadingly suggested MoneyGram was investing "sufficient funds" and "taking adequate measures to effectively prevent fraud" at a time when MoneyGram's measures were in fact inadequate. *Id.* ¶ 133; *see also id.* ¶ 130.

This argument fails to persuade. To be sure, unlike the previous category of statements, these statements did relate to MoneyGram's compliance efforts. But no reasonable investor would have understood these statements to offer assurances about MoneyGram's long-term compliance with its obligations under its agreements with the FTC and DOJ. The statements were truthful descriptions of the company's fraud prevention expenditures and outcomes—nothing more. A corporation and its officers are entitled to make truthful reports of specific expenditures or performance metrics without incurring an obligation to air every ounce of the corporation's dirty laundry. While in some instances, the context in which a literally true statement is made might render the statement misleading, there is no such context here.

In fact, the context here made clear that MoneyGram still had significant work to do to comply with its obligations. As part of the DPA, MoneyGram agreed in November 2012 to make significant improvements and investments in compliance over the course of the following five years. [55] ¶ 60; [65-6]. Plaintiffs do not allege that MoneyGram failed to adequately disclose that agreement. Moreover, the challenged statement in MoneyGram's March 3, 2014 Form 10-K was immediately followed by a statement that the company had launched its Compliance Enhancement Program in December of 2013—just months before the challenged statements. [65-1] at 31; [55] ¶ 132. And the Forms 10-K that MoneyGram filed annually with the SEC—including the March 3, 2014 Form 10-K that contained one of the challenged statements—included specific cautionary language about the risks of failing to make adequate progress under the DPA. *See* [65-1] at 17. Under these circumstances no reasonable investor would have understood MoneyGram's narrow, factual, and historical statements as assurances that MoneyGram had resolved its compliance challenges in the blink of an eye—just over a year after announcing the DPA and mere months after the initial launch of the company's Compliance Enhancement Program. *See In re Telefonaktiebolaget LM Ericsson Sec. Litig.*, 675 F. Supp. 3d 273, 292–94 (E.D.N.Y. 2023) (concluding that a company's statements in the wake of entering into a DPA, including assurances that "we cooperate fully [with government agencies] . . . we have a culture where we have zero tolerance when it comes to

corruption and that we comply with all rules fully," were not actionably misleading because the DPA included findings suggesting that further compliance enhancements were needed and because the company had "warned investors about the possibility of compliance failures and enforcement penalties" (alterations in original)). Plaintiffs therefore have not adequately alleged that MoneyGram's reports of its compliance expenditures and prevented fraud losses were actionably misleading.

### 3. Statements Describing the Purpose of Compliance Programs

Plaintiffs also point to statements that described the purpose or goal of MoneyGram's compliance enhancement program. *See* [55] ¶ 132 (quoting from MoneyGram's March 3, 2014 Form 10-K: "In December of 2013, we launched our Compliance Enhancement Program, which is focused on improving our services for the consumers and completing the programs recommended in adherence with the DPA."); *id.* ¶ 167 (quoting from MoneyGram's March 2, 2016 Form 10-K: "Our compliance enhancement program is focused on improving our services for the consumers and completing the programs recommended in adherence with our settlement with the U.S. Attorney's Office for the Middle District of Pennsylvania ('MDPA') and the Asset Forfeiture and Money Laundering Section of the Criminal Division of the Department of Justice ('U.S. DOJ')."); *id.* ¶¶ 135, 137, 141, 147, 155 (excerpting identical statements from Forms 10-Q that MoneyGram filed between May 2014 and August 2015: "Our compliance enhancement program is focused on improving our services for the consumers and completing the programs recommended in adherence with our settlement with the MDPA and U.S. DOJ."); *id.* ¶ 175 (quoting from MoneyGram's March 16, 2017 Form 10-K: "Our compliance enhancement program is focused on improving our services for consumers and completing the programs recommended in adherence with the DPA.").

Plaintiffs do not contend that these descriptions falsely portrayed the purpose of the compliance enhancement program. Instead, plaintiffs argue that these statements misleadingly implied that MoneyGram was taking "appropriate measures" to comply with its obligations under the 2009 FTC Order and the DPA. *Id.* ¶¶ 134, 136, 138, 142, 148, 156, 168, 177. In support of this argument, plaintiffs cite cases in which courts concluded that defendants had made actionably misleading statements by predicting that their conduct complied with applicable laws and regulations. *See, e.g.*, *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 479–80 (6th Cir. 2014); *Gov't of Guam Ret. Fund v. Invacare Corp.*, No. 1:13CV1165, 2014 WL 4064256, at *3–4, 7 (N.D. OH. Aug. 18, 2014).

Plaintiffs' cases are doubly distinguishable. First, the defendants in those cases made explicit predictions and assurances about their compliance. *See In re Omnicare, Inc. Sec. Litig.*, 769 F.3d at 477–78 (quoting defendants as stating that "[w]e believe that our billing practices materially comply with applicable state and federal requirements" and that "we believe that we are in compliance in all material

12

respects with federal, state and local laws") (emphasis omitted)); *Invacare*, 2014 WL 4064256, at *3–4 (noting that the defendants had assured investors that the company "has addressed" concerns raised by an FDA inspection and had stated that "[t]he company has established numerous policies and procedures that the company believes are sufficient to ensure that the company will operate in substantial compliance with . . . laws and regulations." (emphasis omitted)).  Here, by contrast, defendants made no such assurances.  No reasonable investor would have understood defendants' statements as promising—or even predicting—that defendants' compliance efforts would be found to satisfy MoneyGram's obligations.  Indeed, these statements were limited to descriptions of the *purpose* of MoneyGram's efforts; they made no claims whatsoever about the *results* of those efforts.  *See In re Citigroup Sec. Litig.*, No. 20 CIV. 9132 (LAP), 2023 WL 2632258, at *14–16 (S.D.N.Y. Mar. 24, 2023) (concluding that a company's statement that its "compliance organization is designed to protect [the company] . . . by managing adherence to applicable laws [and] regulations" was "nothing more than [a] 'simple and generic assertion[]'" that was "not materially misleading absent significantly more detailed 'assurances of actual compliance.'" (quoting *Singh v. Cigna Corp.*, 918 F.3d 57, 64 (2d Cir. 2019))); *In re Telefonaktiebolaget LM Ericsson Sec. Litig.*, 675 F. Supp. 3d at 283, 290–92 (concluding that a company's statements touting its "zero tolerance approach to corruption" that was "implemented . . . throughout its global organization with a set of policies and processes" were inactionable because they were "'simple and generic assertions' regarding [the company's] commitment to regulatory compliance and anti-corruption measures" (quoting *Singh*, 918 F.3d at 64)); *see also Citigroup*, 2023 WL 2632258, at *14 (concluding that a company's touting of its "risk governance framework" and its "policies, procedures, and processes" that were "designed to protect [the company]" and to control risk was not actionable because the company's statements were "exactly the types of routine representations of risk-management practices that almost every . . . bank makes and which are inactionable" (internal quotation marks omitted)).  And, as discussed above, MoneyGram's discussions of the 2009 FTC order and the DPA made clear that compliance was a work in progress.

Second, even if defendants' statements could be understood to predict that defendants were in material compliance with their obligations, plaintiffs have not adequately alleged that any such predictions were unjustified at the time they were made.  In both of the cases upon which plaintiffs rely, the defendants had made their assurances despite receiving clear indications of noncompliance.  In *In re Omnicare, Inc. Securities Litigation*, one of the company's internal audits had revealed "substantial fraud" and "billing irregularities," and another showed that the company's pharmacies "were in violation of numerous statutory and regulatory requirements" and "were submitting false and fraudulent Medicare and Medicaid claims."  769 F.3d at 478–79.  And in *Invacare*, the company had made assurances of compliance despite receiving upwards of six warnings of noncompliance from the FDA, including a formal warning letter that warned of the possibility of "serious problems in [the company's] manufacturing and quality assurance systems."  2014 WL 4064256 at *5–6 (emphasis omitted).  Here, plaintiffs do not allege that

defendants had received any comparable indicators of noncompliance. They therefore have not satisfied their burden under the PSLRA. *See Smykla v. Molinaroli*, 85 F.4th 1228, 1236 (7th Cir. 2023) ("The investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.").

### 4. Statements Praising Compliance Efforts

Plaintiffs additionally dispute a series of statements in which defendants expressed optimism or described progress relating to MoneyGram's compliance efforts.

***Vague descriptions.*** First, plaintiffs identify several statements that only vaguely describe MoneyGram's compliance investments in positive terms and espouse optimistic predictions about the future of the compliance efforts. *See* [55] ¶ 129 (quoting a Form 8-K MoneyGram filed on February 11, 2014: "The Company will continue to advance its leadership in global compliance by implementing market-leading systems, technology, and processes, and increasing agent oversight around the world."); ¶ 152 (quoting Holmes's remarks from a July 31, 2015 earnings call: "[W]e believe the systems and program changes we're implementing position MoneyGram at the forefront of compliance programs in the money transfer industry."); ¶ 157 (quoting Patsley's remarks from an October 30, 2015 earnings call: "[W]e are investing in a world-class compliance engine that is not only core to our business but a true competitive advantage that we can leverage in the future.").

These types of "vague statements about industry leadership . . . and expressions of optimism are generally considered 'puffery' and are not actionable." *Vallabhaneni v. Endocyte, Inc.*, No. 1:14-cv-01048-TWP-MJD, 2016 WL 51260, at *15 (S.D. Ind. Jan. 4, 2016) (citing *Searls v. Glasser*, 64 F.3d 1061, 1066–67 (7th Cir. 1995)). This is because such generalized statements are "too vague to constitute [] material statement[s] of fact" to a reasonable investor. *Searls*, 64 F.3d at 1066; *see also Kuebler v. Vectren Corp.*, 13 F.4th 631, 638 (7th Cir. 2021) ("Excessively vague, generalized, and optimistic comments—the sorts of statements that constitute puffery—aren't those that a 'reasonable investor,' exercising due care, would view as moving the investment-decision needle—that is, they're not material." (quotation omitted)).

Indeed, in a very similar case alleging that MoneyGram's chief competitor committed securities fraud by failing to adequately disclose the competitor's compliance deficiencies, the district court found similar statements to be "nothing more than mere puffery consisting of vague corporate optimism." *See Smallen v. W. Union Co.*, No. 17-CV-00474-KLM, 2019 WL 1382823, at *7–8 (D. Colo. Mar. 27, 2019) (addressing statements that characterized the company as "fully engaged in the fight

against money laundering and fraud" and "committed to helping protect its customers against fraud and other financial crimes"), *aff'd*, 950 F.3d 1297 (10th Cir. 2020); *id.* at *15 (addressing statements that described the company as a "market leader" in connection with its compliance efforts and noting that the plaintiffs "provide[d] no allegations that, despite any problems Western Union may have been experiencing, the company was not still a market leader in this realm"); *see also Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) ("[G]eneral statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are too general to cause a reasonable investor to rely upon them." (quotation omitted)).

***Statements Touting Progress.*** The amended complaint also points to various statements in which defendants indicated general positive feelings about the company's compliance efforts to date.

- On October 31, 2014, MoneyGram released a press release that was signed by Defendant Holmes and quoted Defendant Patsley as stating that the company's compliance programs were "executing well" and that the company was "pleased with the progress" on compliance initiatives. [55] ¶ 139.

- On May 1, 2015, MoneyGram released a press release that quoted Defendant Patsley as stating: "We have made *significant progress* on our global transformation initiative with the April launch of the first module in our new *market-leading compliance system* and the opening of our new global business center in Poland earlier this year." *Id.* ¶ 143 (emphasis added). Patsley continued: "The global transformation program we announced in February of last year is a complex initiative requiring significant investment, steadfast dedication and broad coordination across the entire organization. *Midway through the program, I am pleased with our progress and recent success.* When fully implemented, this program will result in a more efficient company with enhanced global compliance capabilities." *Id.* (emphasis added).

- On October 30, 2015, Defendant Holmes stated on a quarterly earnings call that "[b]eing a leader in compliance is so critical for us and not just for compliance with our DPA but also for relationships with banks and global initiatives around the world." *Id.* ¶ 158. He continued: "*We will continue to invest until we get it right, but we feel good about the outlook we have right now.*" *Id.* (emphasis added).

- On February 11, 2016, Defendant Holmes stated on a quarterly earnings call: "Looking back over the past couple of years, I am extremely pleased with all of the progress that we have made. We've completely overhauled our on-line experience, launched kiosks, added millions of mobile wallets, connected to almost 2 billion bank accounts and *made investments into our core compliance* and point of sale technology." *Id.* ¶ 163 (emphasis added). Holmes also

15

described positive financial and transaction growth and noted that "2015 was a transition year" in which the company continued to invest in various objectives, including compliance. *Id.* ¶ 162. Regarding compliance specifically, the complaint excerpts a paragraph of the press release. *Id.* ¶ 163. That paragraph reads in full: "On the compliance front, as you know, the current regulatory environment isn't getting any easier, and this is an area in which we must invest. In 2015, *we continue to make steady progress* on our compliance enhancement program activities and rolled out key functionality. *While we still have a lot of work to do to complete the program, I know that we are making the right investments and that the end result of this project will position MoneyGram at the forefront of our industry*." [65-18] at 6 (emphasis added); *see also* [55] ¶ 163.

Plaintiffs contend that these statements were false or misleading and that any optimism regarding MoneyGram's progress toward compliance with the DPA was unfounded, given the state of MoneyGram's compliance efforts. Plaintiffs read into defendants' statements an implicit assurance that MoneyGram would ultimately be found to have complied with the 2009 FTC order and the DPA. Based on the FTC's and DOJ's eventual conclusions that MoneyGram had failed to comply with those orders, plaintiffs argue that defendants were misleadingly describing progress in a system that was failing.

Plaintiffs' argument is unpersuasive. First, like the vague descriptors discussed above, these statements are once again merely vague, aspirational puffery regarding MoneyGram's progress and future outlook. *See W. Union Co.*, 2019 WL 1382823, at *30 (concluding that similar statements made by MoneyGram's chief competitor were puffery or were not demonstrably false because the statements were "all either forward-looking statements predicting competitive advantages eventually to be gained from large, ongoing compliance investments or present-tense statements of opinions regarding the competitive advantages of having already established compliance infrastructure in more than 200 countries" (internal quotation marks omitted)); *City of Taylor Police and Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 595 (7th Cir. 2021) (suggesting that a CEO's description of a project as "progressing as planned" was not actionable despite difficulties with the project because the statement "did not make any concrete assertion" and "expressed only vague optimism"); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 870 (5th Cir. 2003) ("[T]he representation . . . that Azurix was 'making steady progress' is precisely the sort of generalized positive characterization that is not actionable under the securities laws."); *City of Warwick Mun. Empls. Pension Fund v. Rackspace Hosting, Inc.*, No. 17 Civ. 3501 (JFK), 2019 WL 452051, at *5 (S.D.N.Y. Feb. 5, 2019) (concluding that statements that the company has made "good progress" were inactionable puffery). Defendants' descriptions of progress therefore are not actionable.

Second, even if the statements were not puffery, plaintiffs have not adequately alleged that the statements were false or misleading at the time they were made.

16

These statements predominantly involve statements of opinion. Plaintiffs' complaint contains no particularized allegation that the speakers did not honestly hold the opinions they expressed. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015) ("[A] sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong."); *see also Societe Generale Sec. Servs., GbmH v. Caterpillar, Inc.*, No. 17 CV 1713, 2018 WL 4616356, at *6 (N.D. Ill. Sept. 26, 2018) (holding that the plaintiff's claims failed because the plaintiff did not adequately allege that the defendants' statements of belief were false at the time they were made). Nor have plaintiffs adequately alleged that the opinion statements were misleading.

As described above, to allege that an opinion statement was misleading, plaintiffs "must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Smykla v. Molinaroli*, 85 F.4th 1228, 1236 (7th Cir. 2023) (quoting *Omnicare*, 575 U.S. at 194). Plaintiffs have not carried this burden. To support their contention that defendants' opinions were unjustified, plaintiffs merely point to the conclusions ultimately reached by the FTC and the DOJ. But the agencies reached those conclusions in 2018—long after defendants made the disputed statements. Plaintiffs thus fail to allege with any particularity *when* and *how* defendants were or should have been aware that their optimistic opinions were unjustified.

For example, plaintiffs do not allege that, at the time any statement was made, the speaker had been notified by the authorities or by the external Monitor that MoneyGram's progress was insufficient. Nor do plaintiffs identify any other reason why defendants would have known MoneyGram's compliance efforts would later be deemed inadequate. Indeed, without a direct communication from the FTC or DOJ, it would have been difficult for defendants to know if MoneyGram was adequately complying with its agreements because those agreements set out multiple broad objectives based on subjective criteria for MoneyGram to fulfill over the course of several years. *See, e.g.*, [65-7] at 8 (2009 FTC order provision requiring MoneyGram to implement an anti-fraud program that is "reasonably designed to protect Consumers" and contains safeguards "appropriate to [MoneyGram's] size and complexity"); [55-1] at 57 (DPA provision requiring MoneyGram to do "proper due diligence" with respect to agents suspected of fraud); *id.* at 57–58 (DPA provision requiring MoneyGram to review "the maximum number of transactions feasible" for fraud); *id.* at 64–65 (DPA provision permitting MoneyGram to decline to implement Monitor recommendations that the company considered "unduly burdensome, inconsistent with local or other applicable law or regulation, impractical, costly, or otherwise inadvisable."). Faced with such broad, subjective standards, defendants might reasonably have believed MoneyGram was on track to comply, even though the agencies eventually concluded that MoneyGram's efforts fell short.

17

The Tenth Circuit rejected an argument like plaintiffs' in the appeal of the *Western Union* case. *See Smallen v. The W. Union Co.*, 950 F.3d 1297, 1309 (10th Cir. 2020). There, MoneyGram's chief competitor had similarly agreed to a deferred prosecution agreement and had been the subject of FTC findings, both of which concluded, with the benefit of hindsight, that the company had willfully failed to implement an effective compliance program and had ignored compliance violations. *Id.* The plaintiffs argued that these later findings and admissions showed that the company's earlier statements regarding compliance had been false and were made with scienter, but the Tenth Circuit rejected this argument, stating that "the PSLRA does not permit allegations of fraud by hindsight." *Id.* (quotation omitted); *see also id.* ("Plaintiff may not rely on a subsequent event triggering a decrease in stock price to say that the later, sobering revelations make the earlier, cheerier statement a falsehood." (quotation omitted)).

To be sure, the Tenth Circuit's decision was based on its conclusion that the plaintiff had not alleged scienter—a different legal issue. As the court will describe below, that reasoning demonstrates the inadequacy of plaintiffs' scienter allegations in this case as well. But the same reasoning also demonstrates plaintiffs' failure to allege with particularity that the defendants' statements of opinion were unjustified at the time they were made. *See Smykla*, 85 F.4th at 1236. Indeed, a similar scenario was presented in *In re Citigroup Sec. Litig.*, No. 20 CIV. 9132 (LAP), 2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023). There, the defendants had made several statements describing the company's investments in risk compliance and contending that compliance costs were "plateauing" or had "plateaued," but the company later entered into consent orders with regulators that concluded that the company suffered from "longstanding enterprise-wide risk management and controls deficiencies" and that the company's risk management system had been inadequate "for several years." *See id.* at *16–17. The plaintiffs argued, "reasoning backward from the existence of the [consent orders]," that these subsequent conclusions demonstrated the falsity of the defendants' earlier statements. *Id.* at *16. But the court rejected this argument as an "attempt to use the [consent orders] to carry a weight they will not bear." *Id.* at *17. Because neither the consent orders nor the plaintiffs' complaint contained particular allegations indicating that any of the defendants' statements were false or misleading *at the time they were made*, the court concluded that the plaintiffs had not adequately alleged that the defendants' statements were actionably false or misleading. *Id.* at *16–17. Here, because plaintiffs are similarly just "reasoning backward" from the later FTC and DOJ conclusions, plaintiffs have failed to allege that the disputed statements were actionably misleading.

Finally, to the extent that plaintiffs argue that defendants' vague expressions of positivity triggered a duty to disclose all of MoneyGram's potential compliance shortfalls, plaintiffs are mistaken. *See Shemian v. Rsch. In Motion Ltd.*, No. 11 CIV. 4068 (RJS), 2013 WL 1285779 at *20 (S.D.N.Y. Mar. 29, 2013) (holding that a company's "general" praise for a new product was "too vague and inconsequential to give rise to any duty to disclose" potential shortcomings), *aff'd,* 570 F. App'x 32 (2d

Cir. 2014); *In re UBS AG Sec. Litig.*, No. 07 CIV. 11225 (RJS), 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) (holding that the company's "aspirational statements that constitute non-actionable puffery" did not provide the company with any further duty to disclose), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014). Defendants' expressions of optimism and descriptions of progress are therefore not actionable.

### 5. October 2016 Statements Regarding Fraud Interdiction Software

Finally, plaintiffs identify statements made by Defendant Holmes in response to a compliance-related question posed by an analyst on MoneyGram's quarterly earnings call on October 28, 2016. *See* [55] ¶ 169. The relevant portions of Holmes' answer read:

> We're making some significant progress on our compliance program, and as always, it's important to recognize the hard work internally by all of the employees. *As we have changed our systems and added new functionality, one of the things I have talked about a little bit over the last couple of years has been the tuning of the system. And when you put new things in, I think they tend to hit a little bit harder than intended as we tune them and then try to get the pieces right. We actually just put in some new changes to a lot of our global compliance screening technology just a few weeks ago, which has had a fantastic impact on our business, and is really kind of freeing up more transactions than we had before and really isolating the variables down to those transactions that are more risk and of more concern to us.* So we're very excited about that. *Our fraud losses have dropped tremendously internally*, and that is not online risk management fraud, but this is consumer scam fraud, which is obviously something that we fight hard against and is a big concern to state and federal government agencies who are looking at ensuring that money transfer companies are reducing fraud at an accelerated rate and protecting consumers in more dynamic ways. So we're very pleased with all those changes that we've made. We have [] quite a few more changes to come as we rollout new system functionality later this fall and then into the spring of next year. We've reached a point with the monitor where they begin kind of looking at what we've implemented. They're doing some testing of certain systems and *checking things off the list. So I think we're making good progress there.*
>
> . . . The monitor expense will continue through next year, and we're very hopeful that we'll get all of our changes put in, in a timely way and we'll be able to test those and get the opportunity to kind of move -- move along, but there's a lot to do between here and there. But -- what's fantastic about it is that *I think all the hard work is being recognized by*

*governments around the world*, by local state regulators, et cetera . . . . The transparency that we're creating in our business, I think, is going to lead the way and so we're very excited about how that is all going to continue to function on a go-forward basis, and I think it will [p]ut us in a very unique position when we have new things coming . . . we're going to be very well positioned to address those, which I think will be hopefully *a competitive advantage for us as we move into the next cycle here.*

[65-19] at 13–14 (emphasis added).

Like with the previous statements, plaintiffs argue that these statements were false and/or misleading based on the status of MoneyGram's compliance efforts. *See* [55] ¶¶ 170–74. Specifically, plaintiffs take issue with Holmes's statements that the "new changes" to MoneyGram's compliance screening technology "ha[ve] had a fantastic impact on our business and [are] really kind of freeing up more transactions than we had before," that fraud losses dropped "tremendously," that the Monitor was "checking things off the list" and MoneyGram was "making good progress," that MoneyGram's "hard work" was being recognized by "governments around the world," and that MoneyGram's compliance efforts may provide a "competitive advantage." *See id.*

Many of these statements are only slight variations of statements that, as described above, plaintiffs have not adequately alleged were false or misleading. For example, Holmes's uses of "competitive advantage," "hard work," and "good progress" are indistinguishable from the references to competitive advantage, market leadership, and progress discussed above. These statements were also preceded in Holmes's answer by considerable indications of uncertainty that plaintiffs omitted from the excerpts in their complaint. *See, e.g.*, [65-19] at 14 (including the phrase, "which *I think will be hopefully* a competitive advantage" (emphasis added)). For the reasons discussed above, these statements were puffery, and plaintiffs have not adequately alleged that they were false or misleading. *See Smallen v. W. Union Co.*, No. 17-CV-00474-KLM, 2019 WL 1382823, at *7–8, 15, 30 (D. Colo. Mar. 27, 2019) (references to "market leader[ship]" and "competitive advantages" were puffery); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 870 (5th Cir. 2003) (statement that company was "making steady progress" was "precisely the sort of generalized positive characterization that is not actionable under the securities laws"); *City of Warwick Mun. Emps. Pension Fund v. Rackspace Hosting, Inc.*, No. 17 Civ. 3501 (JFK), 2019 WL 452051, at *5 (S.D.N.Y. Feb. 5, 2019) (statements that "[w]e've made good progress this year" and "[w]e feel good about our progress so far" were puffery).

Similarly, the vague reference to the Monitor "checking things off the list" and the statement that Holmes thought MoneyGram's efforts were being recognized by governments around the world are little more than statements of "vague corporate optimism." *See W. Union*, 2019 WL 1382823, at *7–8; *see also Vallabhaneni v.*

*Endocyte, Inc.*, No. 1:14-cv-01048-TWP-MJD, 2016 WL 51260, at *15 (S.D. Ind. Jan. 4, 2016). No reasonable investor would have understood these statements as assurances that MoneyGram's compliance efforts were near to completion or as guarantees that MoneyGram's efforts would ultimately satisfy government regulators—especially since Holmes's answer specifically indicated that "the monitor expense will continue through next year," and cautioned that, despite MoneyGram's hope that it will be able to move along, "there's a lot to do between here and there." *See* [65-19] at 13–14. Moreover, beyond pointing to the general compliance shortcomings that the FTC and DOJ later identified, plaintiffs do not allege with any particularity that these Monitor- and government-related statements did not accurately reflect reality at the time. For example, there is no allegation that Holmes's statements did not accurately describe the activities of the Monitor. Nor is there a particularized allegation that Holmes's belief as to the perspectives of governments around the world—which would doubtless include many government entities beyond the FTC and DOJ—was unjustified or was not honestly held. *See Smykla v. Molinaroli*, 85 F.4th 1228, 1236 (7th Cir. 2023); *Vallabhaneni*, 2016 WL 51260, at *15; *Societe Generale Sec. Servs., GbmH v. Caterpillar, Inc.*, No. 17 CV 1713, 2018 WL 4616356, at *6 (N.D. Ill. Sept. 26, 2018).

Plaintiffs' arguments about the remaining statements relate more specifically to MoneyGram's transition from its prior fraud interdiction software to new software—a transition that took place less than three weeks before the earnings call during which Holmes made the challenged statements. *See* [55] ¶¶ 169–74 (describing the October 2016 replacement of the prior software); [55-1] ¶ 6 (identifying October 11, 2016 as the precise date of the replacement). First, plaintiffs take issue with Holmes's statement that "fraud losses have dropped tremendously." *See* [55] ¶ 172. Plaintiffs do not allege facts suggesting that this statement was false. Instead, plaintiffs contend that the statement was misleading because Holmes did not also explain that MoneyGram had seen a general rise in fraud complaints between the years of 2012 and 2016, did not state that the previous fraud interdiction software had been ineffective, and did not state that the new software would have a negative impact on overall revenue—by preventing more fraudulent transfers and thereby reducing the total number of transactions from which MoneyGram could collect transfer fees.

These arguments are not persuasive. Holmes's celebration of the new software's impact on fraud detection—offered in response to an analyst question regarding expected future compliance spending—did not require Holmes to offer a detailed accounting of MoneyGram's fraud-detection history. No reasonable investor would have understood Holmes's statement about a recent drop in fraud losses to suggest that fraud had plummeted to levels unseen since before 2012. Holmes's failure to recount the general, long-term trend of rising fraud complaints or to give analysts the blow-by-blow of the prior fraud interdiction software's shortcomings therefore did not render Holmes's statement misleading. *See In re Siebel Sys., Inc. Sec. Litig.*, No. C 04-0983 CRB, 2005 WL 3555718, at *4 (N.D. Cal. Dec. 28, 2005)

("That a new program has kinks does not make a positive statement about the program false. If that were the case, the federal securities laws would prevent software companies from making any positive statements about new software."). Nor did Holmes's statement require him to venture beyond the scope of the analyst's question by speculating about the potential long-term revenue impact of new software that had been implemented just weeks before.

Second, plaintiffs dispute Holmes's statement that the new software "has had a fantastic impact on our business." *See* [55] ¶ 170. Plaintiffs' argument here depends once again on plaintiffs' interpretation of the eventual long-term revenue impact of the new fraud interdiction software. On plaintiffs' theory, MoneyGram's revenue (and unspecified "other metrics") had for years been artificially inflated by transfer fees from fraudulent transactions that MoneyGram was failing to detect. *Id.* Plaintiffs then argue that because MoneyGram's new software was detecting more fraud, it was false and/or misleading for Holmes to state that the new software "has had a fantastic impact on our business," since—plaintiffs argue—the new software would ultimately result in a decrease in revenue. *Id.*

This fails to persuade. As described above, the new software had not yet been in place for even three weeks. Plaintiffs' allegations about the impact on the company's revenue are an attempt at impermissible "securities fraud by hindsight." *City of Livonia Employees' Ret. Sys. & Loc. 295/Loc. 851 v. Boeing Co.*, 711 F.3d 754, 758 (7th Cir. 2013); *see also Smallen v. The W. Union Co.*, 950 F.3d 1297, 1309 (10th Cir. 2020). Plaintiffs offer no particularized allegation that any long-term revenue impacts had begun to take effect by the time Holmes made his statement. Additionally, plaintiffs' argument suggests that an increase in revenue is the only form of impact that could be characterized as a "fantastic impact" on MoneyGram's business. That understanding is too narrow. Holmes could reasonably have considered the new fraud interdiction software to have a "fantastic impact" based purely on its successful detection of fraud—regardless of any eventual revenue impact. This is especially true since, as plaintiffs stress throughout their complaint, fraud detection was a priority for MoneyGram at this time. Holmes's statement about the new software's "fantastic impact" therefore was not actionably false or misleading.

Third, plaintiffs target Holmes's use of the term "tuning" in the lead-up to his answer. *See* [55] ¶ 171. The problem, plaintiffs argue, is that the use of that term suggested that the transition from the old fraud interdiction software to the new software constituted a minor tweak, rather than a replacement of the software. *Id.*

What Holmes meant by using the term in his off-the-cuff remarks is not perfectly clear. But although this statement may be somewhat confusing, plaintiffs' complaint does not adequately allege that the statement is materially false or misleading. Indeed, Holmes's use of the term "tuning" can reasonably be read to refer to the tuning of MoneyGram's compliance system as a whole, of which the fraud

interdiction software was only one part. *See* [55-1] ¶¶ 5–8 (describing the existence of broader anti-money laundering and anti-fraud compliance programs). Additionally, the rest of Holmes's statement made clear that the changes to the company's technology were significant. Holmes described "new changes to *a lot* of our global compliance screening technology" and emphasized the "fantastic impact" of those changes and the resulting "tremendous[]" drop in fraud losses. [65-19] at 13 (emphasis added). Considering the full context of Holmes's statement, it was clear the changes were no minor tweak. Holmes's vague reference to "tuning" therefore did not render his statement materially false or misleading.

Finally, plaintiffs take issue with Holmes's statement that the new software "is really kind of freeing up more transactions than we had before and really isolating the variables down to those transactions that are of more risk and of more concern to us." *See* [55] ¶ 170; [65-19] at 13. Even with context, the meaning of this statement is somewhat unclear. Plaintiffs interpret Holmes's use of "freeing up more transactions" to mean that the prior fraud interdiction software had been overactive (i.e., had been blocking legitimate transactions) and that the new software had resolved this issue and was blocking fewer legitimate transactions. *See* [55] ¶ 170. Thus, based on plaintiffs' allegations that the prior software was ineffective and that the new software ultimately resulted in a greater number of blocked transactions, plaintiffs argue that Holmes's statement was false.

Plaintiffs' interpretation of Holmes's statement appears reasonable, so the court will analyze the statement based on that understanding of its meaning. If any statement identified by plaintiffs is adequately alleged to have been false or misleading, it is this statement. Holmes described the new software as "freeing up more transactions" at a time when—taking plaintiffs' allegations as true—the software was in fact blocking more transactions. Thus, taking the allegations of the complaint as true (as required at this stage), Holmes's statement about the new software "freeing up more transactions" is adequately alleged to have been false when made.

To be sure, plaintiffs' allegations are rather lacking in particularity. It appears plaintiffs' allegations regarding the new software's impact rely almost exclusively on the findings from the 2018 FTC and DOJ investigations. Those findings indicate that MoneyGram's prior fraud interdiction system was ineffective and that the new system remediated many of the issues with the prior system. *See* [55] ¶ 94; [55-1] ¶¶ 5–6. But they do not specifically describe differences in the number or type of transactions blocked by either system. Nor do the 2018 findings say anything about the impact that the new fraud interdiction software had during the first few weeks of its implementation in 2016. It is therefore possible that Holmes's statement was true when it was made.

Nevertheless, because the court takes plaintiffs' allegations as true at this stage, and because plaintiffs directly allege that the new software was in fact blocking

23

more transactions, the court will assume that Holmes's statement that the new software was "freeing up more transactions" was false at the time it was made. The court will also assume that the statement was material. Even assuming both of those conclusions, however, plaintiffs' complaint fails to state a claim. This is because, as described below, plaintiffs' allegations fail to raise a strong inference that this statement—or any other—was made with scienter.

### B.  Scienter

To plead scienter under the PSLRA, plaintiffs must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2) (emphasis added); *see also Tellabs II,* 551 U.S. 308, 313–14 (2007). "The 'required state of mind' in a § 10(b) case is scienter, which means 'knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false.'" *Pugh v. Trib. Co.,* 521 F.3d 686, 693 (7th Cir. 2008) (quoting *Higginbotham v. Baxter Int'l, Inc.,* 495 F.3d 753, 756 (7th Cir. 2007)). "Recklessness is 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Chandler v. Ulta Beauty, Inc.,* No. 18-CV-1577, 2022 WL 952441, at *22 (N.D. Ill. Mar. 30, 2022) (quoting *Makor Issues & Rts., Ltd. v. Tellabs Inc.,* 513 F.3d 702, 704 (7th Cir. 2008) ("*Tellabs III*")). "It does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind." *Tellabs II,* 551 U.S. at 314. Rather, to qualify as strong, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* Plaintiffs may not rely on "group pleading" and instead must create this strong inference "with respect to *each individual defendant*," *Cornielsen v. Infinium Cap. Mgmt., LLC,* 916 F.3d 589, 601–02 (7th Cir. 2019) (quoting *Pugh,* 521 F.3d at 693–94), and "with respect to each act or omission," *Pugh,* 521 F.3d at 693. This is a "difficult hurdle." *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan v. Buth,* 99 F.4th 928, 951 (7th Cir. 2024).

When assessing whether scienter is adequately alleged, the court considers the complaint as a whole. *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.,* 895 F.3d 933, 936–37 (7th Cir. 2018). Here, plaintiffs' allegations of scienter are based on: (1) defendants' positions within MoneyGram; (2) the company's allegedly insufficient compliance policies, as described by two confidential witnesses and one former-employee whistleblower; (3) the stock sales of Defendants Patsley and Holmes and the defendants' alleged motive to sell the company; and (4) so-called "collective" corporate scienter. Considering plaintiffs' complaint as a whole, plaintiffs' allegations do not support a strong inference that the defendants acted with scienter. Although the court weighs plaintiffs' allegations in the aggregate, the court will address each of plaintiffs' arguments in turn.

1.  **General Allegations Based on Rising Fraud Complaints and Defendants' Positions Within MoneyGram**

Plaintiffs' primary argument for scienter is based on the individual defendants' positions at MoneyGram. Plaintiffs argue that MoneyGram's records would have shown that between January 1, 2013 and April 30, 2018, MoneyGram received fraud complaints relating to 295,775 consumer transactions, which was a significant increase from the number of complaints MoneyGram received between 2003 and 2009. *See* [55] ¶ 98. Plaintiffs also point to the FTC's finding in November 2018 that MoneyGram had been aware for years of "high levels of fraud and suspicious activities involving particular agents" yet "sometimes failed to take prompt disciplinary action against those agents as required by the 2009 [FTC] order." [65-13] at 7; *see* [55] ¶ 97. Plaintiffs argue that, based on the defendants' roles within MoneyGram and their access to company records, defendants must have been aware of these fraud complaints because they related to MoneyGram's "core business." *See* [66] at 28–29; [55] ¶¶ 96, 99.

Courts in this district have rejected attempts by plaintiffs to allege a "'must have known' theory" as "an end-run around the requirement that plaintiffs set forth particularized facts to suggest that defendants acted knowingly or recklessly." *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 659 (N.D. Ill. 2020) (quoting *In re Bally Total Fitness Sec. Litig.*, No. 04-cv-03530, 2006 WL 3714708, at *9 (N.D. Ill. July 12, 2006)). This is because "[t]he Seventh Circuit has emphasized that 'hindsight' cannot be the 'only basis' of a proposed scienter inference, since there is no 'fraud by hindsight.'" *Id.* (quoting *Higginbotham*, 495 F.3d at 759). Indeed, the court's guidance has been clear: "[A] complaint fails to satisfy the PSLRA's particularity requirements by making conclusory allegations of scienter derived from a defendant's mere access to information." *Cornielsen*, 916 F.3d at 602 (citing *Pugh*, 521 F.3d at 694); *see also Chandler*, 2022 WL 952441, at *27 ("Mere access to sources of information—without any allegations regarding if, when, and how defendants actually accessed this information—is not enough to contribute to a strong inference of scienter." (quoting *Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 884 (N.D. Ill. 2011))); *Greer v. Advanced Equities, Inc.*, 683 F. Supp. 2d 761, 776 (N.D. Ill. 2010) (concluding that the plaintiffs' allegations that defendants "had access to all of [the company's] senior level managers, books, records, contracts, and financial information" were insufficient because "allegations of access in and of themselves fail to sufficiently allege scienter."). A complaint likewise fails to satisfy the PSLRA if it merely alleges that the defendants held senior positions. *See W. Palm Beach Firefighters' Pension Fund*, 495 F. Supp. 3d at 661 ("In a typical case, 'senior positions' within a company 'do not suggest scienter without additional support from internal documents or communications.'" (quoting *Societe Generale Sec. Servs., GbmH v. Caterpillar, Inc.*, No. 17 CV 1713, 2018 WL 4616356, at *8 (N.D. Ill. Sept. 26, 2018))); *see also Chandler*, 2022 WL 952441, at *25 ("The fact that Dillon and Settersten were Ulta's CEO and CFO is an insufficient basis to infer scienter without

additional support from internal documents or communications." (quotation omitted)).

Plaintiffs' allegations lack particularity and fail to support a strong inference of scienter. Plaintiffs' arguments rely on conclusory assertions of the defendants' status as directors, executives, and/or members of MoneyGram's Compliance Committee. In other words, plaintiffs attempt precisely the sort of "end-run" around the particularity requirement that courts have rejected. *See W. Palm Beach Firefighters' Pension Fund*, 495 F. Supp. 3d at 659 (quoting *In re Bally Total Fitness Sec. Litig.*, 2006 WL 3714708, at *9). As defendants explain, "[t]here is not a single specific allegation in the Complaint regarding the purported knowledge of Patsley, Holmes or any other Defendant regarding the alleged compliance shortcomings, nor do Plaintiffs allege that any other Defendant did anything other than sign SEC filings." [63] at 31. Plaintiffs offer no "additional support from internal documents or communications." *W. Palm Beach Firefighters' Pension Fund*, 495 F. Supp. 3d at 661 (quoting *Societe Generale Sec. Servs.*, 2018 WL 4616356, at *8). And the mere allegation that some defendants were members of MoneyGram's Compliance Committee, while others "would have received regular reports from the Monitor regarding compliance" based on their board membership, *see* [55] ¶ 99, is not sufficient.

Indeed, in the case involving MoneyGram's chief competitor, the plaintiffs had provided greater detail and had identified specific materials from the company's board and committee meetings related to compliance matters. *See Smallen v. The W. Union Co.*, 950 F.3d 1297, 1307 (10th Cir. 2020). The Tenth Circuit nevertheless held that, "[e]ven assuming the Individual Defendants were briefed on these compliance matters while attending the identified meetings, 'mere attendance at meetings does not contribute to an inference of scienter.'" *Id.* (quoting *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1246 (10th Cir. 2016)). Plaintiffs' cursory recitation of the defendants' corporate roles therefore fails to support a strong inference of scienter.

### 2. Allegedly Insufficient Compliance Policies

Plaintiffs also argue that MoneyGram's "institutional procedures and written guidelines" with respect to fraud were flawed, and that the company's choice not to institute more stringent policies supports an inference of scienter. *See* [55] ¶¶ 100–15. Specifically, plaintiffs argue that MoneyGram failed to block individuals suspected of engaging in fraudulent transactions, failed to ensure that its largest agents—retailers like Walmart, *see id.* ¶ 40—were adequately policing fraud, and failed to train agents to prevent consumer fraud. *See id.* ¶¶ 94, 101–04. Plaintiffs recount the reports of two confidential witnesses and one purported whistleblower, each of whom described problems with MoneyGram's fraud prevention systems. *See id.* ¶¶ 108–15, 124–26. Confidential Witness 1, a lower-level employee in MoneyGram's compliance department, described issues with MoneyGram's fraud

interdiction system and reported difficulties blocking individuals who were suspected of engaging in fraudulent transactions. *Id.* ¶¶ 109–11. Confidential Witness 2, an employee who worked in sales and partnership development, described receiving complaints from MoneyGram agents about difficulties blocking suspected sources of fraud. *Id.* ¶¶ 112–13. Confidential Witness 2 also reported that his supervisor overruled his efforts to enforce compliance standards, and that his supervisor discouraged him and other sales employees from writing down any concerns about compliance issues. *Id.* ¶¶ 114–15. Finally, the purported whistleblower reported that he was terminated in retaliation for expressing concerns about MoneyGram's compliance with the DPA, and that MoneyGram's Head of Compliance for the Americas boasted about excluding the Monitor team from a meeting with a major MoneyGram client and encouraged MoneyGram's compliance employees to "shape the message" when discussing compliance with the Monitor team. *Id.* ¶¶ 124–26.

In general, "allegations concerning . . . unnamed confidential sources of damaging information require a heavy discount." *City of Livonia Employees' Ret. Sys. & Loc. 295/Loc. 851 v. Boeing Co.*, 711 F.3d 754, 759 (7th Cir. 2013). This is because "the sources may be ill-informed, may be acting from spite rather than knowledge, may be misrepresented, may even be nonexistent—a gimmick for obtaining discovery costly to the defendants and maybe forcing settlement or inducing more favorable settlement terms." *Id.*

Even accepting all three witnesses' allegations as true, however, the allegations contribute little to an inference of scienter. To be sure, the witnesses' accounts support the contention that MoneyGram's efforts to combat fraud were inadequate—a conclusion the FTC and DOJ publicly announced in 2018. But the fact that MoneyGram's compliance efforts—viewed in hindsight—were insufficient does not relieve plaintiffs of their burden to allege scienter with particularity. The Tenth Circuit rejected the very same argument in the *Western Union* case. *See Smallen v. The W. Union Co.*, 950 F.3d 1297, 1309–10 (10th Cir. 2020) ("While the DPA and FTC Complaint highlight the wrongdoing of Western Union's agents and indicate some of the company's executives knew about ongoing violations, neither document provides particularized facts tying the Individual Defendants to these violations or otherwise showing they were aware of ongoing illegality and widespread disciplinary failures during the Class Period. In the absence of such allegations, Plaintiff's argument is simply another variation of fraud by hindsight, which fails to support an inference of scienter.").

Indeed, § 10(b) and Rule 10b-5 do not impose liability for mere corporate mismanagement; they impose liability for securities fraud. And for such claims, the PSLRA requires plaintiffs to allege with particularity facts giving rise to a strong inference that the defendants acted with scienter. While the witnesses' accounts add some additional detail to plaintiffs' allegations of compliance shortcomings, they do not support an inference—let alone a strong inference—that any of the defendants acted with scienter. In fact, the allegations plaintiffs derive from the witnesses'

accounts do not even *mention* any of the individual defendants. *See* [55] ¶¶ 108–15, 124–26; *see also W. Union*, 950 F.3d at 1308 n.6 ("There are no allegations [that the three confidential witnesses] directly reported to any of the Individual Defendants or even had any form of contact with them, much less informed them Western Union's compliance systems were failing."). Plaintiffs' allegations that former employees witnessed compliance shortcomings therefore contribute little to an inference of scienter.

### 3. Stock Sales and Anticipated Mergers

Plaintiffs additionally contend that the stock sales of Defendants Patsley and Holmes, along with the prospect of selling MoneyGram to another company, give rise to a strong inference of scienter because they would have provided the defendants with a motive to boost MoneyGram's stock price. *See* [55] ¶¶ 116–23. With respect to the potential sale of the company, plaintiffs point to two acquisition offers MoneyGram received: a January 26, 2017 offer from Alipay for $880 million, and a March 14, 2017 offer from EuroNet for $935 million. *See id.* ¶ 121. Plaintiffs argue that MoneyGram's potential buyers were offering to pay substantially more per share of MoneyGram stock than the stock eventually turned out to be worth, and that defendants—hoping to profit from this difference—would have tried to cover up the company's compliance deficiencies. *See id.* ¶¶ 122–23. Similarly, plaintiffs catalog Patsley's and Holmes's stock sales between 2014 and 2018 and argue that these sales show that the defendants would have been motivated to mislead investors so that the defendants could offload their shares at inflated prices. *See id.* ¶¶ 116–20.

Both arguments are unpersuasive. First, plaintiffs' conclusory allegations regarding acquisitions that ultimately were not consummated do not support an inference of scienter. To begin with, plaintiffs ignore the timing of the acquisition offers. The first offer was made on January 26, 2017, and the second was made on March 14, 2017. *See id.* ¶ 121. But, of the numerous statements identified by plaintiffs as allegedly false or misleading, just *one* was made after MoneyGram received the first of these offers: MoneyGram's March 16, 2017 Form 10-K, which merely described an increase in money transfer volume and repeated oft-stated language about the purpose of MoneyGram's compliance program. *See id.* ¶¶ 175–77. Plaintiffs do not allege that defendants knew of the prospective acquisitions before the offers were formally extended. There is therefore no basis to infer that MoneyGram made earlier misleading statements to ensure the acquisitions were consummated.

Moreover, plaintiffs' allegations do not support an inference that defendants wanted to sell the company in the first place, let alone an inference that they wanted to sell the company so badly they were willing to mislead investors. Indeed, the only motivation plaintiffs identify for a sale is the purchase price of $13.25 per share offered for the Alipay acquisition. *See id.* ¶¶ 122. Plaintiffs compare this offer, made in the first month of 2017, to the 90-day average share price between November 2018

28

and February 2019, which was $2.11. *Id.* But that the share price eventually dropped does not mean that Alipay's offer was enticing when it was received—nearly two years earlier. Plaintiffs' complaint contains no allegation regarding the market price of MoneyGram's shares at the time of the Alipay offer.[3] Nor do plaintiffs identify any other reason defendants would have been eager to make the sale. There is no allegation, for example, that Alipay promised defendants prominent positions in the potential combined company or offered lucrative golden parachutes.

And even if defendants had been generally motivated to sell the company, more particularized allegations would be required to support a strong inference of scienter. *See In re Bally Total Fitness Sec. Litig.*, No. 04-cv-03530, 2006 WL 3714708, at *9 (N.D. Ill. July 12, 2006) ("We cannot infer scienter on the part of the Individual Defendants merely from their general desire for their corporation to appear profitable and thereby obtain financing and engage in mergers or acquisitions."); *In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 932 n.20 (S.D. Ind. 2008) ("Plaintiffs' allegations that Defendants were motivated to commit fraud by the desire to consummate the J & J merger do not create the requisite strong inference."); *see also Phoenix Ins. Co. v. ATI Physical Therapy, Inc.*, 690 F. Supp. 3d 862, 889 (N.D. Ill. 2023) (finding general allegations of motive to consummate an acquisition insufficient to support an inference of scienter because "[a] generalized motive common to all corporate executives is not enough to establish scienter" (quoting *Pension Tr. Fund for Operating Engineers v. Kohl's Corp.*, 895 F.3d 933, 939–40 (7th Cir. 2018))). Plaintiffs' allegations regarding offers to acquire MoneyGram therefore do not support a strong inference of scienter.

Second, plaintiffs' allegations regarding Patsley's and Holmes's stock sales do not contribute to a strong inference of scienter. These allegations do nothing to support an inference of scienter for defendants Angelilli, Lawry, Rao, Turner, or Garza—none of whom is alleged to have sold stock during the class period. And even for Patsley and Holmes, these allegations add little.

Defendants respond to plaintiffs' stock sale allegations by attaching SEC Form 4 filings for the transactions identified by plaintiffs. *See* [65-20]; *see also* [63] at 32–33, 33 n.80. Defendants argue that these filings, which disclose and detail Patsley's and Holmes's stock transactions, demonstrate that the alleged "sales" of stock "were simply annual withholdings made by MoneyGram for the payment of tax liabilities in connection with the annual vesting of equity compensation awards, the timing of which was fixed years earlier." [63] at 32–33. If true, this would wholly undercut plaintiffs' argument.

---

[3] In a separate section of plaintiffs' complaint, plaintiffs allege that Defendants Patsley and Holmes each sold shares in late February 2017 for between $12.75 and $12.79 per share. *See* [55] ¶¶ 119–20. Even if the court were to assume that MoneyGram's share price remained similar during the time the Alipay offer was pending, the offer would thus seem to have represented only a modest premium of about $0.50 per share above the market price.

Although plaintiffs have not raised the issue, have not moved to strike defendants' exhibit containing the Form 4 filings, and have not objected to the court's consideration of the filings, the court notes that there is some uncertainty regarding whether courts may take judicial notice of Form 4 filings when considering a motion to dismiss. *Compare, e.g., Garden City Employees' Ret. Sys. v. Anixter Int'l, Inc.*, No. 09-CV-5641, 2011 WL 1303387, at *10–11 (N.D. Ill. Mar. 31, 2011) (concluding that Form 4 filings from within the class period were incorporated into plaintiffs' complaint because the court could "safely assume" that the filings "were the source of the entries" in the plaintiffs' complaint, but noting uncertainty as to whether courts may take judicial notice only of the existence of the filings or also of the truth of the information reported within them), *and City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1059 (N.D. Cal. 2012) ("[C]ourts may take judicial notice of SEC Forms 4, even when not referenced in the pleading, to prove that stock sales were made pursuant to a Rule 10b5–1 trading plan."), *with City of Sterling Heights Gen. Employees' Ret. Sys. v. Hospira, Inc.*, No. 11 C 8332, 2013 WL 566805, at *12–13 (N.D. Ill. Feb. 13, 2013) (questioning the propriety of considering Form 4 filings for the truth of their contents but concluding that it was not necessary to resolve the issue). Here, the court need not determine whether it is proper to take judicial notice of the Form 4 filings because, even without considering the filings, plaintiffs' allegations regarding stock sales do not contribute to a strong inference of scienter.

Because "executives sell stock all the time," stock sales "must generally be unusual or suspicious to constitute circumstantial evidence of scienter." *Chandler v. Ulta Beauty, Inc.*, No. 18-CV-1577, 2022 WL 952441, at *29 (N.D. Ill. Mar. 30, 2022) (quoting *Pugh*, 521 F.3d at 695). To determine whether sales are suspicious, courts may consider "the amount and percentage of overall shares sold, the profit made, the timing of the stock sales and the consistency of the sales with the insider's prior trading history." *Id.* (quoting *Fryman v. Atlas Fin. Holdings, Inc.*, 462 F. Supp. 3d 888, 904 (N.D. Ill. 2020)). The Seventh Circuit "has emphasized that 'the probative value of stock sales depends greatly on timing.'" *Id.* (quoting *Pension Tr. Fund for Operating Eng'rs*, 895 F.3d at 940). Additionally, the Seventh Circuit "generally ha[s] rejected the notion that the exercise of options and receipt of bonuses is enough to show *scienter*." *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan v. Buth*, 99 F.4th 928, 953 (7th Cir. 2024); *see also id.* ("[The plaintiff's] proposed approach would have us find *scienter* any time a corporate officer stood to gain from a high share price and approved financial statements that later turned out to be inflated. That would not be consistent with *Tellabs*."); *Plumbers & Pipefitters Loc. Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 956 (7th Cir. 2012) ("Plaintiffs contend that we should infer scienter because [the CEO] and other top managers had an incentive to make Zimmer look good in order to keep their jobs, improve their bonuses, and increase the value of their stock options. This is too generic to satisfy *Tellabs*.").

Here, plaintiffs' allegations provide no basis to conclude that the stock sales of Defendants Patsley and Holmes were unusual or suspicious. Plaintiffs' allegations

show that the sales took place at regular intervals. Indeed, during the four-year period for which plaintiffs recount stock sales, every sale took place in the month of February. *See* [55] ¶¶ 119–20. Moreover, many of the sales took place on days when both Patsley and Holmes sold shares. *See id.* (reflecting, for example, that in 2016, both Patsley and Holmes sold shares on February 12th, 24th, and 25th, and in 2017, both sold shares on February 23rd, 24th, and 25th). Thus, the timing of the sales corroborates defendants' argument that the sales were regular transactions used to satisfy tax obligations in connection with MoneyGram's annual issuance of shares to Patsley and Holmes as part of their compensation plans. *See* [63] at 32–33; *see also In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 344 (W.D.N.Y. 2008) (concluding that stock sales were not unusual because they "adhered to a pattern and were made at regular intervals as part of preset trading plans"). Plaintiffs offer no persuasive argument that the timing of these sales was suspicious or unusual.

Nor does the magnitude of the sales support an inference of scienter. Although plaintiffs stress that the sales provided gross proceeds of just over $5 million for Patsley and just over $2 million for Holmes throughout the class period, plaintiffs do not provide any context sufficient to render these sales suspicious. Plaintiffs do not allege, for example, that the defendants offloaded most of their shares shortly before making a devastating disclosure. *See Smallen v. The W. Union Co.*, 950 F.3d 1297, 1311 (10th Cir. 2020) ("Plaintiff fails to provide adequate context for these transactions. There are no allegations concerning the price initially paid for the stock, what percentage of total shares these sales consisted of, or whether [the defendants] were buying other types of shares at the same time. Without such information, it is hard to reach any conclusion as to what kind of financial gain is at issue and whether these sales are unusual or suspicious."); *Pension Tr. Fund for Operating Engineers v. Kohl's Corp.*, 266 F. Supp. 3d 1154, 1168–69 (E.D. Wis. 2017) (explaining that allegations setting forth dates, quantities, and values of stock sales "are insufficient to demonstrate scienter" because "they include no context in which the Court could consider the import of the trades—for example, whether they represent a significant percentage of the defendants' total holdings or whether they were offset by later purchases of shares"), *aff'd*, 895 F.3d 933 (7th Cir. 2018). Moreover, plaintiffs' failure to allege that any other defendants sold stock undermines plaintiffs' argument. *See W. Union*, 950 F.3d at 1311 (noting that "the failure of other defendants to sell their stock undermine[s] [Plaintiff's] theor[y] that negative information was withheld to obtain a higher sell price" (alterations in original) (quotation omitted)).

Because plaintiffs' allegations do not indicate that the stock sales of Defendants Patsley and Holmes were unusual or suspicious, the stock sales do not meaningfully contribute to a strong inference of scienter for Patsley and Holmes—let alone for any other defendant. *See City of Livonia Employees' Ret. Sys. & Loc. 295/Loc. 851 v. Boeing Co.*, 711 F.3d 754, 758 (7th Cir. 2013) ("Without a motive to commit securities fraud, businessmen are unlikely to commit it.").

### 4. Allegations of "Collective" Corporate Scienter

Finally, plaintiffs argue that, independent of any individual's knowledge or state of mind, the court "may impute scienter to MoneyGram from the collective knowledge of the Compliance Committee and high-level managers" based on MoneyGram's compliance shortcomings. *See* [66] at 30–31. This argument once again relies on the 2018 conclusions of the FTC and DOJ. For legal support, plaintiffs point to the Seventh Circuit's statement in *Tellabs III* that "it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud." *See* [66] at 30; *Tellabs III*, 513 F.3d 702, 710 (7th Cir. 2008).

But *Tellabs III* did not relieve securities fraud plaintiffs of their burden to allege particular facts that give rise to the strong inference that at least one individual acted with scienter. Instead, the case indicated that, in extreme cases, it may be possible for a complaint to satisfy that burden without specifically naming the responsible individual. Thus, if "General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero," this would support an inference of corporate scienter, since "so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *Tellabs III*, 513 F.3d at 710.

In other words, *Tellabs III* does not stand for the proposition that a plaintiff can allege that the combination of knowledge possessed by a company's employees in the aggregate added up to some threshold of "collective" corporate scienter. Indeed, *Tellabs III* itself explained that "intent to deceive is not a corporate attribute," and that "[t]he problem with inferring a collective intent to deceive behind the act of a corporation is that the hierarchical and differentiated corporate structure makes it quite plausible that a fraud, though ordinarily a deliberate act, could be the result of a series of acts none of which was both done with scienter and imputable to the company by the doctrine of respondeat superior." *Id.* at 707; *see also id.* at 708 ("To establish corporate liability for a violation of Rule 10b–5 requires look[ing] to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." (quotation omitted)).

Instead, the court's SUV hypothetical stands for the point that, where a company's statement is so egregiously and obviously false that any officer who approved the statement must have known it was false, a complaint may survive dismissal even if the plaintiff cannot identify the approving officer by name at the time the plaintiff files the complaint. There must still be at least one individual who acted with scienter. *See id.* at 710; *Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 182 (4th Cir. 2009) (summarizing *Tellabs III* as "concluding that

corporate scienter requires that a corporate agent acted with scienter, but that a plaintiff need not name the corporate agent who acted with scienter"). Indeed, if plaintiffs were correct that they need only refer vaguely to "the collective knowledge of the Compliance Committee and high-level managers," [66] at 30, there would be little left of the PSLRA's requirement that the complaint "state *with particularity* facts giving rise to a strong inference that *the defendant* acted with the required state of mind." *Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 601 (7th Cir. 2019) (first emphasis added) (quoting 15 U.S.C. § 78u-4(b)(2)(A)). Thus, unless plaintiffs can identify a statement "so dramatic" that it "would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false," *see Tellabs III*, 513 F.3d at 710, plaintiffs' reliance on *Tellabs III* is unpersuasive.

Plaintiffs cannot identify such a statement. Not one of the statements in plaintiffs' complaint is comparable to *Tellabs III*'s SUV hypothetical—either in its significance to the company's most central business activities or in its egregious and obvious falsity. *See Smallen v. The W. Union Co.*, 950 F.3d 1297, 1314 (10th Cir. 2020) (explaining that "[a]lthough the compliance violations at Western Union were serious and long-lasting, the facts pleaded [we]re a far cry from" *Tellabs III*'s SUV hypothetical); *see also In re Baxter Int'l Inc. Sec. Litig.*, No. 19 C 7786, 2021 WL 100457, at *21 (N.D. Ill. Jan. 12, 2021) ("Baxter's statements about its financial metrics related to FX fluctuations, its compliance with GAAP, and its internal controls over financial reporting are not in the same ballpark as representing the sale of a million products when not one product has been sold."). Plaintiffs' theory of "collective" corporate scienter based on *Tellabs III* thus fails to contribute to a strong inference of scienter.

\*      \*      \*

At bottom, when considered in the aggregate, plaintiffs' allegations fall far short of plaintiffs' burden to "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added). As described above, plaintiffs' allegations are uniformly cursory, generalized, and speculative. They do not give rise even to a rough impression that defendants were acting with ulterior motives—much less a strong inference that any defendant made any particular statement with scienter.

Indeed, the insufficiency of plaintiffs' allegations is even more apparent when considering individual statements. For example, take Defendant Holmes's statements relating to the implementation of new fraud interdiction software in the October 28, 2016 earnings call. As described above, Holmes's more specific statements on this call likely came closest to the line of being materially misleading, and the court assumes that Holmes's statement about the new software "freeing up more transactions" was false at the time it was made. But plaintiffs' complaint provides no basis to conclude that Holmes made those statements with scienter.

33

Holmes made the statements off the cuff in response to an analyst question on an earnings call less than three weeks after the new software was implemented. *See Plumbers & Pipefitters Loc. Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 956 (7th Cir. 2012) ("Oral exchanges are less precise than written ones. [The CEO] did not know what question was coming, had to answer off the cuff, and did not have an opportunity to review the question and edit his answer before the next question was posed."). There is no allegation that Holmes had recently read a report or attended a presentation that contradicted his representations that "fraud losses ha[d] dropped tremendously," that the new software was "really kind of freeing up more transactions," or that the overall impact on MoneyGram's business was "fantastic." *See In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 1000 (E.D. Wis. 2009) ("Lacking from the Complaint are fact-based connections between a speaker, a statement, and specific, contradictory information presumably known to that speaker at the time the statement was made."). There is no allegation that Holmes had received a memorandum or had a conversation with a subordinate about the matter. *See In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 237 (S.D.N.Y. 2022) ("Plaintiffs' Complaint is devoid of allegations of specific 'facts, reports, or statements' that the [] Defendants had access to and which contained information contrary to [the company's] public disclosures." (quotation omitted)). There is not even an allegation that Holmes knew the company had replaced its previous software rather than modifying it. Plaintiffs therefore have not satisfied their burden under the PSLRA.

Because plaintiffs' allegations regarding defendants' other statements are similarly deficient, plaintiffs have failed to adequately allege scienter for any of the statements recounted in their complaint.

## C.    Item 303

In addition to claiming that defendants' affirmative statements were false or misleading under § 10(b) and Rule 10b-5, plaintiffs briefly assert that they have stated a claim under Item 303 of SEC Regulation S-K. *See* [66] at 23–24. The various subparts of that provision generally require a company to disclose in certain SEC filings any known "trend, demand, commitment, event, or uncertainty" that is "reasonably likely to . . . have a material adverse impact on the Company's net sales, revenues or income." *See* [55] ¶¶ 178–79, 181; *see also* 17 C.F.R. § 229.303(a) (2019).[4]

---

[4] Plaintiffs' formulation of Item 303's requirements, which the court has reproduced above, is evidently an attempt to synthesize the disclosure obligations imposed by the various subsections of Item 303(a) that were in effect when defendants made their statements and when plaintiffs filed their complaint. *See* [55] ¶ 179. That provision has since been amended. *Compare* 17 C.F.R. § 229.303 (2019), *with* 17 C.F.R. § 229.303 (2021); *see also* Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information, 86 Fed. Reg. 2080-01 (Jan. 11, 2021) (to be codified at 17 C.F.R. pts. 210, 229, 230, 239, 240, 249) (describing the amendments). Because no party argues that the amended version of Item 303 applies retroactively or that applying the amended version would impact

It is not clear whether plaintiffs contend that Item 303 provides a cause of action independent of § 10(b) and Rule 10b-5, whether they argue that Item 303 imposes liability under § 10(b) and Rule 10b-5 for failing to disclose material information even without a misleading affirmative statement (i.e., for "pure omissions"), or whether plaintiffs instead contend that defendants' affirmative statements were misleading under § 10(b) and Rule 10b-5 because those statements did not disclose known trends, demands, commitments, events, or uncertainties to which Item 303 applies.

First, given that plaintiffs' complaint asserts just two counts, one for a violation of § 10(b) and Rule 10b-5, and a second for "control person" liability under § 20(a) of the Exchange Act, the court concludes that plaintiffs are not arguing that Item 303 provides its own private cause of action. Even if they were, this argument would be unpersuasive. *See Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1330 (11th Cir. 2019) ("[N]o court of which we are aware has found a private right of action under Item 303, and the rule itself doesn't seem to contemplate one."); *Rein v. Dutch Bros, Inc.*, No. 23 CIV. 1794 (PAE), 2024 WL 3105004, at *6 (S.D.N.Y. June 24, 2024) ("Item 303 itself does not support an independent cause of action . . . .").

Second, to the extent plaintiffs argue that Item 303 imposes liability under § 10(b) and Rule 10b-5 for pure omissions, the Supreme Court recently rejected this theory. *See Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 266 (2024) ("Pure omissions are not actionable under Rule 10b-5(b)."); *see also id.* at 265 ("[T]he failure to disclose information required by Item 303 can support a Rule 10b-5(b) claim only if the omission renders affirmative statements made misleading."). Indeed, as the Court noted in *Macquarie*, § 11(a) of the Securities Act of 1933—which governs the contents of issuers' registration statements—clearly imposes liability when an issuer fails to make mandated disclosures in a registration statement, regardless of whether the issuer has made related affirmative statements. *See id.* at 265 (citing *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 n.3 (2015)). But "there is no similar language in § 10(b) or Rule 10b-5(b)." *Id.* Plaintiffs' reference to Item 303 therefore does not relieve them of their burden under § 10(b) and Rule 10b-5 to identify an affirmative statement that was false or misleading.

Finally, to the extent plaintiffs point to Item 303 merely to bolster their arguments that the affirmative statements discussed above were actionably misleading under § 10(b) and Rule 10b-5, this argument does not change the court's conclusion that plaintiffs' amended complaint fails to state a claim under those provisions. This is true for three reasons.

---

the analysis in this case, the court applies the version of Item 303 that remained in effect when defendants made their statements and when plaintiffs filed their complaint. Nevertheless, even if the amended version of Item 303 applied, the court would reach the same conclusion.

First, if plaintiffs mean to argue that failing to disclose information governed by Item 303 may render actionable a statement that would not otherwise be misleading under § 10(b) or Rule 10b-5, they have waived this argument by failing to develop it. *See Shipley v. Chicago Bd. of Election Comm'rs*, 947 F.3d 1056, 1063 (7th Cir. 2020) ("Arguments that are underdeveloped, cursory, and lack supporting authority are waived."). Plaintiffs do not articulate how Item 303 applies to any particular statement defendants are alleged to have made. Indeed, plaintiffs devote barely a page of their 25-page opposition brief to Item 303. *See* [66] at 23–24. And nowhere do they directly argue that Item 303 imposes liability for a statement that would not otherwise be actionably misleading under § 10(b) and Rule 10b-5. Any such argument—to the extent plaintiffs are seeking to assert it—is therefore waived.

Second, even if the court were to reach this underdeveloped argument, plaintiffs have not adequately alleged that defendants violated Item 303. To begin with, it is worth noting that Item 303 is not a catch-all disclosure requirement applicable to all public statements. Instead, it is an SEC rule governing the contents of documents that companies must file with the SEC. *See* 17 C.F.R. § 229.303; *Gallagher v. Abbott Lab'ys*, 269 F.3d 806, 810 (7th Cir. 2001) (describing the rule's application to "registration statements and annual 10-K reports"); *Macquarie*, 601 U.S. at 259 ("Item 303 of SEC Regulation S-K requires companies to disclose certain information *in periodic filings with the SEC*." (emphasis added)). Thus, although some of defendants' allegedly misleading statements were made in filings subject to Item 303, such as those contained in the company's annual Form 10-K filings, plaintiffs have not explained how Item 303 would apply to the statements defendants made outside of MoneyGram's SEC filings. Significantly, this would seem to include any statements that defendants made on MoneyGram's earnings calls.

Additionally, even when Item 303 applies to a statement, it requires disclosure only of those trends, demands, commitments, events, or uncertainties that are both "known" and "reasonably expect[ed]" to have a material impact on net sales, revenues or income. *See* 17 C.F.R. § 229.303(a) (2019); *see also Gallagher*, 269 F.3d at 810. The Seventh Circuit does not appear to have directly interpreted this language, but other courts of appeals have interpreted the provision to impose a duty to disclose only those trends, demands, commitments, events, or uncertainties that are actually known to the registrant. *See Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016) ("Item 303 requires the registrant to disclose only those trends, events, or uncertainties that it actually knows of when it files the relevant report with the SEC. It is not enough that it should have known of the existing trend, event, or uncertainty."); *J & R Mktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384, 391 (6th Cir. 2008) (rejecting the argument that Item 303 required a company to disclose "knowable," rather than "known," information because it "directly contradict[ed] the text of Item 303, which only requires disclosure of *known* trends or any *known* demands, commitments, events or uncertainties" (quotation omitted)). As described above, plaintiffs' amended complaint includes very few allegations bearing on any defendant's knowledge at any given time. Plaintiffs have therefore failed to

adequately allege that defendants did not disclose a "known" trend, demand, commitment, event, or uncertainty. Without such allegations, plaintiffs have not alleged a violation of Item 303.

Finally, even if plaintiffs had adequately alleged that any of defendants' statements were misleading due to a violation of Item 303, plaintiffs do not contend that this would relieve them of their burden under § 10(b) and Rule 10b-5 to allege scienter. As discussed above, plaintiffs have not carried that burden. Thus, even if plaintiffs had identified a violation of Item 303, their amended complaint would nevertheless fail to state a claim. Plaintiffs' cursory reference to Item 303 therefore does not avoid dismissal.

### D. Safe Harbor

Defendants briefly contend that the PSLRA's "safe harbor" provision forecloses plaintiffs' claims for many of the identified statements. *See* [63] at 26–27 & 26 n.59. That provision "protects the makers of forward-looking statements from liability when those statements are 'accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.'" *Phoenix Ins. Co. v. ATI Physical Therapy, Inc.*, 690 F. Supp. 3d 862, 878 (N.D. Ill. 2023) (quoting 15 U.S.C. § 78u-5(c)(1)). For forward-looking statements, the safe harbor provision also "requires 'actual knowledge of falsity, not merely indifference to the danger that a statement is false.'" *Id.* (quoting *Tellabs III*, 513 F.3d 702, 705 (7th Cir. 2008)). Based on the cautionary language in many of defendants' public statements and on plaintiffs' failure to allege a knowingly false misrepresentation, the safe harbor would likely foreclose liability for the various forward-looking statements that plaintiffs allege were false or misleading. Nevertheless, because the court concludes that plaintiffs' claims fail even without the safe harbor provision, and because defendants do not analyze the application of the safe harbor to any individual statement, the court need not decide whether the safe harbor provision applies. *See Chandler v. Ulta Beauty, Inc.*, No. 18-CV-1577, 2022 WL 952441, at *7 (N.D. Ill. Mar. 30, 2022) (declining to determine whether the safe harbor applied because the plaintiffs' claims failed even without the safe harbor).

## II. Control Person Liability (Count 2)

Plaintiffs also assert a claim for "control person" liability under § 20(a) of the Securities Exchange Act. That provision provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and

did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). To establish liability under § 20(a), plaintiffs must first establish that at least one individual or entity is liable under another provision of securities laws. *See Pugh v. Trib. Co.*, 521 F.3d 686, 693 (7th Cir. 2008) ("[T]o state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws—here, a violation of § 10(b) and Rule 10b–5."); *Walleye Trading LLC v. AbbVie Inc.*, 962 F.3d 975, 977 (7th Cir. 2020) (explaining that liability under § 20(a) of the Exchange Act can arise only if there is primary liability under a different provision). Because the court has found no primary violation of securities laws, plaintiffs have not stated a claim for control person liability under § 20(a).

## CONCLUSION

For the reasons described above, defendants' motion to dismiss, [62], is granted and the amended complaint, [55], is dismissed without prejudice. Since this is a first dismissal on the merits, plaintiffs are granted leave to amend if they can do so consistent with this opinion. Plaintiffs may file a second amended complaint by November 8, 2024. If no second amended complaint is filed by that date, the court will enter final judgment.

Dated: September 30, 2024          /s/ Martha M. Pacold